1  KILPATRICK TOWNSEND & STOCKTON LLP
   NANCY L. STAGG (CA State Bar No. 157034)
2  nstagg@kilpatricktownsend.com
   12730 High Bluff Drive, Suite 400
3  San Diego, CA  92130
   Telephone:  (858) 350-6156
4  Facsimile:   (858) 350-6111

5  JOE P. REYNOLDS (admitted *Pro Hac Vice*)
   jreynolds@kilpatricktownsend.com
6  1100 Peachtree Street, NE, Suite 1100
   Atlanta, GA  30309-4528
7  Telephone:  (404) 815-5912
   Facsimile:   (404) 541-4618

8
   Attorneys for Defendant
9  ARRIS International plc

10

11                 UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                     SAN JOSE DIVISION

14

15  IN RE ARRIS CABLE MODEM           Case No. 5:17-cv-01834-LHK
    CONSUMER LITIGATION
16                                     **DEFENDANT ARRIS INTERNATIONAL
                                       PLC'S OPPOSITION TO PLAINTIFFS'
17  This Document Relates to:  All Actions   MOTION FOR CLASS CERTIFICATION**

18                                     Date:    July 12, 2018
                                       Time:    1:30 p.m.
19                                     Judge:   Hon. Lucy H. Koh
                                       Crtrm:   8, 4th Floor
20

21

22

23

24      **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

25

26

27

28



DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 5:17-CV-01834-LHK

# TABLE OF CONTENTS

Page

I. SUMMARY AS TO WHY CLASS CERTIFICATION SHOULD BE DENIED ..............................................................................................1

II. PROCEDURAL HISTORY AND RELEVANT FACTS ...............................1

   A. Procedural History ...........................................................................1

   B. Relevant Facts .................................................................................2

      1. The ARRIS SURFBoard SB6190 Cable Modem ("SB6190") ..........................................................................2

      2. The Proposed Class Representatives.....................................5

III. APPLICABLE LEGAL STANDARDS ....................................................10

IV. THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR CLASS CERTIFICATION ......................................................................10

   A. Plaintiffs Fail to Meet The Requirements of Rule 23(a).................10

      1. The Proposed Classes are Overbroad...................................10

      2. No California Plaintiffs Have Standing For Any Claims ...................................................................................11

      3. Plaintiff Knowles is Neither a Typical Nor Adequate Class Representative ...............................................................14

      4. Unique Defenses Also Exist as to Plaintiff Walton .............14

      5. Plaintiff Reyna Has Conflicts With The Proposed Classes...................................................................................15

      6. Plaintiff Alexander Is Not Typical Of The Proposed Classes...................................................................................15

   B. Plaintiffs Fail To Meet The Requirements of Rule 23(b)(3)...........16

      1. Plaintiffs Fail to Establish Proof of a Common Defect........17

      2. Plaintiffs Cannot Show Materiality and Reliance Are Susceptible To Common Evidence .......................................19

      3. Plaintiffs' Damages Model Is Not In Accord With *Comcast*................................................................................22

      4. Plaintiffs Fail To Propose A Trial Plan Which Supports Superiority ............................................................25

V. CONCLUSION.......................................................................................25



1

# TABLE OF AUTHORITIES

2

<u>Page</u>

3

**Page(s)**

4

**Cases**

5

*In re 5-Hour Energy Mktg. & Sales Practices Litig.*,
6
   No. ML 13-2438-PSG, 2017 WL 2559615 (C.D. Cal. June 7, 2017)....................................24, 25

7

*Adams v. Target Corp.*,
   No. CV-13-5944-GHK, 2014 WL 12558858 (C.D. Cal. Nov. 25, 2014)..................................24

8

*Amchem Prods., Inc. v. Windsor*,
9
   521 U.S. 591 (1997)......................................................................................................10, 16

10

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
11
   133 S. Ct. 1184 (2013)..................................................................................................10, 16

12

*Azoulai v. BMW of N. Am. LLC*,
   No. 16-CV-00589-BLF, 2017 WL 1354781 (N.D. Cal. Apr. 13, 2017)...............................13, 25

13

*Barakezyan v. BMW of N. Am., LLC*,
14
   No. CV-16-00173-SJO, 2016 WL 2840803 (C.D. Cal. Apr. 7, 2016) .......................................13

15

*Brazil v. Dole Packaged Foods, LLC*,
   2014 WL 2466559 (N.D. Cal. May 30, 2014) ......................................................................23, 25
16

17

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
   173 F.3d 725 (9th Cir. 1999)...............................................................................................20

18

*Comcast Corp. v. Behrend*,
19
   569 U.S. 27 (2013)..............................................................................................*passim*

20

*Daubert v. Merrell Dow Pharm., Inc.*,
21
   509 U.S. 579 (1993)........................................................................................................1, 18

22

*Daugherty v. Am. Honda Motor Co.*,
   144 Cal. App. 4th 824 (Ct. App. 2006))................................................................................21

23

*Davidson v. Apple, Inc.*,
24
   No. 16-CV-04942-LHK, 2018 WL 2325426 (N.D. Cal. May 8, 2018) .........................11, 24, 25

25

*In re eBay Seller Antitrust Litig.*,
   07-01882 JF, 2009 WL 2779374 (N.D. Cal. Sept. 1, 2009) .......................................................19
26

27

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011)...............................................................................................16, 18

28



1

**TABLE OF AUTHORITIES**
(continued)

2

<u>Page</u>

3

*Glover v. BIC Corp.*,
   6 F.3d 1318 (9th Cir. 1993)...................................................................15

4

5

*Herron v. Best Buy Stores, LP*,
   No. 2:12-CV-02103-TLN, 2018 WL 1960659 (E.D. Cal. Apr. 26, 2018) ...................24

6

*In re High-Tech Antitrust Litig.*,
   No. 13-80223, ECF No. 18 (9th Cir. Jan 2014) ...........................................16

7

8

*In re High-Tech Emp. Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) ......................................16, 18, 24

9

10

*Jones v. ConAgra Foods, Inc.*,
   No. C 12-1633 CRB, 2014 WL 2702726 (N.D. Cal. June 13, 2014) .......................21

11

*Kearney v. Foley & Lardner, LLP*,
   590 F.3d 638 (9th Cir. 2009)...............................................................15

12

13

*Lassen v. Nissan N. Am., Inc.*,
   211 F. Supp. 3d 1267 (C.D. Cal. 2016) ....................................................13

14

15

*Mazur v. eBay Inc.*,
   257 F.R.D. 563 (N.D. Cal. 2009)..........................................................11

16

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012)...............................................................21

17

18

*Minkler v. Apple, Inc.*,
   65 F. Supp. 3d 810 (N.D. Cal. 2014) ......................................................12

19

20

*Navellier v. Sletten*,
   262 F.3d 923 (9th Cir. 2001)...............................................................14

21

*Opperman v. Kong Techs., Inc.*,
   No. 13-CV-00453-JST, 2017 WL 3149295 (N.D. Cal. July 25, 2017) ....................24

22

23

*Stearns v. Select Comfort Retail Corp.*,
   No. 08-2746 JF, 2009 WL 1635931 (N.D. Cal. June 5, 2009) ...................13

24

25

*Tietsworth v. Sears*,
   720 F. Supp. 2d 1123 (N.D. Cal. 2010) ....................................................12

26

*In Re Tobacco II Cases*,
   46 Cal.4th 298 (2009) ......................................................................21

27

28

*Wal-Mart Store, Inc. v. Dukes*,
   564 U.S. 338 (2011)........................................................................10



**TABLE OF AUTHORITIES**
(continued)

<u>Page</u>

*Wilson v. Hewlett-Packard Co.*,
    668 F.3d 1136 (9th Cir. 2012)................................................................................ 21

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266
    (9th Cir. 2001)....................................................................................................... 25

**California Statutes**

California Civil Code §1790, et seq. ........................................................................ 11

California Commerical Code § 2316(2)..................................................................... 12

California Consumer Legal Remedies Act ................................................................ 1

California False Advertising Law ............................................................................. 1

California Song-Beverly Consumer Warranty Act ......................................... 1, 11, 13, 15

California Unfair Competition Law .......................................................................... 2

**Federal Authorities**

Federal Rule of Civil Procedure 23...................................................................*passim*

Federal Rule of Evidence 609 ................................................................................. 14

Federal Rule of Evidence 702 ................................................................................. 18



1

## I.      SUMMARY AS TO WHY CLASS CERTIFICATION SHOULD BE DENIED

Plaintiffs' Motion for Class Certification ("Motion") glosses over the requirements under Federal Rule of Civil Procedure 23 for class certification, and completely ignores Plaintiffs' own testimony. The proposed California classes of ARRIS SB6190 cable modem owners are overbroad, sweeping in consumers who have no damages. Each of the 4 remaining California Plaintiffs, Carlos Reyna, Greg Knowles, Brian Alexander and Jon Walton, lack standing or have conflicts with the classes or unique defenses. In this case, where safety risks are not at issue, Plaintiffs are not entitled to a presumption of materiality or reliance on a classwide basis, leading to a myriad of individualized issues. As discussed in ARRIS's separate *Daubert* motions to exclude Plaintiffs' experts, Plaintiffs rely on the unreliable testimony of a technical expert who never tested or examined Plaintiffs' SB6190 modems and on damages experts who propose to conduct a flawed conjoint survey which does not track Plaintiffs' theory of liability. Plaintiffs fail to meet their burden under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) to offer a damages model showing that damages are susceptible of measurement across the entire class for the purposes of Rule 23(b)(3). Finally, Plaintiffs fail to offer any trial plan which would demonstrate that this class action is manageable or superior. Because Plaintiffs fail to meet the adequacy and typicality requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b), Plaintiffs' class certification motion should be denied.

## II.     PROCEDURAL HISTORY AND RELEVANT FACTS

### A.      Procedural History

Plaintiff Carlos Reyna filed suit on March 31, 2017 individually and on behalf of a proposed California class. ECF 1, Compl. On May 11, 2017, Plaintiffs Knowles, Walton and Alexander filed a separate suit alleging the same claims on behalf of a California class, along with plaintiffs from other states and the District of Columbia. ECF 1, Compl., No. 5:17-CV-02740-LHK, *Gregory Knowles, et al. v. ARRIS Int'l. plc*. The Court consolidated the two actions. ECF 24, Order. In the operative Second Amended Consolidated Class Action Complaint ("SAC"), the California Plaintiffs allege violations of the California Song-Beverly Consumer Warranty Act, the California Consumer Legal Remedies Act, the California False Advertising Law, the California



Unfair Competition Law and for Unjust Enrichment.[1] ECF 59-4. Plaintiffs seek to certify two California damages classes under Fed. R. Civ. Proc. 23(b)(3): **All persons who bought an ARRIS SURFBoard SB6190 cable modem in California on or after October 1, 2015**; and **All persons who bought an ARRIS SURFBoard SB6190 cable modem in California for personal, family or household purposes after October 1, 2015.** ECF 75-4, Mot. at 15:17-18, 12:1-11.

### B.     Relevant Facts

#### 1.     The ARRIS SURFBoard SB6190 Cable Modem ("SB6190")

ARRIS's SB6190 came onto the retail consumer market in October 2015.  The SB6190 employs an Intel Puma6 chip as its processor.  It is DOCSIS 3.0 certified, which is a set of telecommunications standards for cable equipment companies and cable operators.  *See* Declaration of Nancy L. Stagg In Support of ARRIS's Opposition to Motion for Class Certification ("Stagg Opp. Decl.")[2] Ex. 4 [Hays 45:21-47:22].  DOCSIS certification is managed by third party CableLabs.[3] *Id.* After gaining market share during its first year of sales, by November 2016 SB6190 was the top-selling cable modem and has remained so since every month, except for one month when it was second. Declaration of Nancy L. Stagg in Support of ARRIS's Motion to Exclude Plaintiffs' Expert Report and Testimony of Richard Newman filed concurrently ("Stagg Decl. ISO MTE Newman"), Ex. B [Walston Report at ¶8(b)].  SB6190 was the first "32 x 8" cable modem, with 32 available download channels and 8 available upload channels. Ex. 4 [Hays 168:17-22]. With regard to the issue of latency at issue in this action, ARRIS makes no representations regarding latency in the SB6190, and there is no standard, specification or limit for latency in DOCSIS 3.0 or otherwise in the industry. Ex. B [Walston ¶15]. As with all ARRIS cable modems, updates to software are routinely pushed to individual cable modems by delivering the updated software to cable operators ("MSOs") to push out over their systems to subscribers.  Ex. 4 [Hays 69:13-70:15]; Ex. B [Walston at ¶ 8].  Once delivered to the

---

[1] The California Plaintiffs appear to have dropped their classwide claims for Unjust Enrichment. ECF 75-4, Mot. at 12:2-11.

[2] All references to numerical Exhibits 1-16 are to exhibits filed with the Stagg Opp. Decl.

[3] CableLabs has since released DOCSIS 3.1 standards, which have different and additional specifications. *See* Stagg Decl. ISO MTE Newman, Ex. B [Walston Report at ¶ 38]; *see also* https://www.cablelabs.com/innovations-old/docsis3-1/.

1   MSO, ARRIS has no control over the timing of the delivery of updates to the consumer.  Ex. 4

2   [Hays 69:13-70:15].

3        The SB6190 offers a Two Year Limited Warranty. Ex. 2 [SB6190 Warranty]; Ex. 4 [Hays

4   116:9-11].  The Limited Warranty disclaims all implied warranties and requires warranty

5   claimants to contact ARRIS for repair or replacements as the sole remedy. Ex. 2 [Warranty].  The

6   Limited Warranty is available on the ARRIS website and is included in the box containing the

7   SB6190.  Ex. 3 [SB6190 Box].

8        ARRIS did no print or media advertising specifically for the SB6190.  Marketing for the

9   SB6190 consists of the ARRIS website at http://www.arris.com/surfboard/ and product pages

10  provided to retailers such as Amazon or Best Buy. Ex. 4 [Hays 164:10-18, 165:2-25, 167:13-19].

11  Except for records related to warranty claims and customer support calls, ARRIS does not

12  maintain records of individual SB6190 purchasers, since the majority of its sales are through

13  retailers. ARRIS does not track consumer sales by state. Ex. 4 [Hays 111:3-8, 123:17-22, 134:12-

14  25].

15       In or about November 2016, a blogger in Phoenix, Arizona, Christopher Stephens, under

16  the alias "Xymox1" started avidly posting about the SB6190 on a tech forum

17  www.DSLReports.com. Stephens claimed he was an engineer who had performed testing on the

18  SB6190 and determined that the Intel Puma6 chip was causing severe "ping latency" which was

19  affecting users' network latency and gaming. Ex. 4 [Hays 60:6-24]; Ex. 6 [Wehmeyer 50:20-55:8.]

20  Stephens also provided this information to various tech media reporters, resulting in a significant

21  amount of negative publicity for ARRIS and Intel. Ex. 1 [Walston 119:11-19]; Ex. 6 [Wehmeyer

22  50:20-55:8.]. Stephens also repeatedly contacted Cox Communications, his cable provider, and he

23  encouraged the readers of DSLReports.com to complain to ARRIS, Intel, their cable operators,

24  and even the FTC. Ex. 4 [Hays 60:6-24]; Ex. 6 [Wehmeyer 52:12-21.]; Ex. 7 [PLST00022-24,

25  413, 624, 632-34].  Stephens admits he had communications with an executive of Broadcom,

26  Intel's chief competitor,  regarding this issue.  Ex. 5 [Stephens 70:9-71:12].  Stephens made

27  complaints to CableLabs about the SB6190 and he made repeated attempts to contact Intel as well.

28  Ex. 5 [Stephens 149:2-7]; Ex. 6 [Wehmeyer 52:12-18].  Stephens also started his own website

1  BadModems.com to post complaints about the SB6190 and other modems. Ex. 5 [Stephens 109:7-

2  23, 150:7-151:13]; Ex. 8 [PLST04727-28]. Stephens admitted at his deposition in this case, he is

3  not an engineer and does not even have a college degree. Ex. 5 [Stephens 50:4-8].  Stephens, a

4  named plaintiff in this case seeking to represent a class of Arizona consumers, took apart his own

5  SB6190, voiding the warranty. Ex. 5 [Stephens 45:25-46:20];  Ex. 2 [Warranty]; ECF 59-4, SAC ¶

6  9. Stephens admits that since he received certain firmware updates from Cox for his SB6190, he

7  no longer observed the "ping latency" issues he originally complained about. Ex. 5 [Stephens

8  89:9-12].

9          To address the uproar created by Stephens online and in tech media, ARRIS and Intel

10  reviewed the claims of Stephens and other consumers who began submitting online reviews and

11  comments about the SB6190. Ex. B [Walston ¶ 13]; Ex. 6 [Wehmeyer 50:20-55:8.] █████████

12  ████████████████████████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████████████████

14  ██████  *Id.*  Ping traffic contains no useable data, but many gamers use free online "ping tests" to

15  estimate their distance from a game server. Ex. B [Walston ¶ 44]; Ex. 11 [Knowles 40:24-41:17].

16  ████████████████████████████████████████████████████████████████████

17  ██████████████████████████████████████████████████████████████████

18  ████████████████████. Ex. B [Walston ¶ 13]; Ex. 6 [Wehmeyer 50:20-55:8.].  Those

19  firmware updates were provided to the MSOs in January 2017, prior to this suit being filed. Ex. 1

20  [Walston 185:5-17, 192:20-25].  As a result of the publicity generated by Stephens and others,

21  ARRIS continued to receive user complaints, including from Stephens, about the SB6190 on a

22  variety of "edge" or "corner" case scenarios.  Ex. 1 [Walston 193:2-196:5]; Ex. 6 [Wehmeyer

23  132:3-133:8.].  ARRIS and Intel worked together to make additional minor modifications to

24  improve the firmware performance of the SB6190 and other models not at issue here.  Ex. 1

25  [Walston 193:2-196:5]; Ex. 6 [Wehmeyer 132:3-133:8.].  ARRIS pushed out additional firmware

26  updates in March 2017 to MSOs which reflect those improvements.  ECF 85-53

27  [ARRIS1201581].

28          Six months before Stephens started posting about the SB6190, ███████████████



1  ██████████████████████████████████████████████████████

2  ██████████████████████. Ex. 6 [Wehmeyer 55:24-57:8.] ████████████████

3  ████████████████████████████████████████████████████████

4  ██████████████████████████ Ex. 6 [Wehmeyer 57:3-8]. ███████████████

5  ██████████████████████████████████████████████████████

6  ███████████████████████████████████. Ex. 6 [Wehmeyer 56:24-57:2]. ████████

7  ████████████████████████████████████████████████████████. Ex. 6

8  [Wehmeyer 159:16-161:9].  Some of these improvements were accepted by ARRIS in the

9  firmware upgrades that were provided to MSOs in March 2017.  Ex. 1 [Walston 192:4-196:5].

10       Sometime prior to the filing of this Motion in March 2017, Plaintiffs' counsel started

11  posting ads on Facebook and DSLReports.com and set up a website page, all seeking to represent

12  consumers who own the SB6190 and other cable modems with the Puma6 chip in a class action

13  lawsuit.  Ex. 9 [Schubert Facebook Ads].  Each of the California Plaintiffs responded to the

14  solicitation.  Ex 9 [Ads]; *see also* Ex. 10 [Alexander 28:24-29:23, 50:10-51:1]; Ex. 11 [Knowles

15  11:24-13:5]; Ex. 12 [Reyna 51:3-52:9].

16            **2.    The Proposed Class Representatives**

17       **Brian Alexander:**  Plaintiff Brian Alexander purchased the SB6190 in December 2016.

18  Ex. 10 [Alexander 19:13-18]. Alexander spent about 10 minutes making the decision to purchase

19  the SB6190 at a Fry's electronics store in Sacramento. *Id.* at 14:14-16, 15:15-19, 16:16-18. His

20  purchase decision came down to a modem that was "fast" and had "a lot of download and upload

21  channels." *Id.* at 15:3-6. He compared the SB6190 box to the box for an unknown Netgear brand

22  modem.  *Id.* at 13:8-10, 14:6-10. He did not go to ARRIS's website or any other website in

23  connection with his purchase decision. *Id.* at 14:17-15:2. He did not review the ARRIS SB6190

24  warranty prior to purchase, nor did he ever make a warranty claim to ARRIS for the SB6190. *Id.*

25  at 17:17-20, 17:24-18:1. He never contacted ARRIS about the SB6190 prior to filing suit. *Id.* at

26  18:6-8.

27       After he purchased the SB6190 to replace the failed modem, Alexander had a Comcast

28  technician come to his residence to install the SB6190 and remove a cable splitter at his residence.



1   *Id.* at 34:17-35:10. Alexander did that because he was not getting a good signal from Comcast. *Id.*

2   After that Comcast service visit, Alexander never contacted Comcast again about his SB6190. *Id.*

3   at 37:18-38:3.  He testified he started having problems with the SB6190 "a day or two" after

4   purchase but did not consider returning the modem to Fry's because he expected any replacement

5   modem – including the alternative Netgear model – to have the same performance. *Id.* at 30:7-

6   31:14.  Alexander alleges he experienced "lag" when playing first person shooter games and

7   "stuttering" if watching a movie streaming online with his SB6190. *Id.* at 21:3-15.  He did not

8   notice any issues with web pages loading, email or basic web browsing. *Id.* at 21:24-22:5.

9   Alexander attributes these performance issues to the SB6190 modem based on certain "ping" test

10  meters he observed. *Id.* at 23:17-24:3, 22:6-23:7.  However, he has no records of any of these test

11  results.  *Id.* at 27:12-14, 59:24-60:1. Alexander knew he would not be getting gigabit service from

12  the modem because he did not have that speed package from Comcast. *Id.* at 32:14-18.  He did

13  notice improvements in his service from Comcast as Comcast increased the speed of his service

14  and sent him email notifications about these speed increases. *Id.* at 43:6-19.  Alexander stopped

15  using the SB6190 in April 2017, when he replaced the modem with another modem. *Id.* at 19:10-

16  18.  Alexander wants a full refund of the purchase price for the SB6190. *Id.* at 29:24-25.  He does

17  not believe he received any value from the modem. *Id.* at 60:23-61:9.  Like all the other

18  California Plaintiffs, Alexander decided to file suit after he saw a solicitation regarding a class

19  action lawsuit, which directed him to Plaintiffs' counsel's website for further information. *Id.* at

20  28:24-29:23.

21      **Greg Knowles:**  Plaintiff Gregory Knowles is a convicted felon and registered sex

22  offender. Ex. 11 [Knowles 8:11-12, 10:2-13].  Knowles did not become aware that the problems

23  he alleges he experienced were related to his SB6190 modem until he saw an online advertisement

24  about the class action lawsuit. *Id.* at 44:14-17, 55:8-14.  Before seeing the online advertisement

25  about the lawsuit, he thought the problems he claims he was experiencing were related to his

26  Comcast service. *Id.* at 55:15-24.  He purchased the SB6190 in August 2016. *Id.* at 15:4-21.

27  Knowles decided to purchase the SB6190 online from Amazon.com after looking at Comcast's

28  website to see what models were approved for use and after reading Amazon.com and other third



party reviews that came up in a Google search. *Id.* at 16:23-18:14, 21:14-22:3. Knowles saw an image of the SB6190 box on Amazon.com prior to purchasing the SB6190. *Id.* at 65:7-66:3. Knowles testified that the box's reference to 32 channels, being the fastest modem and fully compatible with Comcast affected his decision to purchase the modem. *Id.* Knowles claims that he began experiencing problems which he now attributes to a defect in the SB6190 within a month after purchase. *Id.* at 40:16-19. These problems were gaming performance issues, unusual ping and upload and download speed test results and poor quality Skype calls. *Id.* at 39:16-40:17, 48:17-49:25. The gaming performance issues include skips, hiccups, stuttering and jumping back in time in games. *Id.* After he began experiencing problems, Knowles contacted Comcast approximately six times about these specific performance problems. *Id.* at 54:12-14. Each time the technician walked him through an online process, the problems he experienced would temporarily resolve. *Id.* at 52:8-53:10. Once he learned about the lawsuit and believed that the problems might be related to the SB6190 modem, he stopped contacting Comcast. *Id.* at 55:4-7, 83:15-17.

Knowles never made a warranty claim to ARRIS regarding the SB6190. *Id.* at 56:8-10. He never contacted ARRIS about the modem and he never tried to return the modem to Amazon. *Id.* at 57:9-14. While Knowles admits he did receive some value from the modem, "the rewards of internet connectivity," he wants a replacement modem, a full refund of the purchase price he paid ($126.66) and $30 an hour for his gaming time and Skype calls affected by the modem's performance. *Id.* at 58:7-63:25, 118:7-13. Although Knowles contends ARRIS should have told him that Comcast does not utilize all 32 downstream channels, Knowles admits his tier of Comcast service (300 mpbs) doesn't use 32 channels and he isn't impacted by this limitation. Id. at 71:12-72:16.

**Carlos Reyna**: Plaintiff Carlos Reyna, a software engineer, purchased his SB6190 modem in April 2016 from Amazon.com. Ex. 12 [Reyna 9:24-10:7]. Reyna obtains his internet service from Comcast and has a 250 megabit service package. *Id.* at 24:23-25:3. Reyna purchased the SB6190 after he learned his prior modem did not support his current Comcast speed package. *Id.* at 20:19-21:4. Prior to purchasing the SB6190, Reyna looked at Amazon.com reviews, other website reviews, and the ARRIS website for SB6190 technical specifications. *Id.* at 55:18-56:13.



1   Reyna purchased the SB6190 because it was supposed to be great for streaming, have some of the

2   fastest speeds and be DOCSIS 3.0 compliant. *Id.* at 20:19-21:4, 23:9-16. Reyna claims that he

3   experienced 6 months of incomplete speed tests and packet loss, which eventually cleared up, but

4   he continued to experience "connectivity issues" while online gaming when someone else in his

5   household was also streaming Netflix or watching Amazon. *Id.* at 26:5-23, 38:13-40:3. Reyna did

6   not record any of the results of the speed tests he conducted. *Id.* at 27:16-17. Reyna described the

7   problems he attributed to the SB6190 as "Netflix and Amazon video … would cut out" and while

8   streaming (a Netflix or Amazon movie) online gaming would disconnect or "warping" would

9   occur (where the game briefly puts the player in a different scene). *Id.* at 29:16-30:11, 44:5-12.

10      Even before purchasing the SB6190, Reyna was regularly experiencing problems with his

11  Comcast service, including service outages of 30 minutes to three hours at least once a week. *Id.*

12  at 19:14-20:6. The Comcast service problems continued during his ownership of the SB6190.

13  During the time Reyna used the SB6190 modem, he admits he continued to experience "severe"

14  service issues with his Comcast service, and Comcast would issue him credits for his service when

15  he complained. *Id.* at 60:14-25.

16      Reyna used the SB6190 from purchase right up until the week of his deposition in this

17  case, in February 2018. *Id.* at 23:23-24:25. Reyna claimed that in the few days of use of a new

18  modem, he was not experiencing as much warping – although he had seen warping with the new

19  modem. *Id.* at 43:4-11. Reyna did not attribute any performance issues with Google Hangouts or

20  Skype to the SB6190, and he agreed that he cannot connect all of the problems he experienced

21  with streaming Amazon, Netflix and HBO GO to the SB6190. *Id.* at 42:18-22, 67:5-22. Prior to

22  filing suit, Reyna had no communications with ARRIS about his complaints with the SB6190 and

23  never considered returning the modem to Amazon or making a warranty claim to ARRIS. *Id.* at

24  32:7-19, 54:22-24. Reyna filed the initial lawsuit against ARRIS after responding to a Facebook

25  ad placed by Plaintiffs' counsel. *Id.* at 51:3-9. Reyna would like a full refund of the entire

26  purchase price, but admits he got "some value after the fact." *Id.* at 52:23-53:20. Unlike the other

27  Plaintiffs, Reyna is not claiming ARRIS misled him regarding the number of channels available

28  on the Comcast system. Reyna testified the number of channels was "not material" to him and he



1    did not believe he would get "gigabit" service since he was not subscribing to gigabit service.  *Id.*

2    56:14-22.

3        **Jon Walton**:  Plaintiff Jon Walton, another Comcast subscriber, purchased the SB6190 in

4    April 2016 online at Best Buy's eBay store.  Ex. 13 [Walton 7:17-19, 24:9-14]. Walton, who has

5    his own IT support company, purchased the SB6190 because it was the first gigabit network

6    enabled cable modem, was DOCSIS 3.0 compliant and had 32 download and 8 upload channels.

7    *Id.* at 20:9-21:9, 38:22-40:23.  Walton's prior modem was not capable of supporting the speed tier

8    Walton was paying for – the modem supported only 100 mpbs.  *Id.* at 41:25-42:11.  Walton did

9    not have gigabit service when he owned the SB6190, but he had 150 and then 250 mbps service.

10   *Id.* at 13:22-14:8.  Prior to purchasing the SB6190, he reviewed Comcast's and ARRIS's websites,

11   looked at the packaging and went to either the Amazon or e-Bay websites and performed a Google

12   search.  *Id.* at 37:9-48:18.  Walton was not concerned about the SB6190's warranty and did not

13   make a warranty claim to ARRIS.  *Id.* at 24:20-25:16.  Walton admits, and records show, he had

14   Comcast service problems before, during and after he owned the SB6190.  *Id.* at 127:4-142:25; *see*

15   *also* Stagg Decl. ISO MTE Newman, Ex. E [PLWA0215, PLWA0224 ], Ex. F [PLWA0209,

16   PLWA0214, PLWA0243].  He sold the SB6190 for $61.99 on e-Bay in June 2017, two week after

17   filing this action.  *Id.* at 103:19-104:8, 107:25-108:16.  He did not produce the SB6190 modem for

18   inspection in this case. *Id.* at 10:1-9.  Despite selling the modem, Walton wants a full refund of the

19   SB6190 purchase price. *Id.* at 102:8-22. Walton never contacted ARRIS about the problems he

20   claims he experienced with the SB6190 modem. *Id.* at 36:3-6. Walton testified that the SB6190

21   would work satisfactorily for 3-5 days or as long as a week, and then become non-responsive,

22   forcing him to "power cycle" the modem (unplug it and then plug it back in).  *Id.* at 27:24-31:14.

23   Walton claims that he would experience no or "slow" internet, buffering while watching Netflix,

24   slow web page loading, Skype call delays and lag when gaming during "LAN parties" (multi-

25   player online gaming parties). *Id.* at 27:24-31:14, 67:15-70:2. Walton believes these issues were

26   caused by the SB6190 modem, although he admitted that "honestly couldn't" attribute all of the

27   Skype problems to the SB6190 modem. *Id.* at 55:23-60:2, 71:16-18. Walton also testified he

28   upgraded and then downgraded the SB6190 modem firmware and performed "traffic shaping" and

1   other actions to "throttle" down the speed of the modem because he thought that would improve

2   its performance (and believes that his actions on his home network did improve the SB6190's

3   performance).  *Id.* at 66:13-20, 75:3-77:11.

4   **III.    APPLICABLE LEGAL STANDARDS**

5          A party seeking class certification must meet each of the four threshold requirements set

6   forth in Rule 23(a) of the Federal Rules of Civil Procedure: (1) the class is so numerous that

7   joinder of all members is impracticable; (2) there are questions of law or fact common to the class;

8   (3) the claims or defenses of the representative party are typical of the claims or defenses of the

9   class; and (4) the representative party will fairly and adequately protect the interests of the class.

10  Fed. R. Civ. P. 23 (a).  To obtain class certification, Plaintiffs bear the burden of showing through

11  evidentiary proof they have met each of the four requirements of Rule 23(a) and at least one

12  subsection of Rule 23(b).  *Wal-Mart Store, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).  A party

13  seeking class certification must "affirmatively demonstrate" compliance with Rule 23.  *Id.* at 350.

14         Plaintiffs seek class certification here only under Rule 23(b).  ECF 75-4, Mot. at 11:19.

15  The Court can certify a class under Rule 23(b)(3) if the Court finds that "questions of law or fact

16  common to class members predominate over any questions affecting only individual members,

17  and that a class action is superior to other available methods for fairly and efficiently adjudicating

18  the controversy."  Fed. R. Civ. P. 23(b)(3).  The Rule 23(b)(3) predominance inquiry is "far more

19  demanding" than Rule 23(a)'s commonality requirement.  *Amchem Prods., Inc. v. Windsor*, 521

20  U.S. 591, 624 (1997).  "[A] court's class-certification analysis must be 'rigorous' and may 'entail

21  some overlap with the merits of the plaintiff's underlying claim[.]'"  *Amgen Inc. v. Conn. Ret.*

22  *Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013) (quoting *Dukes*, 564 U.S. at 351).  This

23  "rigorous" analysis applies to both Rule 23(a) and Rule 23(b).  *Id.*

24  **IV.   THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR CLASS
         CERTIFICATION**

25

26         **A.    Plaintiffs Fail to Meet The Requirements of Rule 23(a)**

27                 **1.    The Proposed Classes are Overbroad**

28         As a threshold matter, Plaintiffs' proposed class definitions fail because they are



overbroad.  By attempting to certify classes that include anyone who merely purchased an SB6190 after October 1, 2015[4],  Plaintiffs sweep into the Classes persons who suffered no injury in fact: purchasers who returned their modems to the retailer or ARRIS, received replacements from ARRIS, made successful warranty claims, purchased modems with updated firmware or downloaded firmware updates. The proposed class definitions also include persons who purchased but then re-sold their SB6190 (like Walton), and persons who purchased a used SB6190 (and did not rely on any representations by ARRIS).  None of these California consumers have suffered any losses attributable to ARRIS.  *See, e.g.*, *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009) ("Because the class as currently defined would include these **non-harmed** auction winners, this portion of the class definition is both imprecise and overbroad.") (emphasis added).

With regard to Plaintiffs' claim that ARRIS advertised 32 download channels for Comcast gigabit service, but failed to notify consumers that Comcast would not provision all 32 channels on its system (Mot. at §II.A), the proposed classes are not limited to Comcast customers with gigabit service but would include customers of other cable operator systems as well as consumers, like Plaintiffs, who were Comcast customers without gigabit service.  None of these consumers suffered or could suffer any injury relating to these representations regarding Comcast gigabit service even if Plaintiffs prevailed on their theory.  Any presumption that these consumers suffered damages on a classwide basis would be erroneous.

### 2.   No California Plaintiffs Have Standing For Any Claims

Not even one of the California Plaintiffs has Article III standing.  *Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2018 WL 2325426, at *9 (N.D. Cal. May 8, 2018) (holding "it is sufficient for jurisdictional purposes that 'at least one named plaintiff must satisfy Article III standing'") (citation omitted).

Plaintiffs' Song-Beverly Consumer Warranty Act claim is for breach of the implied warranty of merchantability. ECF 59-4, SAC ¶231. Cal. Civ. Code 1790, et seq. However, none of the California Plaintiffs have standing to bring a Song-Beverly claim because ARRIS expressly

---

[4]ARRIS does not dispute numerosity given the total number of SB6190 units sold during the class period, although ARRIS does not maintain sales records to consumers by state. Ex. 4, [Hays 110:20-22].

1  disclaimed any implied warranties in its Limited Warranty and required any retail purchaser to

2  contact ARRIS at 1-877-466-8646 to take advantage of the Limited Warranty. Ex. 2 [Warranty].

3  None of the California Plaintiffs contacted ARRIS about their SB6190 modems or otherwise

4  attempted to make a warranty claim.  Ex. 10 [Alexander 17:24-18:17]; Ex. 11 [Knowles 56:8-

5  57:11]; Ex. 12 [Reyna 30:23-31:8, 32:7-13]; Ex. 13 [Walton 25:17-26:6, 35:3-6].

6        A company may disclaim the implied warranty of merchantability so long as the disclaimer

7  "mentions[s] merchantability" and is "conspicuous."  Cal. Com. Code § 2316(2).  *See also*

8  *Minkler v. Apple, Inc.*, 65 F. Supp. 3d 810, 819 (N.D. Cal. 2014) ("'[A]ll implied warranties are

9  excluded by expressions like 'as is,' 'with all faults,' or other language which in common

10  understanding calls the buyer's attention to the exclusion of warranties and makes plain that there

11  is no implied warranty.'") (quoting Cal. Com. Code § 2316(3)(a)).  Here, ARRIS's Limited

12  Warranty, included with each SB6190 and posted on ARRIS's website, disclaimed all implied

13  warranties in accordance with California law because it states clearly and conspicuously, in

14  writing with capitalized formatting, that:

15        ARRIS IS NOT RESPONSIBLE FOR, AND PROVIDES "AS IS" ANY
        SOFTWARE SUPPLIED BY THIRD PARTIES. EXCEPT AS EXPRESSLY
        STATED IN THIS SECTION ("WARRANTY INFORMATION"), THERE ARE

16        NO WARRANTIES OF ANY KIND RELATING TO THE PRODUCT, EXPRESS,
        IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO IMPLIED

17        WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR
        PURPOSE, OR THE WARRANTY AGAINST INFRINGEMENT PROVIDED IN

18        THE UNIFORM COMMERCIAL CODE.

19        Ex. 2 [Warranty]. Even if ARRIS had not disclaimed all implied warranties, Plaintiffs still

20  fail to establish standing to bring a claim for breach of an implied warranty. To establish a breach

21  of implied warranty of merchantability, Plaintiffs must allege a "fundamental defect that renders

22  the product unfit for its ordinary purpose." *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1142 (N.D.

23  Cal. 2010) (citation omitted). Here, it is clear that Plaintiffs fail to allege, let alone have evidence

24  to support, that their SB6190 modems did not work at all.  Plaintiffs' entire argument, even if

25  credited fully, is that they did not get some incremental performance they expected: they complain

26  of  "slowed" web browsing, "hindered" online gaming and audio and video "glitches."  ECF 75-4,

27  Mot. 2:8-11; Ex. 12 [Reyna 29:16-30:11, 44:5-12]; Ex. 11 [Knowles 39:16-40:17, 48:17-49:25].

28  "The mere manifestation of a defect by itself does not constitute a breach of the implied warranty



1  of merchantability.  Instead, there must be a fundamental defect that renders the product unfit for

2  its ordinary purpose." *Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 WL

3  1635931, at *8 (N.D. Cal. June 5, 2009) (citing *Am. Suzuki Motor Corp. v. Super. Ct.*, 37 Cal.

4  App. 4th 1291, 1295 (Cal. Ct. App. 1995)); *see also Azoulai v. BMW of N. Am. LLC*, No. 16-CV-

5  00589-BLF, 2017 WL 1354781, at *4-*6 (N.D. Cal. Apr. 13, 2017) (holding plaintiffs lacked

6  standing to assert Song-Beverly Claim because plaintiffs failed to plead an actionable defect).

7          Nor do any of the California Plaintiffs have standing to assert claims based on "ARRIS's

8  misrepresentations and omissions about the Modem's latency issues" under the UCL, FAL, and

9  CLRA. ECF 75-4, Mot. at 23:5-8. All of Plaintiffs' claims are premised on the allegation that the

10  SB6190 contains four different "defects." ECF 75-4, Mot. at 6:20-25, 7:2-3, 7:14-8:13, 13:13-14.

11  But "this is not a products liability action," and Plaintiffs have failed to articulate a plausible legal

12  theory of defect in the consumer fraud or warranty context. *Azoulai*, 2017 WL 1354781, at *4-*6;

13  *see also Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1280-84 (C.D. Cal. 2016) (collecting

14  cases where "courts have rejected for lack of standing or injury similar attempts to recast no-injury

15  products-liability claims (which are not cognizable) as consumer fraud claims for contract-like

16  economic damages (which *may* be cognizable).").  Plaintiffs do not allege they bargained for any

17  type of "latency" feature, and it "is well-established that a purchaser of a product who receives the

18  benefit of his bargain has not suffered Article III injury-in-fact traceable to the defendant's

19  conduct." *Barakezyan v. BMW of N. Am., LLC*, No. CV16-00173-SJO, 2016 WL 2840803, at *4

20  (C.D. Cal. Apr. 7, 2016).  Plaintiffs likewise cannot rely on any claimed diminished value due to

21  the alleged "defects," given that there is no evidence "widespread reports of the defect could

22  decrease market demand" for the SB6190. *Azoulai*, 2017 WL 1354781, at *4; *see also*

23  *Barakezyan*, 2016 WL 2840803, at *4 ("In cases such as this one, where the alleged wrong seems

24  to stem from an assertion of insufficient performance, a plaintiff must allege 'something more'

25  than mere 'diminished value' to support a claim."). On the contrary, the SB6190 has been the

26  number one bestselling retail cable modem every month since November 2016, with the exception

27  of one month when it was the number two bestselling retail cable modem. Ex. B [Walston ¶ 8(b)].

28          Because none of the California Plaintiffs can show injury in fact derived from Plaintiffs'



theories of liability in the Motion, no class can be certified.

### 3. Plaintiff Knowles is Neither a Typical Nor Adequate Class Representative

Proposed Class Representative Greg Knowles is a convicted felon and current registered sex offender.  The only evidence Mr. Knowles has presented to support his claim that he experienced poor performance with his modem is his own testimony.  Ex. 11 [Knowles 55:8-24.]; *see also* ECF 75-4, Mot. at 13:13-16.  Under Fed. R. Evid. 609, Knowles' testimony is subject to impeachment based on his multiple felony convictions. As a result, unique defenses exist as to Knowles claims, which render him unsuitable as a class representative.  A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation."  *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001) (that named plaintiff "was neither a typical nor adequate class representative and was subject to unique defenses" was "independently sufficient to support the denial of certification").

### 4. Unique Defenses Also Exist as to Plaintiff Walton

Plaintiff Jon Walton is also subject to unique defenses by ARRIS which render him atypical and inadequate as a class representative.  Mr. Walton sold his SB6190 on June 15, 2017 on e-Bay for $61.99, after retaining counsel and filing suit against ARRIS.  Ex. 13 [Walton 103:19-104:8, 107:25-108:16]; Ex. 15 [Walton Interrog. Resp. 17].  Because it was reasonable to expect that ARRIS would seek to inspect his SB6190[5], Mr. Walton engaged in spoliation of evidence by selling his modem and shipping it out of state after he had engaged counsel to represent him in this action. Spoliation of evidence is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future

---

[5] ARRIS stated early in the litigation that it intended to inspect Plaintiffs' modems. ECF 22 ¶ 8. The video inspection of the modems conducted during the Plaintiffs' depositions was done to determine if any of the plaintiffs had altered, modified, opened or otherwise used or abused the modem, which could provide ARRIS with affirmative defenses to Plaintiffs' claims.  For example, AZ plaintiff Christopher Stephens aka "Xymox1" admitted that he opened his SB6190 and altered his components.  Ex. 5 [Stephens 45:25-46:20, 66:12-68:23].  Thus, ARRIS had no opportunity to determine if Walton's SB6190 had been opened or otherwise abused, voiding the warranty. Ex. 14 [ARRIS Depo Notice -Walton].



litigation." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009) (citation omitted).  The Court may impose sanctions on Walton and his counsel for such conduct.  *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir. 1993). In addition, Mr. Walton recouped $61.99 of the modem purchase price when he sold it.  If the Court or a jury ultimately determined he got more than $88.00 worth of value from the SB6190 for the 13+ months he used it, Walton would not be entitled to any damages. Walton is not an adequate class representative.

### 5.   Plaintiff Reyna Has Conflicts With The Proposed Classes

Plaintiff Carlos Reyna, a software engineer, testified in ways that demonstrate he has conflicts with the proposed classes and therefore is not a typical or adequate class representative. First, Reyna does not allege, as Knowles, Walton and Alexander do, that he was unaware of the limitation of download channels used on the SB6190 when provisioned on Comcast's system. Mot. at 2: fn. 2, 11:5-7.  Rather, Reyna testified that the reduced number of channels was not material to him because he understood the modem was not using the maximum [Comcast] speed because he was not subscribing to Comcast's gigabit service. Ex 12 [Reyna 56:14-22; 25:1-26:1]. More than just revealing a lack of standing for the Comcast Gigabit/32 Channel class, Reyna's testimony is inapposite to that of the proposed classes.  Reyna plainly understood that ARRIS made no representations about the total number of download channels on the SB6190 when provisioned on Comcast's network. *Id.*  Reyna further testified that he did not experience any issues with audio and video conferencing as a result of the alleged latency defect. Ex. 12 [Reyna 67:5-22]. Reyna's testimony instead disproves Plaintiffs' argument that their claims are typical of the class and that common issues of fact predominate. Reyna's testimony is in direct conflict with the proposed classes. Reyna is not an adequate or typical class representative.

### 6.   Plaintiff Alexander Is Not Typical Of The Proposed Classes

Plaintiff Alexander is not a typical or adequate class representative for reasons similar to those of  Reyna.  Alexander's deposition testimony shows he does not have standing to represent a CLRA, FAL or UCL class.[6] He testified he spent approximately 10 minutes at the store making

---

[6] As discussed above at IV.A.2, Alexander lacks standing to represent a Song-Beverly Consumer Warranty Act class or a Comcast Gigabit/32 Channel class.

the purchase decision.  His purchase decision was based solely on the modem's speed and the number of download channels. Ex. 10 [Alexander 11:22-14:25].  Alexander cannot represent a class of individuals who claim ARRIS engaged in false advertising because he cannot identify any specific ARRIS representations that he relied upon in making his purchase of the SB6190.

**B.      Plaintiffs Fail To Meet The Requirements of Rule 23(b)(3)**

Under Rule 23(b)(3), the plaintiffs must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  "The Rule 23(b)(3) predominance inquiry" is meant to test "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623.  This Court has previously identified five principles that guide the Court's predominance inquiry:

> First and most importantly, the critical question that this Court must answer is whether common question predominate over individual questions. *Amgen*, 133 S.Ct at 1191.  In essence this Court must determine whether common evidence and common methodology could be used to prove the elements of the underlying cause of action. *Id.*  Second, in answering this question this court must conduct a "rigorous" analysis. *Comcast Corp.*, 133 S.Ct. at 1432.  This analysis may overlap with the merits, but the inquiry cannot require Plaintiffs to prove the elements of their substantive case at the class certification stage. *Amgen*, 133 S.Ct. at 1194.  Third this Court must determine not only the admissibility of expert evidence that forms the basis of the methodology that demonstrates whether common questions predominate. *Ellis* [*v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)].  Rather this Court must also determine whether the expert evidence is persuasive, which may require the Court to resolve methodological disputes. *Id.*; *see also In Re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013).  Fourth, the predominance inquiry is not mechanical inquiry of "bean counting" to determine whether there are more individual questions than common questions. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).  Instead the inquiry contemplates a qualitative assessment, which includes a hard look at the soundness of the statistical models. *Id.*; *In Re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d at 255.  Fifth, Plaintiffs are not required to show that each element of the underlying cause of action is susceptible to classwide proof. *Amgen*, 133 S.Ct. at 1196.  Rather, they need only show that common questions will predominate with respect to their case as a whole.  *Id.*

*In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1186-87 (N.D. Cal. 2013); *see also*

*In re High-Tech Antitrust Litig.*, No. 13-80223, ECF No. 18 (9th Cir. Jan 2014) (denying Rule



23(f) petition for review of this Court's Order applying the foregoing framework to grant class certification).  In this case, Plaintiffs fail to meet the requirements of Rule 23(b)(3).  Plaintiffs cannot show that the Plaintiffs' SB6190 suffer from a common defect because the opinion of Plaintiffs' proffered expert on the issue, Richard Newman, must be excluded as unreliable and lacking in valid methodology.  Plaintiffs cannot show that materiality and reliance are susceptible to common proof for their CLRA, FAL and dependent UCL claims.  Plaintiffs have not met their burden of presenting a damages model that aligns with their legal theory and shows that damages are susceptible of measurement across the entire class as required by *Comcast*, 569 U.S. at 35. Finally, Plaintiffs have failed to submit a trial plan or otherwise demonstrate that the proposed class litigation is superior or manageable.

### 1. Plaintiffs Fail to Establish Proof of a Common Defect

Plaintiffs' current liability theory is based on the claim that four different common defects in the SB6190's Puma6 chip exist and caused the varying performance issues the plaintiffs allege in the SAC. But the only evidence Plaintiffs offer in support of their latency defect theory are the armchair observations of Richard Newman Ph.D. ECF 75-4, Mot. at 13:13-14 (citing ECF 76-1, Newman Report, ¶¶ 105-136); *see also id.* at 6:20-25, 7:2-3, 7:14-8:13 (discussing the HTTP latency defect, the TCP latency defect, the UDP latency defect, and the DNS latency defect identified by Newman). Newman's opinions are literally just a series of statements, as he did no testing, has never even seen an SB6190, and merely read documents pre-selected and highlighted for him by Plaintiffs' counsel to form the opinions in his report.  Stagg Decl. ISO MTE Newman, Ex. A [Newman 13:22-25, 14:21-15:12.]  In fact, Newman never actually identifies a specific defect in the SB6190 because he never proposes that the SB6190 could have or should have been designed in another way. Newman merely points to internal ARRIS and Intel results for certain specific types of performance testing and suggests that the milliseconds of performance improvement obtained under certain testing conditions reveals (and in fact proves) some unidentified classwide defect.

While Plaintiffs argue that Newman "discusses the ***causes and effects*** of each of these four common latency defects in extensive detail," ECF 75-4, Mot. at 6:26-7:1 (emphasis added),



1    Newman testified he had "not attempted to discover the root cause of the problems that the ARRIS

2    and Intel engineers have identified." Ex. A [Newman 130:21-131:6].  Newman simply divined the

3    presence of the four different product defects by observing how Intel and ARRIS summarized the

4    performance of the Puma6 chip in certain test environments.  But in doing so, Newman points to

5    no standards for network latency for a cable modem, admitting there are none.  *Id.* at 17:14-25,

6    18:20-19:2.  Newman cites to no acceptable or unacceptable error rate. Newman does not have

7    any competitor data to show better results were possible in other modem models.  Newman made

8    no effort to test or inspect how the Plaintiffs' modems operated or to investigate whether their

9    reported performance issues could be due to other issues, such as their home network

10   configurations or their Comcast service.  Newman never read the Plaintiffs' deposition testimony

11   or their discovery responses to determine if what they reported was consistent with the Plaintiffs'

12   pleaded defect theory or whether other causes may explain their reported network issues.  *Id.* at

13   13:5-21, 14:4-6.

14            Newman's Report and his observations are inadmissible under Federal Rule of Evidence

15   702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  *See* ARRIS's concurrently

16   filed Motion to Exclude Plaintiffs' Expert Report and Testimony of Richard Newman which is

17   incorporated herein by reference.  But even if Newman's Report and testimony were somehow

18   admissible, the Court "must also determine whether that expert evidence is persuasive."  *In re*

19   *High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d at 1186; *see also Ellis v. Costco Wholesale*

20   *Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) (holding "the district court was required to resolve any

21   factual disputes necessary to determine whether there was a common pattern and practice that

22   could affect the class *as a whole*").  As ARRIS engineer and expert Allen Walston explains in his

23   Rebuttal Expert Report, it is impossible to determine – on a classwide basis – whether the SB6190

24   (or any cable modem) ***causes*** a consumer to experience performance problems (i.e., slow

25   Internet).  Stagg Decl. ISO MTE Newman, Ex. B [Walston Report at ¶¶ 9-12].

26            Newman himself admits the cable modem is only "one of many pieces," "[t]here are many

27   things that could occur between one end point and the other end point that could affect the

28   experience that a user has.  The modem is only one of those," and "[y]ou'd have to actually see



1  what's happening on both sides of the modem, which the – certainly the users had no way to do

2  that." Ex. A [Newman 57:14-58:6, 58:13-15].

3         Because Newman offers only generalized and theoretical opinions that a common

4  "network latency" defect exists, and these opinions are unsupported by "a functioning model that

5  is tailored to market facts in the case at hand" the Court should reject Plaintiffs' common defect

6  theory. *See In re eBay Seller Antitrust Litig.*, 07-01882 JF, 2009 WL 2779374, at *1 (N.D. Cal.

7  Sept. 1, 2009).  No reliable or persuasive foundation exists upon which to base opinions about a

8  common defect, let alone sufficient data to opine that such defects exist on the classwide bases

9  proposed by Plaintiffs.

10                  **2.      Plaintiffs Cannot Show Materiality and Reliance Are Susceptible To
                             Common Evidence**

11

12        Plaintiffs argue that "the common question of whether ARRIS's conduct was deceptive

13  predominate over any individual issues" and ask the Court to certify a class under the CLRA, FAL

14  and each prong of the UCL. Mot. 18:3-4; 18: 10-13. Plaintiffs are also unable to show that

15  materiality and reliance are susceptible to common classwide evidence to support certification of

16  their proposed CLRA, FAL and UCL classes.

17        Plaintiffs allege in their Motion that ARRIS "uniformly marketed the SB6190 modems as

18  fast and reliable, claiming they supported Gigabit speeds, [featured a five-star rating] and were

19  'the best' for browsing the web, playing online games and streaming videos." ECF 75-4, Mot.

20  Mot. at 1:7-9. Plaintiffs claim that ARRIS never disclosed "that the SB6190 suffered from a series

21  of persistent network latency defects that affected the [SB6190's] reliability, performance and

22  throughput." *Id.* at 4:10.  Plaintiffs additionally allege ARRIS "also knew – but failed to disclose

23  to consumers – that the SB6190 was incapable of using 32 downstream channels or reaching

24  Gigabit speeds when provisioned on Comcast's network."  *Id.* at 10:13-15.  Plaintiffs allege

25  ARRIS marketed its SB6190 as supporting "32 downstream channels" and "speeds up to 1.4

26  Gbps" and was "compatible with major U.S. cable providers, including: Xfinity from Comcast."

27  *Id.* at 10:16-21.  These are the totality of the alleged misrepresentations and omissions Plaintiffs

28

claim as the basis for certification.[7]

The problem for Plaintiffs is that their case is centered around the concept of a "latency" defect – while ARRIS made absolutely no representations regarding latency at all in connection with the SB6190 (and certainly not the 4 specific types of latency cited by Plaintiffs' technical expert). Plaintiffs present no evidence at all that a "reasonable consumer" had any understanding of or expectations regarding latency in the SB6190. They have not produced any consumer survey evidence to show that any ARRIS statements about the SB6190 were material to the class regarding latency. Plaintiffs present no evidence showing how they intend to prove the classes uniformly understood ARRIS's representations regarding the SB6190's speed and reliability to equate to an unspecified latency standard. To the contrary, Plaintiffs' damages survey expert, Steven Gaskin testified that speed, reliability and latency were <u>separate</u> attributes for purposes of his design of Plaintiffs' conjoint survey. Ex. 16 [Gaskin 35:1-23; 68:17-70:4].

But none of Plaintiffs' Declarations state they understood any affirmative representations by ARRIS to be about the modem's latency. ECF 80-1 to 80-4, Exs. 14-17, ¶ 4. Rather, Plaintiffs frame the issue firmly as one of non-disclosure regarding latency: "I relied on the information and statements contained on the Modem's packaging. There, Defendant did not disclose that the Modems suffered from high network latency, packet errors, unreliable Internet connectivity, and other related performance issues…." *Id.* That testimony, even credited fully, does not support Plaintiffs' theory that ARRIS's affirmative representations about the speed and reliability of the SB6190 are actionable on a classwide basis. ECF 75-4, Mot. at 19:4-26. Simply put, Plaintiffs' complaints about the SB6190 are not about its speed or reliability.

Plaintiffs will also be unable to demonstrate that ARRIS's failure to disclose the four alleged latency "defects" or the Comcast Gigabit/32 channel limitation were material on a classwide basis.[8] While each of the Plaintiffs' declarations claim they would not have purchased

---

[7] "The best" and "five-star ratings" are permissible, nonactionable advertising "puffery" as a matter of law and cannot form the basis of a claim because they are not specific measurable claims capable of being proved false or of reasonably being interpreted as an objective statement of fact. *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999).

[8] Plaintiffs Knowles and Walton testified they were trying to "future-proof" their networks by purchasing the SB6190. Ex. 11 [Knowles 17:19-18:1]; Ex. 13 [Walton 91:14-92:18]. But any



1    the SB6190 "had I known of these issues," Plaintiffs have submitted no evidence (and indeed

2    there is none) that ARRIS had a duty to disclose in this instance because there are no allegations

3    that the alleged latency defects related to a safety hazard.  *Wilson v. Hewlett-Packard Co.*, 668

4    F.3d 1136, 1141 (9th Cir. 2012) (summarizing California law and finding that California court has

5    rejected a broad duty to disclose adopting instead the standard as enumerated by the California

6    Court of Appeal in *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, (Ct. App. 2006)).

7          Plaintiffs also contend that consumer reliance can be inferred for the class and thus

8    common issues predominate. ECF 75-4, Mot. at 22:17-23. But the record does not establish that

9    plaintiffs are entitled to that presumption because they have not made a sufficient showing that the

10   statements were material to the class.  *See Jones v. ConAgra Foods, Inc.*, No. C 12-1633 CRB,

11   2014 WL 2702726, at *15-*16 (N.D. Cal. June 13, 2014). As this Court has noted in *Philips v.*

12   *Ford Motor Co.*, the presumption of reliance is not always appropriate where the "limited scope of

13   th[e challenged] advertising… ma[de] it unreasonable to assume that all class members viewed the

14   advertisements," and where the advertisements "d[id] not deny that [the] limitations exist[ed]" and

15   thus even class members who were exposed to the campaign were unlikely to have relied on an

16   expectation [the product] would work without flaws.  No. 14-CV-02989-LHK, 2016 WL 7428810,

17   at *15 (N.D. Cal. Dec. 22, 2016) (discussing *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th

18   Cir. 2012)).  "More generally, in the context of a case involving both misleading statements and

19   omissions, the Ninth Circuit has held that if class members 'were exposed to quite disparate

20   information from various representatives of the defendant,' a presumption of reliance may not be

21   justified." *Id.* at *15 (quoting *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011)).

22         That is the case here.  The minimal advertising at issue here is quite different than the "40

23   years' plus" "saturation" advertising campaign at issue in *In Re Tobacco II Cases*, 46 Cal.4th 298,

24   320 (2009) cited by Plaintiffs. Mot. 18:18-19:1.  ARRIS did little online advertising and no print

25   or other media advertising at all.  Ex. 4 [Hays 164:10-18, 165:18-25, 166:1-12].  The only

---

26   such "future-proofing" could be for no more than the duration of the two year Limited Warranty

27   ARRIS provided for the SB6190.  None of the Plaintiffs testified that they sought to obtain
     Comcast Gigabit service during their SB6190 warranty periods or otherwise.  Ex. 10 [Alexander
     32:19-23, 39:15-40:4]; Ex. 11 [Knowles 19:2-10, 105:11-15]; Ex. 12 [Reyna 25:4-25]; Ex. 13

28   [Walton 14:9-20].



representations made by ARRIS about the SB6190 were those on or in the box packaging, on the ARRIS website and in information provided to retailers for their product pages. *Id.* at 138:20-25, 139:13-16.  Those representations included the Limited Warranty (available with the box and on the website), which expressly states:

"While every reasonable effort has been made to insure that you will receive a Product that you can use and enjoy, <u>ARRIS does not warrant that the functions of the Product will meet your requirements or that the operation of the Product will be uninterrupted or error-free.</u>" Ex. 2 [Warranty]. Those representations also included language on the outside of the box:  "<u>ARRIS cannot guarantee the availability, the reliability or the performance of the broadband service used.</u>" Ex. 3 [Box]. (emphases added.)

Class members were not exposed to uniform misrepresentations during the class period. This can be seen just by reviewing the Plaintiffs' various complaint versions and Plaintiffs' motion for class certification, including the Newman Report.  Only in the motion for class certification did Plaintiffs narrow their theory of liability to the "four common latency defects" described in the Newman Report.  ECF 75-4, Mot. at 6:18-26.  Previously, they had complained about "high spikes in network latency" or just "abnormally high network latency."  ECF-1, CAC at ¶ 2-3, 33.  Moreover, to the extent there was a social media/ Xymox1 driven uproar on DSLReports.com and BadModems.com around the SB6190 and the various firmware updates, ARRIS provided consumers information regarding the firmware updates. Ex. 4 [Hays 121:2-15]. Based on this evidence, an unknown number of class members would have seen the box and warranty limitations or seen or heard ARRIS's statements about the firmware updates. This would require the Court to conduct individualized inquiries to discover which class members read the box and warranty limitations or had seen information put out by ARRIS on the SB6190  As a result, common issues due not predominate over individualized issues and Plaintiffs do not meet the Rule 23(b)(3) predominance requirement.

### 3.    Plaintiffs' Damages Model Is Not In Accord With *Comcast*

The U.S. Supreme Court has held that Plaintiffs have the burden to offer a damages model showing that "damages are susceptible of measurement across the entire class for purposes of Rule

1   23 (b)(3)." *Comcast Corp.*, 133 S.Ct. at 1433.  Such a damages model "must measure only those

2   damages attributable to" Plaintiffs' theory of liability.  *Id.*  "If Plaintiffs do not offer a plausible

3   damages model that matches their theory of liability, 'the problem is not just that the court will

4   have to look into individual situations to determine the appropriate measure of damages; it is that

5   Plaintiffs have not even told the Court what data it should look for.'" *Philips*, 2016 WL 7428810,

6   at *19 (quoting *In re MyFord Touch Consumer Litig.*, No. 3:13-cv-03072-EMC, 2016 WL

7   7734558, at *15 (N.D. Cal. Sept. 14, 2016)).

8        Plaintiffs have identified Colin Weir and Steven Gaskin as damages experts who will

9   testify as to Plaintiffs' benefit of the bargain "Price Premium" damages model, based on a

10  proposed choice-based conjoint survey and resulting damages calculation.[9] ECF 75-4, Mot. at

11  23:9-13, 24:13-23.  The Court should reject Plaintiffs' damages model and deny class certification

12  for failure to meet Rule 23 (b)(3)'s predominance requirement.  Plaintiffs' proposed conjoint study

13  does not measure only those damages attributable to Plaintiffs' theory of liability, but instead

14  would measure consumer's reactions to "slow Internet" generally.  Gaskin's "defect-free" scenario

15  promises consumers an experience of the Internet with "few or no" episodes of slow Internet,

16  something a cable modem manufacturer could never promise because, as discussed above, the

17  cable modem is only one part of the network.  Given the lack of reliable methodology employed in

18  designing the conjoint survey, ARRIS concurrently moves to exclude the Reports and testimony

19  of Plaintiffs' expert Steven Gaskin and the Declaration and Reply Declaration of Colin Weir

20  ("Motions to Exclude") and incorporates herein by reference the arguments made in those Motions

21  to Exclude.

22        Even if Gaskin's proposed conjoint study were admissible, it is far from persuasive.  *In re*

23  *High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d at 1186.  Plaintiffs' conjoint survey is a

24

25  _____

    [9] Plaintiffs initially sought a full refund of the entire purchase price of the SB6190 ("Full
26  Refund").  Ex. 10 [Alexander 29:24-30:2]; Ex. 11 [Knowles 58:7-63:25]; Ex. 12 [Reyna 52:23-
    53:20]; Ex. 13 [Walton 102:8-22, 107:25-108:8].  Apparently now conceding that they received at
27  least some benefit from their functional modems, Plaintiffs recently changed their damages model.
    *Cf. Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559 (N.D. Cal. May 30, 2014) (holding
28  the proper measure of damages where the product was not worthless was the difference between
    what the plaintiff paid and the value of what the plaintiff received).



1  blatantly-biased litigation device, which seeks to use conjoint methodology traditionally employed

2  to measure the perceived value of a product feature or benefit to instead measure consumer

3  reaction to a defective product.  As a result, Gaskin's proposed conjoint study again "does not

4  reflect real-world consumer behavior." *Adams v. Target Corp.*, No. CV-13-5944-GHK, 2014 WL

5  12558858, at *3 & n.3 (C.D. Cal. Nov. 25, 2014) (denying motion for class certification after

6  finding Gaskin's conjoint study inadequate and inconsistent with plaintiff's theory of liability).

7       Plaintiffs' conjoint design is flawed in at least several significant ways and would not lead

8  to a reliable estimate of damages based on Plaintiffs' theory of liability.  *See* Declaration of Nancy

9  L. Stagg in Support of ARRIS's Motion to Exclude Plaintiffs' Expert Reports and Testimony of

10  Steven P. Gaskin and Colin B. Weir ("Stagg Decl. ISO MTE Gaskin and Weir"), Ex. N [Holt

11  Rebuttal Report at 14].  Gaskin's conjoint survey design fails to properly define the attribute of

12  latency at issue in this case, and the selection of the attributes to be surveyed was based on a list

13  provided by Plaintiffs' counsel, rather than through proper survey design.  The proposed

14  descriptions for latency were not based on the experiences described by the testimony of the

15  Plaintiffs.  The descriptions of the various latency levels also lead to biased results. *Id.* at 34.

16       Importantly, Gaskin's conjoint study does not even purport to isolate the damages

17  attributable to Plaintiffs' theory of liability.  *Philips*, 2016 WL 7428810, at *19 (citing *Comcast*,

18  569 U.S. at 35). Gaskin admitted in his deposition he "almost [doesn't] care" whether the study

19  isolates the latency contributed by the cable modem, as opposed to all of the other components of

20  the network. Ex. 16 [Gaskin 56:20-21].

21       This is exactly the type of broad strokes conjoint analysis which courts have rejected under

22  *Comcast*.  *See e.g.*, *Adams,* 2014 WL 12558858, at *3 & n.3 (failure to prove damages on a

23  classwide basis because proposed choice-based conjoint analysis failed to track plaintiff's theory

24  of liability); *Davidson*, 2018 WL 2325426, at *22-*23 (same); *Opperman v. Kong Techs., Inc.*,

25  No. 13-CV-00453-JST, 2017 WL 3149295, at *12 (N.D. Cal. July 25, 2017) (same); *see also*

26  *Herron v. Best Buy Stores, LP*, No. 2:12-CV-02103-TLN, 2018 WL 1960659, at *4-*5 (E.D. Cal.

27  Apr. 26, 2018) (rejecting Weir's damages model as "fundamentally flawed"); *In re 5-Hour Energy*

28  *Mktg. & Sales Practices Litig.*, No. ML 13-2438-PSG, 2017 WL 2559615, at *10-*11 (C.D. Cal.



June 7, 2017) (rejecting Weir's damages model for failing to match plaintiffs' theory of liability). While Gaskin's conjoint survey might measure the value to consumers of guaranteed instantaneously fast Internet, the survey does not measure the value to consumers of knowing about the four specific "defects" which form the basis of Plaintiffs' theory of liability.  As a result, Gaskin's conjoint survey would exponentially overstate Plaintiffs' damages.

Not only does Plaintiffs' damages model fail to track their theory of liability, but it seeks to calculate a measure of damages they cannot recover.  Plaintiffs cannot rely on a diminution in value theory as a result of a defect in the consumer fraud context without presenting evidence that "widespread reports of the defect could decrease market demand" for the SB6190.  *Azoulai*, 2017 WL 1354781, at *4.  In addition, Plaintiffs' damages model fails to "account for consumer preferences and the relative value that consumers ascribe to different aspects of the product." *In re 5-Hour Energy Mktg. & Sales Practices Litig.*, 2017 WL 2559615, at *11; *see also Brazil*, 2014 WL 5794873, at *5 (discussing the proper measure of restitution under UCL, FAL, and CLRA in a mislabeling case). Gaskin's conjoint study does not do any of this.  Rather than account for the factors which might drive consumer preferences in purchasing a cable modem Gaskin proposes to ask consumers how they "feel about" having "problems using the Internet."  Ex. 16 [Gaskin 56:15-57:12].  This cannot possibly satisfy *Comcast*'s requirement "that damages models measure 'only those damages attributable' to Plaintiffs' theory of liability."  *Davidson*, 2018 WL 2325426, at *23 (quoting *Comcast*, 569 U.S. at 35).

**4.     Plaintiffs Fail To Propose A Trial Plan Which Supports Superiority**

To satisfy Rule 23(b)(3), Plaintiffs must produce a "suitable and realistic plan for trial of the class claims." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001). Plaintiffs fail to provide a trial plan or articulate even a single fact in this case supporting superiority.  ECF 75-4, Mot. at 25:1-22.

# V.     CONCLUSION

ARRIS respectfully requests that the Court deny Plaintiffs' Motion for Class Certification.



1    DATED:  May 31, 2018              Respectfully submitted,

2                                      KILPATRICK TOWNSEND & STOCKTON LLP

3                                      By:  */s/ Nancy L. Stagg*

4                                            NANCY L. STAGG

5                                      Attorneys for Defendant, ARRIS International plc

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



70806382V.2