UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

IN RE ARRIS CABLE MODEM
CONSUMER LITIGATION

Case: 17-cv-1834-LHK

Declaration

of

**COLIN B. WEIR**

IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO EXCLUDE EXPERT

REPORT AND TESTIMONY OF COLIN B. WEIR

June 14, 2018

REFERENCES MATERIALS DESIGNATED "CONFIDENTIAL" AND "CONFIDENTIAL

ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

I, Colin B. Weir, declare as follows:

I am Vice President at Economics and Technology, Inc. ("ETI"), One Washington Mall, 15th Floor, Boston, Massachusetts 02108.  ETI is a research and consulting firm specializing in economics, statistics, regulation and public policy.  I am the same Colin B. Weir who submitted testimony in this matter on March 9, 2018.

## I.  QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.    I hold a Masters of Business Administration, with honors, from the High Technology program at Northeastern University, Boston, Massachusetts.  I hold a Bachelor of Arts degree cum laude in Business Economics from The College of Wooster, Wooster, Ohio.  I have provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions, and have contributed research and analysis to numerous ETI publications and expert testimony at the state, federal, and international levels.  I have consulted on a variety of consumer and wholesale products cases, calculating damages relating to food products, household appliances, herbal remedies, health/beauty care products, electronics, and computers.  My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony during the last four years, is attached hereto as Exhibit 1.  This includes a list of all cases in which, during the previous four years, I have testified as an expert at trial or by deposition.  Prior to joining ETI, I worked at Stop and Shop Supermarkets for a period of seven years, working as a cash department head, grocery/receiving clerk, and price-file maintenance head.



Declaration of Colin B. Weir
June 14, 2018
Page 2 of 15

## II.  ENGAGEMENT

2.    I provide this declaration in connection with the case filed by Plaintiffs in the above-captioned action against Defendant ARRIS International plc ("Arris") as it relates to sales of the SURFboard SB6190 cable modem, (the "Modem" or "Product").  I make this declaration based upon my own personal knowledge and, if called as a witness in this action, I would be able to competently testify as to the facts and opinions set forth herein.

3.    I have been advised by Counsel for Plaintiff that putative Classes of individuals purchased Arris Modems that suffer from a defect ("Defect") that cause it to suffer from "high spikes in network latency--delays in data communication over the network--that degrade users' Internet connectivity."[1]  Plaintiff alleges that that this Defect resulted in the diminution in value of the Modems.

4.    I have been asked by Counsel for Plaintiff to review the April 9, 2018 Rebuttal Report of Krista Holt ("Holt Rebuttal Report") and to respond thereto.

5.    ETI is being compensated at the rate of $695 per hour for my work on this case.  The opinions expressed in this declaration are my own, and my compensation is not dependent upon the substance of these opinions or the outcome of the litigation.

6.    The documents, data and other materials that I relied upon in forming my opinions are identified throughout my report, and in Exhibit 2, attached hereto.  In addition, I have relied upon my educational background and more than 14 years of experience.

## III.  RESPONSE TO HOLT

7.    Holt provides a response to the March 9, 2018 Declarations submitted by Steven Gaskin and myself, and suggests that her assignment includes and evaluation of whether Plaintiffs "damages model consistent with Plaintiffs' theory of liability," or more specifically,

---

[1] *See, generally,* Second Amended Class Action Complaint, February 5, 2018 ("Complaint").



Declaration of Colin B. Weir
June 14, 2018
Page 3 of 15

that the damages model "must measure only those damages attributable to [ARRIS's conduct]."[2]
I will evaluate Holt's criticisms from the perspective of economics, damages quantification and
Plaintiffs theory of liability.

8.   Fundamentally, Holt's criticisms in this case are unsound, as Holt seems to lack even
a basic foundation as to the damages and economic concepts at issue in this litigation.

9.   Holt's criticisms as to the ability to quantify damages in this litigation cannot be
taken seriously: Plaintiffs' theory of liability relates to an alleged "product defect" and Holt does
not know what that term means.  "Q  Well, how would you define a product defect?  A   I don't
know."[3]

10.   Worse, Holt effectively cannot assume that Plaintiffs are able to establish their
theory of liability -- a fundamental first step in a typical damages analysis.  Holt cannot think of
a single scenario where a product defect could impact the price of a product.

> Q   So in that situation where you have Firestone tires that are blowing up, it
> would likely cause an impact on the market price of the product when
> Firestone disclosed that its tires were blowing up?
>
> A   Yeah, so I don't know if it caused an effect on the price or not.  I just
> would have no idea.  I haven't seen any data about that.  I would have no idea
> whether it did or not.
>
> Q   Can you think of any other examples?
>
> A   Not as I sit here, I can't.[4]

11.   Moreover, Holt does not seem to understand the benefit of the bargain framework
that commonly underpins damages analyses such as what I proposed in the Weir Declaration.

---

[2] Holt Rebuttal Report, at 3-4.

[3] Deposition of Krista Holt, April 16, 2018, ("Holt Deposition"), at 16.

[4] *Id.*, at 18.



Declaration of Colin B. Weir
June 14, 2018
Page 4 of 15

Under this theory, damages are measured as the difference in value between what was promised and what was received, or in this litigation wherein the portion of the price consumers paid for the Modems that reflects the diminished value of the Modems solely attributable to Defendant's conduct of selling Modems with the Defect.  Instead, Holt is evaluating damages in this case from a perspective of the "next best alternative" -- an approach Holt acknowledges in not commonly used in litigation.

> Q   Once you knew that information, how would you decide what potential methods could be used to calculate class-wide damages?
>
> A   So what you would be wanting to look at is what their next best alternative would be.
>
> Q   And is the next best alternative, is that, is that a model that's commonly used in litigation to calculate damages?
>
> A   Well, no.[5]

12.   In the alternative, Holt suggests that another way to calculate damages in this litigation would be to collect the subjective valuation of damages from individuals -- though she could not think of a way to implement such a method.[6]

13.   Holt does not know how prices are set for the modems, nor does she understand the basic economic concept of market value.[7]

14.   I understand that Gaskin is providing a response to Holt's technical criticisms of the proposed conjoint analysis.  However, I will note that Holt does not suggest that the conjoint methodology that Gaskin and I have proposed is an invalid method -- nor could she.  Conjoint analysis is a time-tested, peer-reviewed, well-accepted and widely used method.  Conjoint has a

---

[5] *Id.*, at 23-24.

[6] *Id.*, at 54-55.

[7] *Id.*, at 92-93.



Declaration of Colin B. Weir
June 14, 2018
Page 5 of 15

long history of use in litigation to determine economic damages, as well as in academia and in industry.

15.   Instead, Holt quibbles about the implementation of this methodology.  In all instances, Holt's criticisms are speculative at best.  She did not perform any empirical work or tests to support her claims.  She did not measure the diminution in value resulting from the Defect, nor can she think of any method by which to do so.[8]  She did not speak with any actual purchasers of the Modems.[9]

16.   This is not surprising, given that Holt is not an expert on conjoint analysis.  Holt has designed and executed only one conjoint analysis survey.[10]  Her general lack of expertise in conjoint analysis and its use in class action matters is evident throughout her rebuttal report, as well as her deposition.[11]  She did not know the method proposed by Mr. Gaskin to run the market simulation.  Nor did she know what several common conjoint statistics were or how they were used.[12]

17.   In contrast, Gaskin and I have a combined 44 years of experience with designing and executing conjoint studies.  I received graduate level training in conjoint analysis as part of my MBA.  I take continuing education in advanced conjoint design, execution, and analysis through Sawtooth Software, a leading provider of conjoint analysis software.  I have provided expert testimony about the design, execution and/or determination of the economic suitability of conjoint analysis in more than two dozen litigations, and have been found by the courts to have expertise in conjoint analysis

---

[8] *Id.*, at 43-46.

[9] *Id.*, at 55.

[10] *Id.*, at 47.

[11] *See, e.g.,* Holt Deposition at 91.

[12] *Id.*, at 96-97.



Declaration of Colin B. Weir
June 14, 2018
Page 6 of 15

18.  My combination of training and experience with both conjoint and economics puts me in a position to evaluate whether the proposed conjoint design and market simulation are economically appropriate for determining the diminution in value suffered by Class members solely attributable to the undisclosed latency Defect.  Nothing in the Holt Declaration causes me to change my opinion set forth in the Weir Declaration that, given "the methodology underlying Gaskin's conjoint survey, and the documentary evidence relied upon by Gaskin and incorporated into the survey design, it is my opinion that Gaskin's conjoint survey is properly designed to measure the diminution in market value of the Modems at the time and point of sale as a result of the Defect. The survey is especially economically suitable given Gaskin's use of market based prices, and considerations given as to the fixed quantity of Modems sold that are part of the Class Definition."[13]

**Holt refuses to assume that Plaintiffs will establish their theory of liability**

19.  It is common practice in any economic damages analysis that the first step of any such analysis is to assume that liability has been established.  As set forth in the Reference Guide on Estimation of Economic Damages section of the Reference Manual on Scientific Evidence, "[d]amges quantification operates on the premise that the defendant is liable for the defendant's harmful act."[14]

20.  In this case, Plaintiffs allege that individuals purchased Arris Modems that suffer from a Defect that cause it to suffer from "high spikes in network latency--delays in data communication over the network--that degrade users' Internet connectivity."[15]  Plaintiff alleges that that this Defect resulted in the diminution in value of the Modems.

---

[13] Weir Declaration, at para 24.

[14] "Reference Guide on Estimation of Economic Damages", Reference Manual on Scientific Evidence (3rd Ed.), at 429.

[15] *See, generally,* Second Amended Class Action Complaint, February 5, 2018 ("Complaint").


ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
June 14, 2018
Page 7 of 15

21.  Consistent with the Reference Manual, to begin a proper damages analysis, it must be assumed that Plaintiffs will establish this liability.

22.  Yet Holt cannot conceive of a single situation where the presence of a product defect could result in a change in market price or value for that product.

> Q   So in that situation where you have Firestone tires that are blowing up, it would likely cause an impact on the market price of the product when Firestone disclosed that its tires were blowing up?
>
> A   Yeah, so I don't know if it caused an effect on the price or not.  I just would have no idea.  I haven't seen any data about that.  I would have no idea whether it did or not.
>
> Q   Can you think of any other examples?
>
> A   Not as I sit here, I can't.[16]

23.  It is not clear that Holt even fully understands Plaintiffs' theory of liability, as she claims to not know what a product defect is, even though that is the central issue of this case.

> Q   Well, how would you define a product defect?
>
> A   I don't know.  I mean I don't know what the official definition would be for a product defect.[17]

24.  It is not clear how Holt can determine whether the damages framework matches with Plaintiffs' theory of liability when she herself does not understand that theory.

**Holt refuses to accept the benefit of the bargain framework**

25.  Holt does not seem to understand the benefit of the bargain framework that commonly underpins damages analyses such as what I proposed in the Weir Declaration.  Under

---

[16] Holt Deposition, at 18.

[17] *Id.*, at 16.



Declaration of Colin B. Weir
June 14, 2018
Page 8 of 15

this theory, damages are measured as the difference in value between what was promised and

what was received, or in this litigation wherein the portion of the price consumers paid for the

Modems that reflects the diminished value of the Modems solely attributable to Defendant's

conduct of selling Modems with the Defect.  Instead, Holt is evaluating damages in this case

from a perspective of the "next best alternative" -- an approach Holt acknowledges in not

commonly used in litigation.

> Q   Once you knew that information, how would you decide what potential
> methods could be used to calculate class-wide damages?
>
> A   So what you would be wanting to look at is what their next best alternative
> would be.
>
> Q   And is the next best alternative, is that, is that a model that's commonly
> used in litigation to calculate damages?
>
> A   Well, no.[18]

26.   In the alternative, Holt suggests that another way to calculate damages in this

litigation would be to collect the subjective valuation of damages from individuals -- though she

could not think of a way to implement such a method.[19]

27.   Part of Holt's difficulty in evaluating the benefit of the bargain framework stems

from her lack of understanding of market value, or how the market for the Arris Modems even

works.  Gaskin and I propose to measure the diminution in value of the Modems as a result of the

Defect by comparing the price of the Modems that consumers actually paid in the marketplace,

with the price from Gaskin's market simulation that measures the market price had Arris

disclosed the Defect at the time and point of sale.  This difference in price is the market value

lost due to the presence of the defect.

---

[18] *Id.*, at 23-24.

[19] *Id.*, at 54-55.



Declaration of Colin B. Weir
June 14, 2018
Page 9 of 15

28.  But Holt does not understand that common meaning of the term "market value" and conflates the concept with "market share."

> Q   How would you define "market value" in this case as it relates to the value of the SB6190 cable modem?
>
> A   Well, if you had a market, let's just say, and the market had $200 million, a $200 million modem market, right?  And let's just say that we had 150 million of that market, right?  Then -- then your market share would be the percentage of the market that you sold, right, and the market value would be the dollar amount of the market that you have.[20]

29.  Gaskin and I are not proposing to measure the change in market share for Arris Modems or other modems.  As such, Holt's criticisms of Gaskin's methodology deserve little weight.

30.  Even if Holt did understand the goal of the damages framework that I have set forth or the market simulation proposed by Gaskin, she still lacks a fundamental understanding of the economic market for the Arris Modems.  Given that Gaskin and I are proposing to measure changes in price, it is astonishing that Holt has no idea how the prices are set for the Arris Modems.

> Q   Who sets the retail prices of the SB6190 modems; retailers or Arris?
>
> A   I don't know.[21]

**Holt admits the fundamentals underpinning Plaintiffs theory of liability**

31.  Despite her prior claims that she could not think of such a scenario, Holt admits that disclosure of a Defect could possibly impact the price of a product.

---

[20] *Id.*, at 93.

[21] *Id.*, at 92.



Declaration of Colin B. Weir
June 14, 2018
Page 10 of 15

Q   You would agree that there are some situations where a defect in a consumer product sold at retail would have influence on the market price of that product?

A   I think that there -- I think it's possible.  You know, given a particular defect and a particular market, that could be true.[22]

32.   Holt admits that, all else equal, consumers are better off paying less for a product.

Yes.  I think that customers would generally prefer to pay a lower price for the exact same product.[23]

33.   Holt admits that individual issues such as intended use do not change the market price that consumers will pay, and that consumers do not negotiate the prices of the Modems at retail.

Q   But they couldn't negotiate within that one individual retailer?

A   No.  Big box store, I think it would be pretty hard.

I don't think you get to say hey, I'm just going to use this to check the internet. Can I have a lower price, right?[24]

34.   Holt also admits that if the market price were lower, everyone buying the Modems would pay the same lower price.

Q   So in the same hypothetical where a group of consumers go into Best Buy and are looking to buy an SB6190, and everyone in the group buys the SB6190, if the price were $80 instead of $100, then these hypothetical purchasers would pay $80, correct? […] If they decide to buy this modem at that time, they're going to pay whatever the listed price is, right?

---

[22] *Id.*, at 17.

[23] *Id.*, at 21.

[24] *Id.*, at 87.


ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
June 14, 2018
Page 11 of 15

> A   Yeah, if your question is if people go in a store hypothetically to buy
> something, would they pay the price that it's at in the store that day, if they're
> going to buy it that day, and the answer would be yes.[25]

**Holt does not suggest that conjoint is an invalid method -- she simply disagrees with the proposed implementation**

35.   I understand that Gaskin is providing a response to Holt's technical criticisms of the proposed conjoint analysis.  However, I will note that Holt does not suggest that the conjoint methodology that Gaskin and I have proposed is an invalid method -- nor could she.  Conjoint analysis is a time-tested, peer-reviewed, well-accepted and widely used method.  Conjoint has a long history of use in litigation to determine economic damages, as well as in academia and in industry.  Holt cites to several authorities on the subject of conjoint analysis and its power as a tool, and acknowledges that there is a whole community dedicated to the technique.

> Q   Okay, we've talked about the Rao book applied conjoint a fair amount.
> Would you say that the Rao book is a reputable source?
>
> A   Yeah, like I said, a lot of these things, in fact, all these things I'm talking
> about are just generally known within the conjoint community, but I wanted to
> find some sources saying the same thing, but yeah, I mean it's as good as
> anything else that I, that I see.[26]

36.   Instead, Holt quibbles about the implementation of the conjoint methodology.  In all instances, Holt's criticisms are speculative at best.  She did not perform any empirical work or tests to support her claims.  She did not measure the diminution in value resulting from the Defect, nor can she think of any method by which to do so.[27]

---

[25] *Id.*, at 90-91.

[26] *Id.*, at 170.

[27] *Id.*, at 43-46.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
June 14, 2018
Page 12 of 15

Q   Have you empirically determined the change in market value of the SB6190 cable modems in this case that would occur as a result of Arris disclosing the alleged latency defect to its customers?

A   I have not made, I have not made that calculation.

Q   No.  What I'm asking is:  Do you have any independent information as to what the diminution value or the reduction in price would be if Arris had disclosed the alleged defects?  Did you determine that?

A   I have not calculated that.

Q   So you did not conduct a conjoint analysis in this case; is that correct?

A   I did not conduct a conjoint analysis in this case.

Q   Have you performed any analysis that would allow you to determine how many fewer SB6190 modems Arris would have sold if they had disclosed the alleged defects?

A   I have not.[28]

37.   Nor has she done the necessary work to determine how or if it is possible to measure the diminution in value, or even given any thought as to the correct way to make any of these calculations.

Q   If you are asked to determine the diminution in market value attributable to the latency defect that plaintiffs allege with the SB6190, how would you do it?

A   I have not be asked to do that.

Q   I'm asking you:  If you were asked do that, how would you do it?

A   I don't know.  I'd have to look at it.  That's not something I've looked at.[29]

---

[28] *Id.*

[29] *Id.*



Declaration of Colin B. Weir
June 14, 2018
Page 13 of 15

38.   Although Holt speculates as to how respondents will react to the Gaskin survey -- and how they might understand latency -- she did not speak with any actual purchasers of the Modems.

> Q   Have you spoken with any purchasers of the SB6190 in the preparation of your report?
>
> A   I have not spoken with purchasers of the 6190 in, in preparation of my report.[30]

39.   All of these frailties are not surprising, given that Holt is not an expert on conjoint analysis.  Holt has designed and executed only one conjoint analysis survey.[31]  Her general lack of expertise in conjoint analysis and its use in class action matters is evident throughout her rebuttal report, as well as her deposition.[32]  She did not know the method proposed by Mr. Gaskin to run the market simulation.  Nor did she know what several common conjoint statistics were or how they were used.[33]

**Nothing in the Holt Reply Report causes me to change my opinion that classwide damages can be calculated in this litigation using common evidence, and that the Gaskin conjoint is an economically suitable tool to measure the diminution in value stemming from Defendant's conduct**

40.   In contrast, Gaskin and I have a combined 44 years of experience with designing and executing conjoint studies.  I received graduate level training in conjoint analysis as part of my MBA.  I take continuing education in advanced conjoint design, execution, and analysis through Sawtooth Software, a leading provider of conjoint analysis software.  I have provided expert

---

[30] *Id.*, at 55.

[31] *Id.*, at 47.

[32] *See, e.g.,* Holt Deposition at 91.

[33] *Id.*, at 96-97.



Declaration of Colin B. Weir
June 14, 2018
Page 14 of 15

testimony about the design, execution and/or determination of the economic suitability of

conjoint analysis in more than two dozen litigations, and have been found by the courts to have

expertise in conjoint analysis

41.  My combination of training and experience with both conjoint and economics puts

me in a position to evaluate whether the proposed conjoint design and market simulation are

economically appropriate for determining the diminution in value suffered by Class members

solely attributable to the undisclosed latency Defect.  Nothing in the Holt Declaration causes me

to change my opinion set forth in the Weir Declaration that, given "the methodology underlying

Gaskin's conjoint survey, and the documentary evidence relied upon by Gaskin and incorporated

into the survey design, it is my opinion that Gaskin's conjoint survey is properly designed to

measure the diminution in market value of the Modems at the time and point of sale as a result of

the Defect. The survey is especially economically suitable given Gaskin's use of market based

prices, and considerations given as to the fixed quantity of Modems sold that are part of the Class

Definition."[34]

---

[34] Weir Declaration, at para 24.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
June 14, 2018
Page 15 of 15

## IV.  RESERVATION OF RIGHTS

My testimony is based upon the information and data presently available to me. Additional, different and/or updated data including market research data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my testimony.

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at Austin, Texas, this 14th day of June, 2018.

Colin B. Weir



**Exhibit 1**

**Statement of Qualifications
of**

**COLIN B. WEIR**

**Statement of Qualifications**

**COLIN B. WEIR**


Colin B. Weir is Vice President at Economics and Technology, Inc.  Mr. Weir conducts economic, statistical, and regulatory research and analysis, and testifies as an expert witness. Mr. Weir's work involves econometric and statistical analysis, multiple regression, surveys, statistical sampling, micro- and macroeconomic modeling, accounting and other economic analysis.  Such analysis often involves analysis of databases, call detail records, and other voluminous business records.  Mr. Weir is familiar with common statistical and econometric software packages such as STATA and Sawtooth Software.  Mr. Weir assists with analysis of economic, statistical and other evidence; and preparation for depositions, trial and oral examinations.  Mr. Weir has provided expert testimony before federal and state courts, the FCC, and state regulatory commissions, and has contributed research and analysis to numerous ETI publications and testimony at the state, federal, and international levels.  Prior to joining ETI, Mr. Weir worked at Stop and Shop Supermarkets as a cash department head, grocery/receiving clerk, and price-file maintenance head.

Mr. Weir's experience includes work on a variety of issues, including: economic harm and damage calculation; liquidated damages provisions; lost profits; false claims; diminution in value; merger/antitrust analysis; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets.

Mr. Weir has conducted research and analysis in numerous litigation and regulatory matters on behalf of corporate, government and individual clients, including AT&T, MTS Allstream (Canada), The US Department of Justice, Office of the Attorney General of Illinois, Pennsylvania Department of Revenue,  Thomas v. Global Vision, (class action litigation, Superior Court, County of Alameda), Ayyad v. Sprint (class action litigation,  Superior Court, County of Alameda), Forcellati v. Hylands (class action, U.S. District Court, Central District of California), and Ebin v. Kangadis Foods (class action, U.S. District Court, Southern District of New York).

Mr. Weir holds an MBA with honors from Northeastern University.  He also holds a Bachelor of Arts degree *cum laude* in Business Economics from The College of Wooster.

Mr. Weir is a member of the Boston Economic Club, a business member of the Boston Bar Association, serves on the Board of Trustees of the Waring School, and serves as the comptroller for the Sybaris Investment Partnership.

1

ECONOMICS AND
TECHNOLOGY, INC.

**Publications and Testimony of Colin B. Weir**

Mr. Weir has co-authored the following:

*Interoperability and Spectrum Efficiency: Achieving a Competitive Outcome in the US Wireless Market* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, July 2012.

*The Price Cap LECs' "Broadband Connectivity Plan": Protecting Their Past, Hijacking the Nation's Future* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, September 2011.

*Regulation, Investment and Jobs: How Regulation of Wholesale Markets Can Stimulate Private Sector Broadband Investment and Create Jobs* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of Cbeyond, Inc., Covad Communications Company, Integra Telecom, Inc., PAETEC Holding Corp, and tw telecom inc., February 2010.

*Revisiting Us Broadband Policy: How Re-regulation of Wholesale Services Will Encourage Investment and Stimulate Competition and Innovation in Enterprise Broadband Markets*, (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, February 2010.

*Longstanding Regulatory Tools Confirm BOC Market Power: A Defense of ARMIS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, January 2010.

*Choosing Broadband Competition over Unconstrained Incumbent Market Power: A Response to Bell and TELUS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, April 2009.

*The Role of Regulation in a Competitive Telecom Environment: How Smart Regulation of Essential Wholesale Facilities Stimulates Investment and Promotes Competition* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, March 2009.

*Special Access Overpricing and the US Economy: How Unchecked RBOC Market Power is Costing US Jobs and Impairing US Competitiveness* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, August 2007.

*The AWS Spectrum Auction: A One-Time Opportunity to Introduce Real Competition for Wireless Services in Canada* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, June 2007.

*Comparison of Wireless Service Price Levels in the US and Canada* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of MTS Allstream, May 2007.



*Hold the Phone! Debunking the Myth of Intermodal Alternatives for Business Telecom Users In New York* (with Susan M. Gately and Lee L. Selwyn) Economics and Technology, Inc., prepared for the UNE-L CLEC Coalition, August 2005.


Mr. Weir has submitted the following testimony:

**United States District Court, Northern District of California,** *Stephen Hadley, on behalf of himself, all others similarly situated, and the general public, v. Kellogg Sales Company*, Case No. 5:16-cv-04955-LHK-HRL, on behalf of Law Offices of Jack Fitzgerald, PC, Declaration submitted April 30, 2018, Deposition on May 31, 2018.

**United States District Court, Northern District of Illinois, Eastern Division,** *Teresa Elward, Dennis Keesler, Leasa Brittenham, Kathy Beck and Nathaniel Beck, Angelia East, Sarah LaVergne, Tony And Lauren Fitzgerald, Gregory Gray, Bethany Williams, John McLaughlin, Stacy Cisco, and William Ferguson and Cheryl Ferguson, individually and on behalf of all others similarly situated, v. Electrolux Home Products, Inc.*, Case No. 1:15-cv-09882-JZL, on behalf of Greg Coleman Law, Declaration submitted April 20, 2018.

**United States District Court for the Northern District of California,** *Jackie Fitzhenry-Russell, an individual, on behalf of herself, the general public and those similarly situated v. The Coca Cola Company, and Does 1-50*, Case No. 5:17-CV-00603-EJD, on behalf of Gutride Safier, LLP, Declaration submitted April 16, 2018.

**United States District Court for the Southern District of New York,** *Josephine James Edwards, individually and on behalf of all others similarly situated, v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT, on behalf of Bursor & Fisher, P.A., Declaration submitted April 16, 2018; Deposition on June 7, 2018.

**United States District Court, Northern District of California,** *Jackie Fitzhenry-Russell, Robin Dale, and Gegham Margaryan, as individuals, on behalf of themselves, the general public and those similarly situated, v. Dr. Pepper Snapple Group, Inc., Dr Pepper/Seven Up, Inc., and Does 1-50*, Case No. 5:17-cv-00564-NC (lead); Case No. 5:17-cv-02341-NC (consolidated); Case No. 5:17-cv-04435-NC (consolidated)*, on behalf of Gutride Safier, LLP, Declaration submitted April 9, 2018; Deposition on April 19, 2018.

**United States District Court for the Western District of Texas, Austin Division,** *Sylvia Morris, on behalf of herself and all others similarly situated, v. Modernize Inc.*, Case No. 17:-cv-963-SS, on behalf of Bursor & Fisher, P.A., Declaration submitted March 13, 2018.

**United States District Court, Northern District of California, San Jose Division,** *In re: Arris Cable Modem Consumer Litigation*, Case No. 17-cv-1834-LHK, on behalf of Schubert Jonckheer & Kolbe, Declaration submitted on March 9, 2018; Reply Declaration submitted April 9, 2018; Deposition on April 11.


ECONOMICS AND TECHNOLOGY, INC.

**United States District Court, Southern District of New York,** *In re: Amla Litigation*, Case No. 1:16-cv-06593-JSR, on behalf of Levi & Korsinsky LLP, Declaration submitted on March 5, 2018.

**United States District Court, Eastern District of Michigan,** *Toby Schechner, Barbara Barnes, Laura Bliss, Kathleen Jordan, Kathryn Limpede, Louise Miljenovic, Candace Oliarny, Beverly Simmons, Richard Thome And Mary Ellen Thome, V. Whirlpool Corporation,* Case No. 16-cv-12409-SJM, on behalf of Robbins Geller Rudman & Dowd, LLP, Declaration submitted February 12, 2018; Deposition on May 15, 2018; Reply Declaration submitted May 17, 2018.

**United States District Court, Southern District of California,** *Jose Conde, et al., v. Sensa, et al.*, Case No. 14-cv-51 JLS (WVG), on behalf of Bursor & Fisher, P.A., Declaration submitted February 6, 2018.

**United States District Court, Northern District Of Illinois, Eastern Division,** *Angel Bakov, Julie Herrera, and Kinaya Hewlett, individually and on behalf of all others similarly situated, v.Consolidated World Travel, Inc. d/b/a Holiday Cruise Line, a Florida corporation,* Case No. 15-cv-02980-HDL SEC, on behalf of Bursor & Fisher, P.A., Declaration submitted February 6, 2017; Deposition on April 25, 2018.

**United States District Court, Northern District of Illinois,** *Jennifer Beardsall, Daniel Brown, Jennifer Carlsson, Deborah Cartnick, Amy Connor-Slaybaugh, Phyllis Czapski, Raelee Dallacqua, Autumn Dean, Skye Doucette, Christopher Draus, Gerald Gordon, Alexandra Groffsky, Emma Groffsky, Joyce Ivy, La Tanya James, Michelle Jessop, Joy Judge, Kathy Mellody, Susan Nazari, Megan Norsworthy, Deborah Ostrander, Martina Osley, Dana Phillips, Thomas Ramon, Jr., Nancy Reeves, Matthew Robertson, Shelley Waitzman, Jamilla Wang, and Amber Wimberly, Individually and on Behalf of All Others Similarly Situated, v. CVS Pharmacy, Inc., Target Corporation, Walgreen Co., Wal-Mart Stores, Inc., and Fruit of the Earth, Inc.*, Case No. 1:16-cv-06103, on behalf of Greg Coleman Law, Declaration submitted December 22, 2017; Reply Declaration on May 4, 2018.

**United States District Court, Southern District of New York,** *Jaish Markos, individually and on behalf of all others similarly situated, v. Russell Brands, LLC*, Case No. 16-CV-04362(CS), on behalf of The Sultzer Law Group, Declaration submitted on December 1, 2017, Deposition on January 4, 2018.

**United States District Court, Northern District of California,** *Siera Strumlauf, Benjamin Robles, and Brittany Crittenden, individually and on behalf of all others similarly situated, v. Starbucks Corporation,* Case No. 16-CV-01306-YGR, on behalf of Bursor & Fisher, P.A., Declaration submitted on October 31, 2017, Deposition on December 13, 2017.



**United States District Court, Southern District of California,** *Sheila Dashnaw, William Meier, and Sherryl Jones, individually, and on behalf of all others similarly situated, v. New Balance Athletics, Inc., a corporation; and DOES 1 through 50, inclusive,* Case No. 3:17-cv-00159-L-JLB, on Behalf of The Wand Law Firm, Declaration submitted on September 8, 2017; Deposition on October 5, 2017; Rebuttal Declaration submitted December 11, 2017.

**United States District Court, Central District of California,** *Veronica Brenner, on behalf of herself and all others similarly situated, v. Procter & Gamble Co.*, Case No. 8:16-1093-JLS-JCG, on behalf of Bursor & Fisher, P.A., Declaration submitted September 5, 2017; Deposition on October 10, 2016.

**United States District Court, Eastern District of California,** *Joann Martinelli, individually and on behalf of all others similarly situated, v. Johnson & Johnson And McNeil Nutritionals, LLC*, Case No. 2:15-cv-01733-MCE-DB, on behalf of Bursor & Fisher, P.A., Declaration submitted August 28, 2017, Deposition on December 20, 2017; Reply Declaration submitted on January 5, 2018.

**United States District Court, Northern District of California, San Francisco Division,** *Martin Schneider, Sarah Deigert, Laurie Reese, Theresa Gamage, Tiffanie Zangwill, and Nadia Parikka, Individually and on Behalf of All Others Similarly Situated, v. Chipotle Mexican Grill, Inc.*, Case No. 3:16-cv-02200-HSG, on behalf of Kaplan Fox & Kilsheimer LLP, Declaration submitted August 11, 2017; Deposition on September 22, 2017.

**United States District Court, Southern District of Ohio,** *Tom Kondash, on behalf of himself and all others similarly situated, v. Kia Motors America, Inc., and Kia Motors Corporation*, Case No. 1:15-cv-00506-SJD, on behalf of Gibbs Law Group, LLP, Declaration submitted July 10, 2017, Deposition on November 29, 2017.

**United States District Court, Northern District of Illinois, Eastern Division,** *Ryan Porter and Haarin Kwon, individually and on behalf of all others similarly situated, v. NBTY, Inc., United States Nutrition Inc., Healthwatchers (DE), Inc., and MET-RX Nutrition, Inc.*, Case No. 15-cv-11459, on behalf of Bursor & Fisher, P.A., Settlement Declaration submitted June 22, 2017.

**United States District Court, Northern District of California,** *Sandra McMillion, Jessica Adekoya And Ignacio Perez, on Behalf of Themselves and all Others Similarly Situated, v. Rash Curtis & Associates*, Case No. 16-cv-03396-YGR, on behalf of Bursor & Fisher, P.A., Declaration submitted May 30, 2017, Declaration submitted August 25, 2017, Declaration submitted on October 16, 2017.

**United States District Court, Northern District of California,** *Vincent D. Mullins, et al., v. Premier Nutrition Corporation,* Case No. 13-cv-01271-RS, on behalf of Blood, Hurst, & O'Reardon, LLP, Reply Declaration submitted May 19, 2017; Deposition on July 20, 2017.



**United States District Court, Southern District of California,** *Preston Jones and Shirin Delalat, on behalf of themselves, all others similarly situated, and the general public, v. Nutiva Inc.*, Case No. 16-cv-00711 HSG, on behalf of Law Offices of Jack Fitzgerald, PC, Declaration submitted May 9, 2016; Deposition on August 23, 2017; Reply Declaration submitted January 12, 2018; Reply Declaration submitted March 2, 2018.

**United States District Court, Central District of California, Southern Division,** *Billy Glenn, Kathy Warburton, Kim Fama, and Corinne Kane, on behalf of themselves and all others similarly situated, v. Hyundai Motor America And Hyundai Motor Company*, Case No. 15-cv-02052-DOC-KES, on behalf of Gibbs Law Group, LLP, Declaration submitted May 1, 2017; Deposition on July 27, 2017; Reply Declaration submitted on October 2, 2017; Reply Declaration submitted on October 6, 2017; Declaration submitted on March 23, 2018.

**United States District Court, Southern District of California,** *Sherry Hunter, on behalf of herself, all others similarly situated, and the general public, v. Nature's Way Products, LLC, and Schwabe North America, Inc.,* Case No. 3:16-cv-00532-WQH-BLM, on behalf of Law offices of Jack Fitzgerald, PC, Declaration submitted March 24, 2017; Reply Declaration submitted May 26, 2017; Reply Declaration submitted on July 11, 2017.

**United States District Court, Southern District Of New York,** *Joanne Hart, and Sandra Bueno, on behalf of themselves and all others similarly situated, v. BHH, LLC d/b/a Bell + Howell and Van Hauser LLC*, Case No. 1:15-cv-04804-WHP, on behalf of Bursor & Fisher, P.A., Declaration submitted March 16, 2017; Deposition on January 10, 2018; Supplemental Declaration submitted January 30, 2018; Declaration submitted on March 2, 2018; Supplemental Declaration submitted on March 30, 2018.

**United States District Court, Eastern District Of New York, Brooklyn Division,** *Reply All Corp., v. Gimlet Media, Inc.,* Case No. 15-cv-04950-WFK-PK, on behalf of Wolf, Greenfield & Sacks, P.C., Declaration submitted March 15, 2017; Deposition on April 26, 2017.

**United States District Court, Northern District of California,** *James P. Brickman, individually and as a representative of all others similarly situated, v. Fitbit, Inc.*, Case No. 3:15-cv-02077-JD, on behalf of Dworken & Bernstein LPA, Declaration submitted February 28, 2017; Deposition on March 8, 2017.

**United States District Court, Northern District of California,** *Jamie Pettit, an individual, on behalf of herself, the general public and those similarly situated, v. Procter & Gamble Company; and Does 1 Through 50*, Case No. 15-cv-02150-RGS, on behalf of Gutride Safier LLP, Declaration submitted February 14, 2017; Deposition on March 3, 2017; Reply Declaration submitted May 11, 2017.

6



**United States District Court, Southern District of New York,** *Alan Gulkis, individually and on behalf of all others similarly situated, Zicam LLC and Matrixx Initiatives, Inc.*, Case No. 7:15-cv-09843-CS, on behalf of Bursor & Fisher, P.A., Declaration submitted on February 8, 2017; Deposition on July 14, 2017.

**United States District Court, Central District of California,** *Elisabeth Martin, on behalf of herself, all others similarly situated, and the general public, v. Monsanto Company*, Case No. 16-02168-JFW (SPx), on behalf of the Law Office of Jack Fitzgerald, PC, Declaration submitted February 6, 2017; Deposition on February 9, 2017; Reply Declaration on February 27, 2017.

**United States District Court, Southern District of New York,** *Walt Famular, on behalf of himself and all others similarly situated, v. Whirlpool Corporation*, Case No. 16-cv-00944, on behalf of Bursor & Fisher, P.A., Declaration submitted February 3, 2017, Deposition on August 15, 2017, Rebuttal Declaration on March 20, 2018.

**United States District Court, Central District of California,** *In re: 5-Hour Energy Marketing and Sales Practices Litigation*, Case No. 2:13-ml-02438 PSG, on behalf of Bursor & Fisher, P.A., Declaration submitted September 26, 2016; Reply Declaration submitted October 14, 2016; Deposition on October 27, 2016; Declaration submitted on December 22, 2016; Rebuttal Declaration submitted on March 15, 2017.

**United States District Court, Southern District of Florida,** *Benjamin Hankinson, James Guerra, Jeanette Gandolfo, Lisa Palmer, Donald Anderson, Catherine Long, and Lisa Prihoda, individually and on behalf of others similarly situated, v. R.T.G. Furniture Corp., d/b/a Rooms to Go, RTG America, LLC, The Jeffrey Seaman 2009 Annuity Trust, RTG Furniture Corp. of Georgia, d/b/a Rooms to Go, Rooms to Go North Carolina Corp., d/b/a Rooms to Go, RTG Furniture of Texas, L.P., d/b/a Rooms to Go, RTG Texas Holdings, Inc., and R.T.G. Furniture Corp. of Texas*, Case No. 9:15-cv-81139-COHN/SELTZER, on behalf of Cohen Milstein, Declaration submitted September 1, 2016; Declaration submitted October 3, 2016; Deposition on November 4, 2016; Declaration submitted on January 5, 2017.

**Circuit Court Of Cook County, Illinois County Department, Chancery Division,** *Amy Joseph, individually and on behalf of all others similarly situated, Benjamin Perez, individually and on behalf of all others similarly situated, Intervening Plaintiff, v. Monster Inc., a Delaware Corporation, and Best Buy Co., Inc., a Minnesota Corporation*, Case No. 2015 CH 13991, on behalf of Interveners, Declaration submitted August 8, 2016; Supplemental Declaration submitted January 22, 2018.

**United States District Court, Central District of California, Eastern Division,** *Jeff Looper, Michael Bright, Scott Johnson, individuals on behalf of themselves and all others similarly situated, v. FCA US LLC, f/k/a Chrysler Group LLC, a Delaware limited liability company, and DOES 1-100 inclusive*, Case No. 14-cv-00700-VAP-DTB, on behalf of Gibbs Law Group, LLP; Declaration submitted August 7, 2016; Deposition on September 29, 2016.



**United States District Court, Eastern District of California,** *Chad Herron, individually, on behalf of himself and all others similarly situation, v. Best Buy Stores, LP, a Virginia limited partnership*, Case No. 12-cv-02103-TLN-CKD, on behalf of Stonebarger Law, A Professional Corporation; Declaration submitted June 24, 2016; Deposition on July 29, 2016; Supplemental Declaration submitted September 8, 2016.

**United States District Court for the Southern District of Florida,** *Angela Sanchez-Knutson v. Ford Motor Company*, Case No. 14:61344-CIV DIMITROULEAS, on behalf of Kelley Uustal Trial Attorneys; Deposition on June 1, 2016.

**United States District Court, Central District of California,** *Jacqueline Dean, on behalf of herself and all others similarly situated, v. Colgate-Palmolive Co.*, Case No. 5:15-cv-00107, on behalf of Bursor & Fisher, P.A.; Declaration submitted April 29, 2016; Deposition on July 13, 2016; Reply Declaration submitted on May 2, 2017; Declaration submitted on October 2, 2016; Reply Declaration submitted on December 14, 2017.

**United States District Court, District of New Jersey,** *In re: AZEK Decking Marketing & Sales Practices Litigation*, Case No. 12-cv-06627-MCA-MAH, on behalf of Seeger Weiss, LLP; Declaration submitted February 26, 2016; Declaration submitted May 16, 2016; Deposition on July 6, 2016; Reply Declaration submitted August 29, 2016.

**United States District Court. Northern District of California,** *In re: Nest Labs Litigation*, Case No. 5:14-cv-01363-BLF, on behalf of Bursor & Fisher, P.A.; Declaration submitted on January 22, 2016; Deposition on March 2, 2016; Reply Declaration submitted on June 3, 2016.

**United States District Court, Northern District of California,** *Rohini Kumar, an individual, on behalf of herself, the general public and those similarly situated, v. Salov North America Corp.; And Italfoods, Inc.*, Case No. 4:14-cv-02411-YGR, on behalf of Gutride Safier LLP; Declaration submitted on January 19, 2016; Deposition on February 24, 2016; Reply Declaration submitted on May 10, 2016; Declaration submitted on April 11, 2017, Declaration submitted on May 16, 2017.

**United States District Court, Northern District of Ohio, Eastern Division,** *Christopher Meta, On Behalf Of Himself And All Others Similarly Situated v. Target Corporation, et al.*, Case No. 4:14-0832-DCN, on behalf of Tycko & Zavareei, LLP, Declaration submitted January 6, 2016; Deposition on March 15, 2016; Reply Declaration submitted on March 18, 2016.

**United States District Court, District of New Jersey,** *Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, Jennifer Schramm, and Aspasia Christy on behalf of themselves and all others similarly situated, v. Whirlpool Corporation, Lowe's Home Center, Sears Holdings Corporation, The Home Depot, Inc., Fry's Electronics, Inc., And Appliance Recycling Centers Of America, Inc.,* Case No. 12-cv-0089-KM-JBC, on behalf of Bursor & Fisher, P.A., Declaration submitted December 28, 2015; Deposition on April 22, 2016; Rebuttal Declaration submitted June 10, 2016.



**United States District Court, District of New Jersey,** *In re: Tropicana Orange Juice Marketing and Sales Practices Litigation,* Case No. 12-cv-7382-WJM-JBC, on behalf of Carella, Byrne, Cecchi, Olstein, Brody & Agnello, PC.; Declaration submitted on November 6, 2015; Deposition on January 28, 2016.

**United States District Court, Northern District of California**, *Scott Koller, an individual, on behalf of himself, the general public and those similarly situated v. Deoleo USA, Inc. and Med Foods, Inc.*, Case No. 3:14-cv-02400-RS, on behalf of Gutride Safier LLP; Declaration submitted on October 29, 2015; Deposition on December 21, 2015; Reply Declaration submitted on April 3, 2017.

**United States District Court, Eastern District Of New York,** *Patrick Hughes and Nafisé Nina Hodjat, individually and on behalf of others similarly situated, v. The Ester C Company; NBTY, Inc.; and Naturesmart, LLC*, Case No. 12-cv-00041-JFB-ETB, on behalf of Reese LLP and WhatleyKallas LLP; Declaration submitted October 22, 2015; Deposition on December 1, 2015; Reply Declaration submitted on January 28, 2016; Surrebuttal Declaration submitted on April 20, 2016; oral testimony and cross examination on September 20, 2016.

**United States District Court, District Of Connecticut,** *Glen Grayson, and Doreen Mazzanti, individually and on behalf of themselves and all others similarly situated, v. General Electric Company*, Case No. 3:13-cv-01799-WWE, on behalf of Izard Nobel LLP; Declaration submitted October 15, 2015; Deposition on November 17, 2015; Rebuttal Declaration submitted March 23, 2016.

**United States District Court, District of New Jersey,** *Lynne Avram, on behalf of herself and all others similarly situated, v. Samsung Electronics America Inc., and Lowe's Home Centers, Inc.*, Case No. 11-cv-6973-KM-MCA, on behalf of Faruqi & Faruqi LLP; Declaration filed July 15, 2015; Deposition September 29, 2015.

**United States District Court, District of Connecticut,** *Heidi Langan, on behalf of herself and all others similarly situated, v. Johnson & Johnson Consumer Companies, Inc.*, Case No. 3:13-cv-01471-RNC, on behalf of Izard Nobel LLP; Declaration filed June 23, 2015; Deposition on July 21, 2015; Reply Declaration filed October 15, 2015.

**United States District Court, Eastern District of California,** *Yesenia Melgar, on behalf of herself and all others similarly situated, v. Zicam LLC, and Matrixx Initiatives, Inc.*, Case No. 2:14-cv-00160-MCE-AC, on behalf of Bursor & Fisher, PA; Declaration filed June 8, 2015.

**United States District Court, Central District of California, Eastern Division-Riverside** *Michael J. Otto, individually, and on behalf of other members of the general public similarly situated, v. Abbott Laboratories, Inc.*, Case No. 12-01411-SVW(DTBx), on behalf of Baron & Budd; Declaration filed May 25, 2015; Deposition on June 2, 2015; Supplemental Declaration filed July 6, 2015.



**United States District Court, Central District of California,** *Russell Minoru Ono, individually and on behalf of others similarly situated, v. Head Racquet Sports USA, a corp. and Head USA Inc.*, Case No. 13-04222-FMO, on behalf of Baron & Budd; Declaration filed April 24, 2015, Deposition on June 30, 2015; Reply Declaration filed July 2, 2015.

**United States District Court, Southern District of Florida,** *Vanessa Lombardo, on behalf of herself and all others similarly situated, v. Johnson & Johnson Consumer Companies and Neutrogena Corporation*, Case No. 13-60536-SCOLA, on behalf of Morgan & Morgan; Declaration filed March  31, 2015.

**United States District Court, Eastern District of New York,** *D. Joseph Kurtz, individually and on behalf all others similarly situated, v. Kimberly-Clark  Corporation and Costco Corporation*, Case No. 14-01142-JBW, on behalf of Robbins Geller Rudman & Dowd LLP; Declaration filed February 27, 2015; Rebuttal Declaration filed March 27, 2015.

**United States District Court, Eastern District of New York,** *Anthony Belfiore, on behalf  of himself and all others similarly situated, v. Procter & Gamble*, Case No. 14-04090-JBR, on behalf of  Wolf Popper LLP;  Declaration filed February 27, 2015;  Rebuttal Declaration filed April 30, 2015.

**United States District Court, Northern District of California,** *Patrick Hendricks, individually and on behalf of all others similarly situated, v. StarKist Co.*, Case No. 13-0729-YGR, on behalf of Bursor & Fisher, PA; Declaration filed January 20, 2015; Deposition on February 10, 2015; Reply Declaration filed April 7, 2015.

**United States District Court, Northern District of California, San Francisco Division,** *Scott Miller and Steve Leyton, individually and on behalf  themselves, the general public and those similarly situated v. Ghirardelli Chocolate Company*, Case No. 12-04936-LB, on behalf of Gutride Safier LLP, Declaration filed January 8, 2015; Reply Declaration filed February 5, 2015.

**United States Bankruptcy Court, Eastern District of New York,** *In re: Kangadis Food Inc., d/b/a The Gourmet Factory, Debtor*, Case No. 14-72649-REG, on behalf of Bursor & Fisher, PA; Declaration filed August 5th, 2014; Oral testimony on November 24, 2014.

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchum Jenkins, individually and on behalf of all others similarly situated v. Kangadis Family Management LLC, Aristidia Kangadis a/k/a "Mr. Aris," Andromahi Kangadis a/k/a "Mrs. Mahi," and Themis Kangadis*, Case No. 14-cv-1324-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 5, 2014; Deposition on October 9, 2014.

**United States District Court, Northern District of California, San Francisco Division,** *Erin Allen, on behalf of herself and all others similarly situated, v. Con Agra Foods, Inc.*, Case No. 13-cv-01279-VC,  on behalf of Hagens Berman Sobol Shapiro LLP and The Eureka Law Firm; Declaration filed August 11, 2014; Deposition on September 30, 2014.



**United States District Court, Eastern District of California,** *Kyle Dei Rossi and Mark Linthicum, on behalf of themselves and those similarly situated, v. Whirlpool Corporation*, Case No. 12-cv-00125-TLN-CKD, on behalf of Bursor & Fisher, P.A.; Declaration filed July 31, 2014, Deposition on August 20, 2014.

**United States District Court, Northern District of Illinois, Eastern Division,** *In re: Southwest Airlines Voucher Litigation.*, Case No. 11-cv-8176, Hon. Matthew Kennelly, on behalf of Siprut PC; Declaration filed June 4, 2014; Oral testimony and cross examination on June 16, 2014.

**United States District Court, Central District of California, Western Division,** *In re: ConAgra Foods, Inc.*, Case No. 11-cv-05379-MMM, MDL No. 2291, on behalf of Milberg LLP and Grant & Eisenhofer, P.A.; Declaration filed May 5, 2014; Deposition on May 23, 2014; Declaration filed June 30, 2014; Declaration filed September 8, 2014; Deposition on September 16, 2014, Declaration filed October 27, 2014.

**United States District Court, Southern District of New York,** *In re: Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB, on behalf of Bursor & Fisher, PA; Declaration filed March 31, 2014; Deposition on May 21, 2014; Declaration filed on January 8, 2016; Deposition on February 10, 2016; Reply Declaration submitted June 30, 2016; Declaration submitted September 1, 2016; Declaration submitted on October 20, 2016.

**United States District Court, Central District of California,** *Julie Fagan, Michael Fagan, Melissa Pennalatore, Amy Sapeika and Shelley Trinchero, individually and on behalf of all others similarly situated v. Neutrogena Corporation*, Case No. 13-cv-01316-SVW, on behalf of Izard Nobel LLP; Declaration filed March 21, 2014; Deposition on April 3, 2014; Supplemental Declaration filed August 4, 2014; Deposition on August 13, 2014; Declaration filed September 9, 2014.

**United States District Court, Central District of California,** *Enzo Forcellati and Lisa Roemmich, individually and on behalf of all others similarly situated v. Hyland's Inc., Standard Homeopathic Laboratories, Inc. and Standard Homeopathic Company*, Case No. 12-cv-01983-GHK, on behalf of Faruqi and Faruqi; Declaration filed December 13, 2013; Deposition on February 27, 2014.

**United States District Court, Southern District of Florida,** *Adam Karhu, on behalf of himself and all others similarly situated, v. Vital Pharmaceuticals, Inc., d/b/a VPX Sports*, Case No. 13-cv-60768-JIC, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed December 13, 2013; Declaration filed January 6, 2014; Declaration filed March 31, 2014.

**Trial Court of Massachusetts, District of Edgartown,** *Schepici v. JetBlue Airways Corp.,* on behalf of plaintiff; Mediation on December 4, 2013.

**Superior Court of California, County of Alameda,** *In re: Cellphone Termination Fee Cases, Ramzy Ayyad, et al, v. Sprint Spectrum, L.P.,* JCCP No. 4332, Case No. RG03-121510, on behalf of the Executive Committee; Declaration filed September 18, 2013.



**United States District Court, Northern District of California,** *Maria Torres, Gabriel Rojas, and Ian Kerner, individually and on behalf of all others similarly situated v. JC Penney Corporation, Inc.; and JC Penney Company, Inc.,*, Case No. cv-12-01105-RS, on behalf of Bramson, Plutzik, Mahler and Birkhaeuser; Declaration filed September 13, 2013; Deposition on October 2, 2013.

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchum Jenkins, individually and on behalf of all others similarly situated v. Kangadis Foods Inc*, Case No. 13-cv-02311-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 26, 2013; Deposition on October 21, 2013.

**United States District Court, Northern District of California,** *Desiree Moore, on behalf of themselves, the general public, and all those similarly situated, v. Verizon Communications*, Case No. 4:09-cv-01823-SBA, on behalf of David Schachman and Associates PC, Jacobs Kolton Chtd., and Keller Grover, LLP; Declaration filed June 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on March 1, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 20, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 19, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of  Claimant; Oral testimony and cross examination on February 13, 2013.

**American Arbitration Association,**  *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 7, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 4, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on January 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 12, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 10, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on November 28, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on  behalf of Claimant, Declarations filed October 4, 2012 and November 5, 2012; Oral testimony and cross examination on November 27, 2012.



**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declaration filed April 16, 2012; Oral testimony and cross examination on May 11, 2012.

**United States District Court, District of Massachusetts,** *Marcy Cruz v. Justin Kagan, Arthur Hegarty, Ronald Teachman, and the City of New Bedford*, Case No. 1:09-cv-11793-RGS, on behalf of Marcy Cruz, Expert Report filed February 28, 2011; Oral testimony and cross examination on December 1, 2011.

**United States District Court, Southern District of New York,** *Bursor & Fisher P.A., v. Federal Communications Commission*, Case No. 1:11-cv-05457-LAK, on behalf of Bursor & Fisher P.A., Declaration filed August 17, 2011.

**United States District Court, District of New Jersey,** *In Re: Sprint Premium Data Plan Marketing and Sales Practices Litigation,* Master Case No. 10-6334 (SDW) MDL No. 2228, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed August 11, 2011.

**United States District Court, Northern District of California,** *Patrick Hendricks, on behalf of himself and all others similarly situated, v. AT&T Mobility LLC,* Case No. C11-00409, on behalf of Bursor & Fisher, P.A., Declaration filed August 7, 2011.

**Federal Communications Commission,** *In the Matter of Applications of AT&T Inc. & Deutsche Telekom AG for Consent to Assign or Transfer Control of Licenses and Authorizations*, WT Docket No. 11-65, on behalf of Butch Watson, Declaration filed June 20, 2011.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. O1 Communication, Inc. (U 6065 C), Defendant*, Case No. C.08-03-001, on behalf of the O1 Communications, Inc., Reply Testimony filed November 6, 2009; Oral testimony and cross examination on November 16, 2009.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Oral testimony and cross examination on November 9, 2009.

**United States District Court, District of New Jersey,** *Judy Larson, Barry Hall, Joe Milliron, Tessie Robb, and Willie Davis, individually and on behalf of all others similarly situated, v. AT&T Mobility LLC f/k/a Cingular Wireless LLC and Sprint Nextel Corporation and Sprint Spectrum L.P. d/b/a Sprint Nextel and Nextel Finance Company, Civ. Act. No. 07-5325 (JLL)*, on behalf of PinilisHalpern, LLP and Law Offices of Scott A. Bursor, Declaration filed *under seal* October 19, 2009.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. Pac-West Telecomm, Inc. (U 5266 C), Defendant*, Case No. C.08-09-017, on behalf of the Pac-West Telecomm, Inc., Rebuttal Testimony filed May 1, 2009.



**Illinois Commerce Commission,** Illinois Bell Telephone Company Annual Rate Filing for Non-Competitive Services Under an Alternative Form of Regulation, Ill. C. C. Docket No. 08-0249, on behalf of the People of the State of Illinois, Declaration filed May 2, 2008.

**Federal Communications Commission,** Qwest Petition for Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of AT&T Inc, For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of BellSouth Corporation For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of the Embarq Local Operating Companies for Forbearance Under 47 U.S.C. §160(c) From Application of *Computer Inquiry* and certain Title II Common Carriage Requirements; WC Docket Nos. 06-125 and 06-147, on behalf of the AdHoc Telecommunications Users Committee, Declaration filed October 9, 2007.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Declaration filed January 5, 2007; Deposition on November 13, 2007; Oral testimony and cross-examination on December 19, 2007; Oral testimony on January 9, 2008.

Mr. Weir has served as a consultative expert in numerous proceedings that did not result in testimony, and has contributed research and analysis to numerous additional publications and testimony at the state, federal, and international levels.



# Exhibit 2

# Documents Reviewed

- Second Amended Class Action Complaint, February 5, 2018

- Expert Report of Steven P. Gaskin, March 9, 2018

- Report of Krista F. Holt, March 9, 2018

- Rebuttal Report of Krista F. Holt, April 9, 2018

- Deposition of Krist F. Holt, April 16, 2018.

- Sawtooth Software technical papers, available online at

http://www.sawtoothsoftware.com/support/technical-papers

- *When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013)

http://www.analysisgroup.com/forums/winter-2013/when-all-natural-may-not-be/

- Applying Conjoint Analysis to Legal Disputes: A Case Study, Wind, Yoram, et al.

- Khoday v. Symantec Corp., No. 11-180 (JRT/TNL), (2014 WL 1281600, at *10 (D. Minn. March 13, 2014)

- Sanchez-Knutson v. Ford Motor Company, 310 F.R.D. 529, 538-39 (S.D. Fl. 2015)

- In re: Lenovo Adware Litigation, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016)

- Brown v. Hain Celestial Group, Inc., 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014)

- Microsoft v. Motorola, Inc., 904 F.Supp.2d 1109, 1119-20 (W.D. Wa. 2012)

- In re Scotts EZ Seed Litig., 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015)

- *Getting Started with Conjoint*, Brian Orme, 2014

- 1042_EDW_Sales_Transaction_Data (Confidential)

- ARRIS0000096

- ARRIS0001488_CONFIDENTIAL

- Best Buy Co., Inc., 2016 10-K Annual Report

- Amazon.com, Inc., 2017 10-K Annual Report

- Wal-mart Stores, Inc., 2016 10-K Annual Report

- sec.gov

- arris.com

- bestbuy.com

- amazon.com

- walmart.com

ATTACHMENT ONE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

TO BE FILED UNDER SEAL SUBJECT TO PROTECTIVE ORDER

----------------------------x

In Re ARRIS Cable Modem        )

Consumer Litigation            )   Case Number:

This Document Relates To:      )   17-cv-1834-LHK

All Actions                    )

----------------------------x

Deposition of Krista F. Holt

Washington, D.C.

Monday, April 16, 2018

10:30 a.m.

Reported by:

Laurie Donovan, RPR, CRR, CSR

Job No. 21323

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 16

```
1    that the modem has a serious defect that causes

2    high spikes and network latency, resulting in poor

3    internet performance for customers?

4         A    Is that written in the complaint?  Is

5    that what you --

6         Q    I'm asking whether you would agree that

7    plaintiffs have alleged that in this case.

8         A    Yeah, I mean that's what this says in

9    paragraph 2.

10        Q    Let me ask you generally:  Can the

11   disclosure of a defect in a consumer product that

12   is sold at retail ever have any influence on the

13   market price of that product?

14        A    What do you mean by "product defect"?

15        Q    Well, how would you define a product

16   defect?

17        A    I don't know.

18             MS. STAGG:  Objection.  Calls for a

19        legal conclusion.

20             THE WITNESS:  I mean I don't know

21        what the official definition would be for a

22        product defect.

23   BY MR. SCHUBERT:

24        Q    Well, let's just consider it in layman's

25   terms as a problem with a product that occurs in
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 17

 1    normal use of the product.

 2              Would you agree with that general

 3    description?

 4         A    So you're positing a problem that occurs

 5    in normal use with a product as the definition for

 6    a product defect, and now you go back to your

 7    question, which is would a product -- the

 8    announcement of a product defect, which would be a

 9    problem in using a product in normal use, would

10    that cause the price of a product to go down.  I

11    mean it would depend on the product, and I think

12    it would depend on the defect, you know.

13         Q    So you would agree that there are some

14    situations where a defect in a consumer product

15    sold at retail would have influence on the market

16    price of that product?

17         A    I think that there -- I think it's

18    possible.  You know, given a particular defect and

19    a particular market, that could be true.

20         Q    Can you think of any examples where it

21    would be true?

22         A    What comes to mind is Firestone had an

23    issue where its tires were blowing up, and I don't

24    know that it caused a decrease in the price at

25    all, but I would think if something were

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 18

1    significant enough and were well-known enough,

2    that it could cause that.  I'm not familiar with

3    it -- I'm not familiar with data that would show

4    that.  I just could see how that potentially could

5    occur.

6         Q    The Firestone example that you

7    mentioned, is that a case that you worked on?

8         A    No.

9         Q    So in that situation where you have

10   Firestone tires that are blowing up, it would

11   likely cause an impact on the market price of the

12   product when Firestone disclosed that its tires

13   were blowing up?

14        A    Yeah, so I don't know if it caused an

15   effect on the price or not.  I just would have no

16   idea.  I haven't seen any data about that.  I

17   would have no idea whether it did or not.

18        Q    Can you think of any other examples?

19        A    Not as I sit here, I can't.

20        Q    Well, let me give you a hypothetical

21   example then.

22             Let's consider a consumer laptop, and

23   the laptop is advertised by the manufacturer as

24   having ten hours of battery life, and let's assume

25   that in actuality it only gets one hour of battery

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 21

1          customer could get the exact same product for

2          less, I think a customer would be inclined to

3          do that.

4     BY MR. SCHUBERT:

5          Q    So that's what I'm asking.

6               You would agree that if a customer was

7     looking at an identical product, and one costs

8     $100 and the identical product costs $50, that

9     customer would be better off paying $50; is that

10    right?

11         A    Yes.  I think that customers would

12    generally prefer to pay a lower price for the

13    exact same product.

14         Q    Are there any methods that can be used

15    to determine class-wide damages for a consumer

16    product sold at retail?

17         A    Are there any methods that can be used

18    to determine class-wide prices?  I assume you mean

19    retail prices; is that correct?

20         Q    Well, I'm talking about class-wide

21    damages.  So imagine any case where the maker of

22    the product makes a representation about the

23    product.  It turns out the representation is

24    false.  Is there any method to measure what the

25    damages for the class would be for that product?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 23

```
 1    this one is getting one hour, then that would be
 2    different than if other laptops are getting ten
 3    hours and this one is getting one hour.
 4           So can you answer that for me, how it
 5    works with the comparable products that one could
 6    buy?
 7      Q    Well, I'm just asking you what are the
 8    potential methods for calculating damages
 9    generally.
10      A    But if you could be more specific about
11    exactly what the scenario is, then I could give
12    you methods that you could calculate it.
13      Q    So as I said before, the scenario is --
14    it's very simple.  There's a laptop that's
15    advertised as having ten hours' battery life.  It
16    turns out that's false, and it only gets one hour
17    battery life.
18           So what additional information would you
19    need?
20      A    I would need to know what other laptops
21    that are comparable have in terms of battery life.
22    So do they have one hour or do they have ten
23    hours?
24      Q    Once you knew that information, how
25    would you decide what potential methods could be
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 24

1    used to calculate class-wide damages?

2          A    So what you would be wanting to look at

3    is what their next best alternative would be.

4          Q    And is the next best alternative, is

5    that a model that's commonly used in litigation to

6    calculate damages?

7          A    Well, no, but you would have to

8    understand what a person could have bought instead

9    and whether that would have given them the same

10   thing or not.

11         Q    Okay.

12         A    So if all of the laptops are at ten

13   hours and this one is at one, right, then they

14   would have lost nine hours of battery life from

15   what they could have purchased.  If all of the

16   laptops are at one hour, well, now they couldn't

17   have bought another laptop that's going to give

18   them more than an hour.

19         Q    So for this hypothetical, let's assume

20   that it's the former, and all of the laptops

21   advertise ten hours' battery life, but this

22   particular one has a defect that only allows it to

23   get one hour of battery life.  So as you said

24   before, the consumer has lost nine hours.

25              How would you calculate or what method

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 43

1                    (Whereupon, a short recess was

2                    taken.)

3     BY MR. SCHUBERT:

4          Q     Have you empirically determined the

5     change in market value of the SB6190 cable modems

6     in this case that would occur as a result of Arris

7     disclosing the alleged latency defect to its

8     customers?

9          A     Can you repeat that again.

10         Q     Have you empirically determined the

11    change in market value of the SB6190 cable modems

12    in this case that would occur as a result of Arris

13    disclosing the alleged latency defect to its

14    customers?

15         A     I have not made that calculation.

16         Q     So you would not have any independent

17    information as to what the diminution in value

18    would be if Arris had disclosed the defect; is

19    that correct?

20         A     I mean if you're talking about the

21    releases, right, if you're talking about the

22    releases they put out that had the improvements in

23    it.  Is that what you're referring to?

24         Q     No.  What I'm asking is:  Do you have

25    any independent information as to what the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 44

1    diminution value or the reduction in price would

2    be if Arris had disclosed the alleged defects?

3    Did you determine that?

4         A    I have not calculated that.

5         Q    Do you plan to calculate it in the

6    future?

7         A    If I am asked to.

8         Q    And have you been asked to?

9         A    No, I have not been asked to.

10        Q    So you did not conduct a conjoint

11   analysis in this case; is that correct?

12        A    I did not conduct a conjoint analysis in

13   this case.

14        Q    Do you plan to conduct a conjoint

15   analysis in this case?

16        A    If I am asked to.

17        Q    And you haven't been asked as of this

18   point; is that correct?

19        A    I have not been asked.

20        Q    Did you conduct a contingent valuation

21   survey in this case?

22        A    I did not conduct a contingent valuation

23   survey in this case.

24        Q    Do you plan to conduct a contingent

25   valuation survey in this case?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 45

1        A    If I'm asked.

2        Q    And you haven't been asked?

3        A    I have not been asked.

4        Q    Did you conduct a regression analysis in

5    this case?

6        A    I have not conducted a regression

7    analysis in this case.

8        Q    Do you plan to conduct one in the

9    future?

10       A    If I am asked.

11       Q    And you haven't been asked; is that

12   correct?

13       A    I have not been asked.

14       Q    Have you performed any analysis that

15   would allow you to determine how many fewer SB6190

16   modems Arris would have sold if they had disclosed

17   the alleged defects?

18       A    Have I done what now?  Go ahead.

19                  (Whereupon, reporter reads

20                  requested material.)

21                  THE WITNESS:  I have not.

22   BY MR. SCHUBERT:

23       Q    Do you plan to do so in the future?

24       A    If I'm asked to.

25       Q    And have you been asked?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 46

1        A    I have not been asked.

2        Q    If you are asked to determine the

3    diminution in market value attributable to the

4    latency defect that plaintiffs allege with the

5    SB6190, how would you do it?

6                 MS. STAGG:  Objection.  Outside the

7           scope of her designation.  Incomplete

8           hypothetical.  Lacks foundation.

9                 THE WITNESS:  I have not been asked

10          to do that.  I have been asked to rebut

11          Mr. Gaskin's survey.

12    BY MR. SCHUBERT:

13       Q    I'm asking you:  If you were asked do

14    that, how would you do it?

15       A    I don't know.  I'd have to look at it.

16    That's not something I've looked at.  I would have

17    to look at it.

18       Q    Do you feel that you would be qualified

19    to determine the diminution in market value

20    attributable to the alleged latency defect with

21    the SB6190?

22       A    Yes.

23       Q    And what is that based on?

24       A    It's based on I've been in surveys since

25    1989.  I have conducted surveys both

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 47

1    professionally for business outside of litigation

2    and also within litigation.  I have conducted a

3    conjoint survey.  I have rebutted conjoint

4    surveys.  I have testified as a survey expert.  I

5    have worked on surveys and other marketing issues

6    since 1989, so it's a long period of experience.

7         Q    You mentioned that you've conducted a

8    conjoint survey.  Well, how many times have you

9    designed a conjoint survey?

10        A    One time that I've designed it.

11        Q    And was that time in litigation?

12        A    It was a plaintiff that did not move

13   forward.

14        Q    So you were working for the plaintiff?

15        A    Yes.

16        Q    Was it a class action?

17        A    No.

18        Q    What was the case about?

19        A    It was consumer products.

20        Q    What was the product?

21        A    I can't say.  It was consumer

22   electronics.

23        Q    Did you write a report?

24        A    No.

25        Q    Did you testify in a deposition in that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 54

1   economic harm than a customer who cares less about

2   that product defect?

3       A    I think that a customer who is affected

4   more by a product defect could incur more economic

5   harm than one who is affected less.

6       Q    Why?

7       A    Let's say that I have a phone and

8   there's a certain part of the phone I don't use,

9   and it has a defect in it, depending on how I use

10  my phone.  If I don't use that, then I wouldn't

11  know or care if it had a defect in that area,

12  because I don't use it.  So it doesn't affect my

13  daily usage of the product.  For me it works

14  perfectly, because I don't use that.

15      Q    So would you say that it is appropriate

16  to measure damages in this case by calculating how

17  much value each customer independently places on

18  the presence or absence of the alleged latency

19  defects with the SB6190?

20      A    Can you repeat that.

21              (Whereupon, reporter reads

22              requested material.)

23              THE WITNESS:  So if what you're

24      saying is should damages be calculated, is a

25      way to calculate the damages to put a value

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 55

1        on how much each person is affected by it?

2        Is that what you're saying?

3    BY MR. SCHUBERT:

4        Q    That's right.

5        A    So that is one way that you could try to

6    put damages on it.

7        Q    In your opinion, would it be an

8    appropriate way?

9        A    I think it depends.

10       Q    What does it depend on?

11       A    How you go about doing that.

12       Q    Well, is there an appropriate way to go

13   about doing that?

14       A    As I sit here, I'm not aware of one,

15   but -- just as I sit here, I'm not aware of one.

16       Q    Have you spoken with any purchasers of

17   the SB6190 in the preparation of your report?

18       A    I have not spoken with purchasers of the

19   6190 in preparation of my report.

20       Q    And in your view, how is network latency

21   generally perceived by consumers?

22       A    What do you mean by "latency"?

23       Q    I'm talking about the network latency

24   that's generally alleged in this case, delays in

25   sending data over a network.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 87

1    SB6190 cable modem with a large retail store?

2         A    I would think that a consumer could go

3    to a different store to get a different price, but

4    that within a large retailer, a big box retailer,

5    I would think that they would typically, other

6    than waiting for sales, not be able to do that.

7         Q    So if a consumer were to go into a Best

8    Buy, for example, they wouldn't be able to

9    negotiate the price of an SB6190 modem; they would

10   simply pay whatever the listed price is at that

11   time, correct?

12        A    I mean they would have to wait for a

13   sale if they wanted to go to that particular --

14   now, a lot of times people go online, and then

15   they pick the one that has the price they want,

16   and that's who they buy it from.

17        Q    But they couldn't negotiate within that

18   one individual retailer?

19        A    No.  A big box store, I think it would

20   be pretty hard.  You need to get a sale if you

21   wanted a lower price, or you go to somebody else.

22        Q    The same would be true with WalMart?

23        A    I would assume so.

24        Q    And would the same be true if they

25   bought online through Amazon.com?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 90

1    features that are important for selling the

2    product, right?  It's limited space, so you got to

3    put on it what's important for selling the

4    product.

5            So once someone determines that that's

6    the modem they want, then they're going to buy

7    that modem.  I don't know that latency comes into

8    it.  That's not an advertised feature, and it's

9    not a -- I don't even know if it's a defined

10   feature.  You know what I mean?  I don't know

11   if -- so I don't quite understand how something is

12   coming into their purchase decision that's not

13   advertised and -- yeah, so I don't know, you know.

14        Q    So in the same hypothetical where a

15   group of consumers go into Best Buy and are

16   looking to buy an SB6190 and everyone in the group

17   buys the SB6190, if the price were $80 instead of

18   $100, then these hypothetical purchasers would pay

19   $80, correct?

20        A    I mean I don't know.  I have price

21   thresholds that I'm willing to pay for something,

22   so I don't -- you know, I assume that the people

23   in the group that want to pay the $80 pay the $80,

24   and the people in the group that don't want to pay

25   the $80, they can buy it elsewhere or they can buy

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 91

1    a different modem.

2         Q    But if they decide to buy this modem at

3    that time, they're going to pay whatever the

4    listed price is, right?

5         A    Yeah, if your question is if people go

6    in a store hypothetically to buy something, would

7    they pay the price that it's at in the store that

8    day, if they're going to buy it that day, and the

9    answer would be yes.   If they determine that

10   they're going to buy it, and the price is

11   acceptable to them, and they don't want to buy it

12   from someone else and they don't want to buy a

13   different modem, then they would buy it based on

14   whatever it's selling at if it were acceptable to

15   them.

16        Q    Are you familiar with the concept of

17   Randomized First Choice analysis?

18        A    Yes.

19        Q    And what is that?

20        A    It's my understanding that it's looking

21   at the first choice that each person has made and

22   doing an analysis based on that.

23        Q    Are you familiar with the concept of

24   hierarchical Bayes regression?

25        A    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 92

1      Q    And what is that?

2      A    So that's the methodology by which you

3  can get your part-worths for your different

4  attributes.

5      Q    Would you agree that the number of

6  SB6190 modems sold during the class period is

7  fixed as a matter of history in this case?

8      A    Is that the 6190 modems, or are you

9  saying the 6190 modems with latency?  Because I

10  understand there are some fixes that came out in

11  February of 2017, so I don't -- I think the number

12  of modems that was sold during a certain period

13  would be fixed.

14          The performance of the modems, according

15  to the plaintiffs -- Mr. Newman has stated that

16  people who got the modem after the February fix,

17  that those would have a different experience, so I

18  know he feels that they would have a different

19  experience with the modem, but the number of

20  modems that were sold would be fixed.  It's

21  just -- I know he feels that there is a different

22  experience going on after the fixes and before.

23      Q    Who sets the retail prices of the SB6190

24  modems; retailers or Arris?

25      A    I don't know.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 93

1        Q    Would you define "market value" in this
2    case as the price paid for the SB6190 modem?
3        A    Market value?  Are you saying -- ask
4    that question again.
5        Q    How would you define "market value" in
6    this case as it relates to the value of the SB6190
7    cable modem?
8        A    Well, if you had a market, let's just
9    say, and the market had $200 million, a
10    $200 million modem market, right?  And let's just
11    say that we had $150 million of that market,
12    right?  Then your market share would be the
13    percentage of the market that you sold, right, and
14    the market value would be the dollar amount of the
15    market that you have.
16        Q    Looking at a conjoint analysis, are
17    there any objective measures of the accuracy of
18    the conjoint analysis?
19        A    If you were -- I mean if you were doing
20    a conjoint analysis for a new feature, let's say,
21    right, and you were familiar that competitors had
22    sold that new feature for a certain price, right,
23    then you could compare the results of the conjoint
24    with the price that other competitors were selling
25    the same feature, right, or you could compare it

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 96

1    holdout performance as used in a conjoint

2    analysis?

3         A    Yes.

4         Q    And what is that?

5         A    So a holdout is where you take the data

6    and you take away some of the responses.  You hold

7    them back, and then you look at the rest of the

8    responses and see if you can fill it in, the

9    missing response, and to the degree that you can

10   do that, that's good.  It means that the

11   predictive ability is good.

12        Q    And so would you say that holdout

13   performance is used to measure the predictive

14   ability of a conjoint analysis?

15        A    Within the data, right?  So obviously if

16   you want to know if a conjoint is accurate, you're

17   going to have to measure it to something outside

18   of the conjoint, right, because a conjoint could

19   be accurately measuring the wrong thing, right?

20             So you would have to measure it to

21   something outside of it, but within a conjoint,

22   right, if you want to see if the conjoint is

23   working properly, then you can do that within a

24   conjoint, but that doesn't mean that the result of

25   the conjoint, you know, that you've measured the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 97

1    right thing.

2            Do you follow me?  You'd have to use

3    something outside the conjoint to see if you've

4    measured the right thing.

5        Q    Are you familiar with the concept of

6    mean average error as used in a conjoint analysis?

7        A    Yes.

8        Q    And what is that?

9        A    It's the average error, basically.

10       Q    And how is mean average error different

11   from standard error in a conjoint analysis?

12       A    I don't recall as I sit here.

13       Q    Do you recall what mean average error is

14   used for in a conjoint analysis?

15       A    I don't recall as I sit here.

16       Q    How would you define the term

17   "willingness to pay" as you used it in your

18   rebuttal report?

19       A    So willingness to pay is different than

20   driving demand for something.  Willingness to pay

21   means that there's some number greater than zero

22   that the consumer is willing to pay, and that's

23   different than figuring out what drives demand for

24   a product, but willingness to pay is figuring out

25   is there a number greater than zero that the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 170

1          a break?

2                    MS. STAGG:  Sure.

3                    (Whereupon, a short recess was

4                    taken.)

5     BY MR. SCHUBERT:

6          Q     Okay.  We've talked about the Rao book,

7     Applied Conjoint, a fair amount.  Would you say

8     that the Rao book is a reputable source?

9          A     Yes.  Like I said, a lot of these

10    things -- in fact, all these things I'm talking

11    about are just generally known within the conjoint

12    community, but I wanted to find some sources

13    saying the same thing, but yeah, I mean it's as

14    good as anything else that I, that I see.

15         Q     I'd like you to turn to page 299 in the

16    Rao book.  Are you there?

17         A     Yes.

18         Q     Do you see in the top of page 299

19    there's a table called Table 8.3 that says

20    "Attributes and Concepts for the Apartment Study"?

21         A     Yes.

22         Q     This is a survey about apartment choice

23    from a peer-reviewed academic paper.  Would you

24    agree that Table 8.3 depicts a list of attributes,

25    the number of levels for each attribute, and the

ATTACHMENT TWO

*Reference Guide on Estimation of Economic Damages*

# I.    Introduction

This reference guide identifies areas of dispute that arise when economic losses are at issue in a legal proceeding. Our focus is on explaining the issues in these disputes rather than taking positions on their proper resolutions. We discuss the application of economic analysis within established legal frameworks for damages. We cover topics in economics that arise in measuring damages and provide citations to cases to illustrate the principles and techniques discussed in the text.

We begin by discussing the qualifications required of experts who quantify damages. We then set forth the standard general approach to damages quantification, with particular focus on defining the harmful event and the alternative, often called the but-for scenario. In principle, the difference between the plaintiff's economic value in the but-for scenario and in actuality measures the loss caused by the harmful act of the defendant. We then consider damages estimation for two cases: (1) a discrete loss of market value and (2) the loss of a flow of income over time, where damages are the discounted value of the lost cash flow. Other topics include the role of inflation, issues relating to income taxes and stock options, adjustments for the time value of money, legal limitations on damages, damages for a new business, disaggregation of damages when there are multiple challenged acts, the role of random events occurring between the harmful act and trial, data for damages measurement, standards for disclosing data to opposing parties, special masters and neutral experts, liquidated damages, damages in class actions, and lost earnings.[1]

Our discussion follows the structure of the standard damages study, as shown in Figure 1. Damages quantification operates on the premise that the defendant is liable for damages from the defendant's harmful act. The plaintiff is entitled to recover monetary damages for losses occurring before and possibly after the time of the trial. The top line of Figure 1 measures the losses before trial; the bottom line measures the losses after trial.[2]

The goal of damages measurement is to find the plaintiff's loss of economic value from the defendant's harmful act. The loss of value may have a one-time character, such as the diminished market value of a business or property, or it may take the form of a reduced stream of profit or earnings. The losses are net of any costs avoided because of the harmful act.

The essential elements of a study of losses are the quantification of the reduction in economic value, the calculation of interest on past losses, and the appli-

---

1. For a discussion of specific issues relating to estimating damages in antitrust, intellectual property, and securities litigation, see Mark A. Allen et al., *Estimation of Economic Damages in Antitrust, Intellectual Property, and Securities Litigation* (June 2011), *available at* http://www.stanford.edu/~rehall/DamagesEstimation.pdf.

2. Our scope here is limited to losses of actual dollar income. However, economists sometimes have a role in the measurement of nondollar damages, including pain and suffering and the hedonic value of life. *See generally* W. Kip Viscusi, Reforming Products Liability (1991).