# EXHIBIT A

ROBERT C. SCHUBERT (S.B.N. 62684)
(rschubert@sjk.law)
WILLEM F. JONCKHEER (S.B.N. 178748)
(wjonckheer@sjk.law)
DUSTIN L. SCHUBERT (S.B.N. 254876)
(dschubert@sjk.law)
NOAH M. SCHUBERT (S.B.N. 278696)
(nschubert@sjk.law)
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center, Suite 1650
San Francisco, California 94111
Telephone:      (415) 788-4220
Facsimile:      (415) 788-0161

*Class Counsel*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| IN RE ARRIS CABLE MODEM CONSUMER LITIGATION | No. 17-cv-1834-LHK |
|---|---|
| This Document Relates To: All Actions | **FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | <u>CLASS ACTION</u> |
| | <u>DEMAND FOR JURY TRIAL</u> |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Upon personal knowledge as to their own acts, and based upon their investigation, their

2    counsel's investigation, and information and belief as to all other matters, Plaintiffs, on behalf

3    of themselves and all others similarly situated, allege:

4

5    **I.    INTRODUCTION**

6    1.    This is a class action brought on behalf of purchasers of the SURFboard SB6190

7    cable modem (the "Modem") sold by Defendant ARRIS International Limited ("Arris"),

8    formerly known as ARRIS International plc. A cable modem is a device that allows cable

9    subscribers to connect to broadband Internet service.

10    2.    As alleged herein, since its launch in late 2015, Arris marketed the Modem as a

11    high-end cable modem delivering "the fastest speeds and most reliable connection to the

12    Internet." However, Arris failed to disclose that the Modem contains a serious defect that

13    prevents it from operating properly. News reports, customer complaints, and Arris's own testing

14    since the release of the Modem indicate that it suffers from high spikes in network latency—

15    delays in data communication over the network—that degrade users' Internet connectivity.

16    3.    Plaintiffs purchased their Modems for personal use and suffered network latency,

17    an experience shared by many purchasers of the Modem. Despite this widespread defect, Arris

18    has not announced a recall of the affected model or otherwise offered to repair or replace it.

19    4.    By shipping Modems with this defect, Arris sold goods that were substantially

20    below the quality generally available in the market, were not fit for the Internet connectivity for

21    which they were generally used, and were not adequately packaged and labeled. Arris also

22    concealed the network latency problem with the Modems through its marketing, advertising, and

23    packaging of the product.

24    5.    Plaintiffs herein seek relief under the consumer protections laws of Alabama,

25    Arizona, California, Connecticut, Florida, Georgia, Hawaii, Illinois, Iowa, Kansas, Louisiana,

26    Massachusetts, New Jersey, New York, Ohio, Pennsylvania, Texas, Virginia, and Washington.

27

28

## II.     PARTIES

6.     Plaintiff Christopher Bullard ("Bullard"). Plaintiff Christopher Bullard is a citizen of Alabama. Plaintiff Bullard purchased a Modem on March 9, 2017 through Amazon.com. In connection with his Modem purchase, Plaintiff Bullard reviewed and relied upon the information and materials available on the Amazon.com product page for the Modem, including an image of the front of the Modem's packaging, which represented that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS," "SPEEDS UP TO 1.4 GBPS," and that purchasers "Get what you pay for." Plaintiff Bullard also reviewed and relied upon an image of the back of the Modem's packaging, included on the Amazon.com product page, which represented that the modem would provide "BLAZING-FAST INTERNET," "ULTIMATE GAMING," "INSTANT GRATIFICATION," and "Unbelievable download speeds." Plaintiff Bullard also reviewed information and materials on the Amazon.com product page for the Modem appearing under the "from the manufacturer" heading, which was provided by Arris for display to consumers. On this section of Amazon's website, Arris represented that the Modem would "deliver the fastest speeds" and "most reliable connection to the internet." Under the Modem's "Product description" heading on the Amazon.com webpage, Arris further promised "lightning-fast broadband speed." The representations and statements described above in this this ¶ 6 were material to Plaintiff Bullard. None of these representations or statements disclosed that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. Based on the foregoing representations and omissions, at the time of his purchase, Plaintiff Bullard believed the Modem was a fast, reliable modem suitable for online activities. At the time he purchased his Modem, Plaintiff Bullard did not know that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. At various times during the operation of the Modem, Plaintiff Bullard experienced high network latency, packet loss, unreliable internet connectivity, slow internet speeds, or other related performance issues. Had Plaintiff Bullard known that the Modem suffered from high network

1   latency, packet loss, unreliable Internet connectivity, slow internet speeds, and other related

2   performance problems, he would not have purchased the Modem.

3        7.     Plaintiff Matthew Penner ("Penner") is a citizen of Arizona. Plaintiff Penner

4   purchased a Modem on January 23, 2017 at a Best Buy store in Tucson, Arizona. Prior to his

5   Modem purchase, Plaintiff Penner reviewed the website and information materials of his Internet

6   service provider ("ISP")—Cox Communications ("Cox")—for modems compatible with Cox's

7   premium cable internet. The Modem was listed as compatible with Plaintiff Penner's service.

8   Prior to purchasing the Modem, Plaintiff Penner reviewed the information, materials,

9   specifications, and reviews available on the bestbuy.com product page for the Modem, including

10   an image of the front of the Modem's packaging, which represented that the Modem was the

11   "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and "SPEEDS UP

12   TO 1.4 GBPS." The representations and statements described above in this ¶ 7 were material to

13   Plaintiff Penner. None of these representations or statements disclosed that the Modem suffered

14   from high network latency, unreliable Internet connectivity, and other related performance

15   problems. Based on the foregoing representations and omissions, at the time of his purchase,

16   Plaintiff Penner believed the Modem was a fast, reliable modem suitable for online activities. At

17   the time he purchased his Modem, Plaintiff Penner did not know that the Modem suffered from

18   high network latency, unreliable Internet connectivity, and other related performance problems.

19   At various times during the operation of the Modem, Plaintiff Penner experienced high network

20   latency, unreliable internet connectivity, slow internet speeds, or other related performance

21   issues. Plaintiff Penner had to reboot his Modem multiple times a day due to these connectivity

22   issues. Had Plaintiff Penner known that the Modem suffered from high network latency,

23   unreliable Internet connectivity, and other related performance problems, he would not have

24   purchased the Modem.

25        8.     Plaintiff Christopher Stephens ("Stephens") is a citizen of Arizona. Plaintiff

26   Stephens purchased a Modem on or about November 4, 2016 through Amazon.com. Believing

27   his initial Modem was defective, Plaintiff Stephens thereafter exchanged his Modem with

28   Amazon.com for a replacement Modem on or about November 7, 2016. In connection with his

1   Modem purchase, Plaintiff Stephens reviewed Arris's website for the Modem. There, Arris

2   represented that the Modem would "deliver the fastest speeds" and "most reliable connection to

3   the Internet," that it was the "First Gigabit+ Cable Modem" and could achieve "Download speeds

4   up to 1.4 Gbps." Under the "Specifications" tab of Arris's website, Arris represented "Yes" next

5   to the categories of "HD Multi-Media Streaming" and "High-Performance Online Gaming" for

6   the Modem.  In connection with his Modem purchase, Stephens also reviewed and relied upon

7   the Modem's packaging and the Modem's technical specifications. The front of the Modem's

8   packaging represented that the Modem was the "First Gigabit+ Cable Modem," with "SPEEDS

9   UP TO 1.4 GBPS."  The packaging further stated that the Modem provided "BLAZING FAST

10  INTERNET," "ULTIMATE GAMING," and "INSTANT GRATIFICATION." The Modem's

11  packaging also represented that the Modem's "Internet Browsing" and "High-Performance

12  Online Gaming" features were "★ ★ ★ ★ ★," which were upgrades as compared to other Arris

13  cable modem products listed on the Modem's packaging. These representations and statements

14  described above in this ¶ 8 were material to Plaintiff Stephens. Arris did not disclose on its

15  website or the Modems' packaging that the Modems suffered from high network latency,

16  unreliable Internet connectivity, and other related performance problems on its website.  Based

17  upon the foregoing representations and omissions, at the time of his purchase, Plaintiff Stephens

18  believed that the Modem was a fast, reliable modem suitable for online activities.  At the time

19  he purchased his Modem, Plaintiff Stephens did not know that the Modems suffered from high

20  network latency, unreliable Internet connectivity, and other related performance problems. Had

21  Plaintiff Stephens known that the Modems suffered from high network latency, unreliable

22  Internet connectivity, and other related performance problems, he would not have purchased the

23  Modem.

24       9.      Plaintiff Brian Alexander ("B. Alexander") is a citizen of California. Plaintiff B.

25  Alexander purchased a Modem on December 14, 2016 at a Fry's Electronics store in Sacramento,

26  California. In connection with his Modem purchase, Plaintiff B. Alexander reviewed and relied

27  upon the Modem's packaging and the Modem's technical specifications. The front of the

28  Modem's packaging represented that the Modem was the "First Gigabit+ Cable Modem," with

"32 DOWNSTREAM CHANNELS" and "SPEEDS UP TO 1.4 GBPS." The packaging further stated that the Modem provided "BLAZING FAST INTERNET," "ULTIMATE GAMING," and "INSTANT GRATIFICATION," and was "Compatible with Major U.S. Cable Providers, Including Xfinity from Comcast" and others. The Modem's packaging also represented that the Modem's "Internet Browsing" and "High-Performance Online Gaming" features were "★ ★ ★ ★ ★," which were upgrades as compared to other Arris cable modem products listed on the Modem's packaging. These representations and statements described above in this ¶ 9 were material to Plaintiff B. Alexander. The packaging did not disclose that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. The packaging further failed to disclose that the Modem would only support 24 download channels on Plaintiff B. Alexander's ISP network, Comcast Corporation ("Comcast"). Based upon these representations and omissions, at the time of his purchase, Plaintiff B. Alexander believed that the Modem was a fast, reliable modem suitable for online gaming as well as other purposes. At the time he purchased his Modem, Plaintiff B. Alexander did not know that the Modems suffered from high network latency and unreliable Internet connectivity, and he did not know that the Modem was only capable of 24 downstream channels on his ISP, Comcast. Had Plaintiff B. Alexander known that the Modems suffered from high network latency, unreliable Internet connectivity, and other related performance issues—or had he known that the Modem could only achieve 24 downstream channels on Comcast—he would not have purchased the Modem.

10.     Plaintiff Greg Knowles ("Knowles") is a citizen of California. Plaintiff Knowles purchased a Modem on or about August 15, 2016 through Amazon.com. Prior to his Modem purchase, Plaintiff Knowles reviewed the website and information materials of his ISP—Comcast—for a list of DOCSIS 3.0 compatible or approved cable modems. This information listed his Modem as compatible and approved for use on Comcast. In connection with his Modem purchase, Plaintiff Knowles also reviewed and relied upon the information and materials available on the Amazon.com product page for the Modem, including representations that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and

"SPEEDS UP TO 1.4 GBPS."  Amazon.com's product page also featured a picture of the front of Modem's packaging. He also reviewed information and materials on the Amazon.com product page for the Modem appearing under the "From the manufacturer" heading, which was provided by Arris for display to consumers. On this section of Amazon's website, Arris represented that the Modem would "deliver the fastest speeds" and "most reliable connection to the Internet." Under the Modem's "Product description" heading on the Amazon webpage, Arris further promised "lightning-fast broadband speed" and represented that the Modem would "make[] streaming HD Video, gaming, shopping, downloading, working, high-quality voice and video conferencing, and peer-to-peer networking applications far more realistic, faster, and efficient than ever before." These representations and statements described above in this ¶ 10 were material to Plaintiff Knowles. Plaintiff Knowles also reviewed the Modem's technical specifications in connection with his Modem purchase.  In none of the aforementioned advertising and marketing materials—the product packaging, materials on the Amazon.com website, and product specifications—did Arris disclose that the Modems suffered from high network latency, unreliable Internet connectivity, and other related performance problems, or that the Modem would only support 24 download channels on Plaintiff Knowles's ISP's network, Comcast.  Based upon the foregoing representations and omissions, at the time of his purchase, Plaintiff Knowles believed that the Modem was a fast, reliable modem suitable for online gaming as well as other purposes.  At the time he purchased his Modem, Plaintiff Knowles did not know that the Modems suffered from high network latency, unreliable Internet connectivity, and other related performance problems and he did not know that the Modem was only capable of 24 downstream channels on his ISP, Comcast.  Had Plaintiff Knowles known that the Modems suffered from high network latency, unreliable Internet connectivity, and other related performance problems—or had he known that the Modem could only achieve 24 downstream channels on Comcast—he would not have purchased the Modem.

11.     Plaintiff Christopher Kaflik ("Kaflik") is a citizen of Connecticut. Plaintiff Kaflik purchased a Modem on January 14, 2017 through Amazon.com. Prior to his Modem purchase, Plaintiff Kaflik reviewed the website and information materials of his ISP—Cox—for a list of

DOCSIS 3.0 compatible or certified cable modems. This information listed his Modem as compatible and approved for use on Cox. Plaintiff Kaflik further relied on representations that his Modem would support "32x8 channel bonding." In connection with his Modem purchase, Plaintiff Kaflik also reviewed and relied upon the information and materials available on the Amazon.com product page for the Modem, including representations that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and "SPEEDS UP TO 1.4 GBPS." Amazon's product page also featured a picture of the front of Modem's packaging. Plaintiff Kaflik also reviewed information and materials on the Amazon product page for the Modem appearing under the "From the manufacturer" heading, which was provided by Arris for display to consumers. On this section of Amazon's website, Arris represented that the Modem would "deliver the fastest speeds" and "most reliable connection to the Internet." Under the Modem's "Product description" heading on the Amazon webpage, ARRIS further promised "lightning-fast broadband speed" and represented that the Modem would "make[] streaming HD Video, gaming, shopping, downloading, working, high quality voice and video conferencing, and peer-to-peer networking applications far more realistic, faster, and efficient than ever before." These representations and statements described above in this ¶ 11 were material to Plaintiff Kaflik. Plaintiff Kaflik also reviewed the Modem's technical specifications in connection with his Modem purchase. In none of the aforementioned advertising and marketing materials did Arris disclose that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. At various times during his operation of the Modem, Plaintiff Kaflik experienced high network latency, packet loss, unreliable Internet connectivity, slow Internet speeds, and other related performance issues. These Internet performance issues included significantly slow Internet performance and lags during data operations activities. The Modem's Internet performance issues manifested several times a day, which resulted in connection hang-ups every fifteen to twenty minutes, limited the usable bandwidth, and degraded the quality of Plaintiff Kaflik's regular Internet activities. Had Plaintiff Kaflik known that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems, he would not have purchased the Modem.

12.     Plaintiff Jeffrey Greenfield ("Greenfield") is a citizen of Florida. Plaintiff Greenfield purchased a Modem on March 18, 2017 at a Best Buy store in Boca Raton, Florida. Prior to his Modem purchase, Plaintiff Greenfield reviewed the website and information materials of his ISP—Comcast—for a list of DOCSIS 3.0 compatible or approved cable modems. This information listed his Modem as compatible and approved for use on Comcast. In connection with his Modem purchase, Plaintiff Greenfield also reviewed and relied upon the Modem's packaging and the Modem's technical specifications. The front of the Modem's packaging represented that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and "SPEEDS UP TO 1.4 GBPS." The packaging further stated that the Modem provided "BLAZING FAST INTERNET" and "INSTANT GRATIFICATION," and was "Compatible with Major U.S. Cable Providers, Including Xfinity from Comcast" and others. The Modem's packaging also represented that the Modem's "Internet Browsing" features were "☆☆☆☆☆," which were upgrades as compared to other ARRIS cable modem products listed on the Modem's packaging. These representations and statements described above in this ¶ 12 were material to Plaintiff Greenfield. Based upon these representations and omissions, at the time of his purchase, Plaintiff Greenfield believed that the Modem was a fast, reliable modem suitable for data operations as well as other purposes. The packaging did not disclose that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. The packaging further failed to disclose that the Modem would only support 24 download channels on Plaintiff Greenfield's Comcast network. At the time he purchased his Modem, Plaintiff Greenfield did not know that the Modems suffered from high network latency and unreliable Internet connectivity, and he did not know that the Modem was only capable of 24 downstream channels on his Comcast network. At various times during his operation of the Modem, Plaintiff Greenfield experienced high network latency, unreliable Internet connectivity, slow Internet speeds, and other related performance issues. These Internet performance issues included significantly slow Internet performance and lags during data operations activities. The Modem's Internet performance issues manifested several times a day and became more persistent over time, which resulted in

connectivity hang-ups and degraded the quality of Plaintiff Greenfield's regular Internet activities. Had Plaintiff Greenfield known that the Modems suffered from high network latency, unreliable Internet connectivity, and other related performance issues—or had he known that the Modem could only achieve 24 downstream channels on Comcast—he would not have purchased the Modem.

13.     Plaintiff Giovanni Murphy ("Murphy") is a citizen of Georgia. Plaintiff Murphy purchased two Modems. Plaintiff Murphy purchased one Modem on February 19, 2016 through Amazon.com and a second Modem on May 2, 2016 through Amazon.com. Prior to his Modem purchases, Plaintiff Murphy reviewed the website and information materials of his ISP—Cox— for modems compatible with Cox's premium cable internet. The Modem was listed as compatible with Plaintiff Murphy's service. Prior to purchasing the Modems, Plaintiff Murphy reviewed the information, materials, specifications, and reviews available on the Amazon.com product page for the Modem, including an image of the front of the Modem's packaging, which represented that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and "SPEEDS UP TO 1.4 GBPS." Plaintiff Murphy also reviewed and relied upon an image of the back of the Modem's packaging, included on the Amazon.com product page, which represented that the modem would provide "BLAZING-FAST INTERNET," and "Unbelievable download speeds." Plaintiff Murphy also reviewed information and materials on the Amazon.com product page for the Modem appearing under the "from the manufacturer" heading, which was provided by Arris for display to consumers. On this section of Amazon's website, Arris represented that the Modem would "deliver the fastest speeds" and "most reliable connection to the internet." The representations and statements described above in this ¶ 13 were material to Plaintiff Murphy. None of these representations or statements disclosed that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. Based on the foregoing representations and omissions, at the time of his purchases, Plaintiff Murphy believed the Modem was a fast, reliable modem suitable for online activities. At the time he purchased his Modems, Plaintiff Murphy did not know that the Modems suffered from high network latency, unreliable Internet connectivity, and other related

performance problems. At various times during the operation of the first-purchased Modem, Plaintiff Murphy experienced high network latency, unreliable internet connectivity, slow internet speeds, or other related performance issues. Plaintiff Murphy had to reboot his first-purchased Modem multiple times a day due to these connectivity issues. Plaintiff Murphy purchased the second Modem because the connectivity issues of the first-purchased Modem were significant and incurable. However, Plaintiff Murphy experienced the same high network latency, unreliable internet connectivity, slow internet speeds, or other related performance issues with his second-purchased Modem. Plaintiff Murphy had to reboot his second-purchased Modem multiple times a day due to these connectivity issues. Had Plaintiff Murphy known that the Modems suffered from high network latency, unreliable Internet connectivity, and other related performance problems, he would not have purchased the Modems.

14.    Plaintiff Tony Romeo ("Romeo") is a citizen of Hawaii. Plaintiff Romeo purchased a Modem on October 31, 2016 through Amazon.com. Prior to his Modem purchase, Plaintiff Romeo reviewed the website and information materials of his ISP – Oceanic Time Warner Cable – for modems compatible with the ISP's premium cable internet. The Modem was listed as compatible with Plaintiff Romeo's service. Prior to purchasing the Modem, Plaintiff Romeo reviewed the information, materials, and reviews available on the Amazon.com product page for the Modem, including information under the "from the manufacturer" heading, which was provided by Arris for display to consumers. On this section of Amazon's website, Arris represented that the Modem would "deliver the fastest speeds" and "most reliable connection to the internet." The representations and statements described in this ¶ 14 were material to Plaintiff Romeo. None of these representations or statements disclosed that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. Based on the foregoing representations and omissions, at the time of his purchase, Plaintiff Romeo believed the Modem was a fast, reliable modem suitable for online activities. At the time he purchased his Modem, Plaintiff Romeo did not know that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. At various times during the operation of the Modem, Plaintiff Romeo experienced high network

latency, unreliable internet connectivity, slow internet speeds, packet loss, or other related performance issues. The Modem's Internet performance issues significantly affected Plaintiff Romeo's use of the modem. At times, Plaintiff Romeo used the modem for gameplay and noticed drop-off, making such gaming impossible. Had Plaintiff Romeo known that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems, he would not have purchased the Modem.

15.     Plaintiff Marco Fernandez is a citizen of Illinois. Plaintiff Fernandez purchased a Modem on February 4, 2016 at a Best Buy store in Chicago, Illinois. Prior to his Modem purchase, Plaintiff Fernandez reviewed the website and information materials of his ISP— Comcast—for modems compatible with Comcast's premium cable internet. The Modem was listed as compatible with Plaintiff Fernandez's service. Prior to purchasing the Modem, Plaintiff Fernandez reviewed the information, materials, specifications, and reviews available on the Amazon.com product page for the Modem, including an image of the front of the Modem's packaging, which represented that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and "SPEEDS UP TO 1.4 GBPS." Plaintiff Fernandez also reviewed and relied upon an image of the back of the Modem's packaging, included on the Amazon.com product page, which represented that the modem would provide "BLAZING-FAST INTERNET," "ULTIMATE GAMING," "INSTANT GRATIFICATION," and "Unbelievable download speeds." Prior to purchasing the Modem, Plaintiff Fernandez also visited Arris's website and reviewed the information and technical specifications for the Modem. Arris's website represented that the Modem would "deliver the fastest speeds" and the "most reliable connection to the Internet." The representations and statements described above in this ¶ 15 were material to Plaintiff Fernandez. None of these representations or statements disclosed that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. The representations and statements further failed to disclose that the Modem would only support 24 download channels on Plaintiff Fernandez's ISP network, Comcast. Based on the foregoing representations and omissions, at the time of his purchase, Plaintiff Fernandez believed the Modem was a fast, reliable modem suitable for online activities.

At the time he purchased his Modem, Plaintiff Fernandez did not know that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. Nor did he know that the Modem was only capable of 24 downstream channels on his ISP, Comcast. At various times during the operation of the Modem, Plaintiff Fernandez experienced high network latency, unreliable internet connectivity, slow internet speeds, or other related performance issues. Plaintiff Fernandez also experienced Internet slowdowns and freezes, which disrupted Plaintiff Fernandez's use of the modem for gameplay and, at times, made such gaming impossible. Had Plaintiff Fernandez known that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems—or had he known that the Modem could only achieve 24 downstream channels on Comcast—he would not have purchased the Modem.

16.     Plaintiff Jamie Coyle ("Coyle") is a citizen of Iowa. Plaintiff Coyle purchased a Modem on August 2, 2018 from Amazon.com. Prior to his Modem purchase, Plaintiff Coyle reviewed the website and information materials of his ISP—Mediacom Communications ("Mediacom")—for a list of DOCSIS 3.0 compatible or approved cable modems. This information listed his Modem as compatible and approved for use on Mediacom. In connection with his Modem purchase, Plaintiff Coyle also reviewed and relied upon the information and materials available on the Amazon.com product page for the Modem, including representations that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and "SPEEDS UP TO 1.4 GBPS." Amazon's product page also featured a picture of the front of Modem's packaging. He also reviewed information and materials on the Amazon product page for the Modem appearing under the "From the manufacturer" heading, which was provided by ARRIS for display to consumers. On this section of Amazon's website, Arris represented that the Modem would "deliver the fastest speeds" and "most reliable connection to the Internet." Under the Modem's "Product description" heading on the Amazon webpage, Arris further promised "lightning-fast broadband speed" and represented that the Modem would "make[] streaming HD Video, gaming, shopping, downloading, working, high quality voice and video conferencing, and peer-to-peer networking applications far more realistic, faster, and

efficient than ever before." At the time of his Modem purchase, Plaintiff Coyle was unaware of the pendency of this litigation and purchased without knowledge of the claims at issue herein. These representations and statements described above in this ¶ 16 were material to Plaintiff Coyle. Based upon these representations and omissions, at the time of his purchase, Plaintiff Coyle believed that the Modem was a fast, reliable modem suitable for online gaming as well as other purposes. Plaintiff Coyle also reviewed the Modem's technical specifications in connection with his Modem purchase. In none of the aforementioned advertising and marketing materials—the product packaging, materials on Amazon's website, and product specifications—did Arris disclose that the Modems suffered from high network latency, unreliable Internet connectivity, and other related performance problems. Had Plaintiff Coyle known that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems, he would not have purchased the Modem.

17.     Plaintiff Rodney Bryant ("Bryant") is a citizen of Kansas. Plaintiff Bryant purchased a Modem on January 15, 2017 through Amazon.com. In connection with his Modem purchase, Plaintiff Bryant reviewed and relied upon the information and materials available on the Amazon.com product page for the Modem, including an image of the front of the Modem's packaging, which represented that the Modem was the "First Gigabit+ Cable Modem," and a "DOCSIS 3.0 Cable Modem," with "32 DOWNSTREAM CHANNELS," "SPEEDS UP TO 1.4 GBPS," and that purchasers "Get what you pay for." Plaintiff Bryant also reviewed and relied upon an image of the back of the Modem's packaging, included on the Amazon.com product page, which represented that the modem would provide "BLAZING-FAST INTERNET," "ULTIMATE GAMING," "INSTANT GRATIFICATION," and "Unbelievable download speeds." The representations and statements described above in this ¶ 17 were material to Plaintiff Bryant. None of these representations or statements disclosed that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. Based on the foregoing representations and omissions, at the time of his purchase, Plaintiff Bryant believed the Modem was a fast, reliable modem suitable for online activities. At the time he purchased his Modem, Plaintiff Bryant did not know that the Modem suffered from

high network latency, unreliable Internet connectivity, and other related performance problems. At various times during the operation of the Modem, Plaintiff Bryant experienced high network latency, unreliable internet connectivity, slow internet speeds, or other related performance issues. These internet performance issues significantly affected Plaintiff Bryant's use of the Modem for Internet-dependent conferencing services, resulting in call degrading and dropped calls. The Modem's Internet slowdowns and freezes also disrupted Plaintiff Bryant's use of the Modem for gaming and, at times, made such gaming impossible. Had Plaintiff Bryant known that the Modem suffered from high network latency, unreliable Internet connectivity, slow internet speeds, and other related performance problems, he would not have purchased the Modem.

18.     Plaintiff Timothy Oefelein ("Oefelein") is a citizen of Louisiana. Plaintiff Oefelein purchased a Modem on March 21, 2016 through Amazon.com. Prior to purchasing the Modem, Plaintiff Oefelein reviewed the information, materials, specifications, and reviews available on the Amazon.com product page for the Modem, including an image of the front of the Modem's packaging, which represented that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and "SPEEDS UP TO 1.4 GBPS." Prior to purchasing the Modem, Plaintiff Oefelein also reviewed the information and technical specifications set forth on Arris's website. Arris's website represented that the Modem would "deliver the fastest speeds" and the "most reliable connection to the Internet."     The representations and statements described above in this ¶ 18 were material to Plaintiff Oefelein. None of these representations or statements disclosed that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. Based on the foregoing representations and omissions, at the time of his purchase, Plaintiff Oefelein believed the Modem was a fast, reliable modem suitable for online activities. At the time he purchased his Modem, Plaintiff Oefelein did not know that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. At various times during the operation of the Modem, Plaintiff Oefelein experienced high network latency, unreliable internet connectivity, slow internet speeds, or other related performance

issues.   The Modem's Internet performance issues significantly affected Plaintiff Oefelein's operation of Skype—an Internet-dependent video and audio-conferencing service—resulting in call degradation and poor performance. Plaintiff Oefelein's operation of a virtual private network ("VPN") and use of a remote desktop connection, both of which Plaintiff Oefelein utilized in connection with work, were also regularly impacted by the Modem's Internet performance issues. Plaintiff Oefelein contacted Arris regarding these slowdowns and performance issues and Arris agreed to replace Plaintiff Oefelein's Modem. Plaintiff Oefelein returned his Modem on or about July 7, 2016 and received a replacement Modem from Arris on July 26, 2016. At various times during the operation of the replacement Modem, Plaintiff Oefelein experienced the same high network latency, unreliable internet connectivity, slow internet speeds, or other related performance issues, which he experienced with his original Modem. Had Plaintiff Oefelein known that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems he would not have purchased the Modem.

19.     Plaintiff Daniel Rees ("Rees") is a citizen of Massachusetts. Plaintiff Rees purchased a Modem on August 21, 2016 at a Best Buy store in Worcester, Massachusetts. Prior to purchasing the Modem, Plaintiff Rees reviewed the Modem's packaging, representations on the Modem's box, and in-store informational materials concerning the Modem at the Best Buy store located in Worcester, Massachusetts. Plaintiff Rees also reviewed the Modem's technical specifications prior to his purchase. Specifically, Plaintiff Rees reviewed the information and materials available on his ISP's website—RCN Corporation ("RCN")—pertaining to approved modems. Plaintiff Rees also reviewed Arris's website, which represented that the MODEM would "deliver the fastest speeds" and "most reliable connection to the Internet." Plaintiff Rees also reviewed representations on Arris's website stating that the Modem was optimized for online gaming. The representations and statements described above in this ¶ 19 were material to Plaintiff Rees. None of these representations or statements disclosed that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. Based on the foregoing representations and omissions, at the time of his purchase, Plaintiff Rees believed the Modem was a fast, reliable modem suitable for online activities. At

the time he purchased his Modem, Plaintiff Rees did not know that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. At various times during the operation of the Modem, Plaintiff Rees experienced high network latency, unreliable internet connectivity, slow internet speeds, or other related performance issues. The Modem's Internet performance issues and large latency spikes significantly affected Plaintiff Rees' operation of online gaming activities, which disrupted competitive play, and at times made such gaming impossible. Plaintiff Rees also frequently experienced severe lags in Internet connection during regular Internet activities,  such as browsing. These Internet performance issues further resulted in constant VPN connection losses, which disrupted remote work operations, and other persistent downgrades in the quality of streamed content, such as with Netflix. Had Plaintiff Rees known that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems he would not have purchased the Modem.

20.     Plaintiff Michael Breslin ("Breslin") is a citizen of New Jersey. Plaintiff Breslin purchased a Modem on February 14, 2016 at a Best Buy store in Brick, New Jersey. Prior to purchasing the Modem, Plaintiff Breslin reviewed the website and information materials of his ISP—Comcast—for modems compatible with Comcast's premium cable internet. The Modem was listed as compatible with Plaintiff Breslin's service. Prior to purchasing the Modem, Plaintiff Breslin examined the Modem's packaging. The front of the Modem's packaging represented that the Modem was the "First Gigabit+ Cable Modem," a "DOCSIS 3.0 Cable Modem," with "32 DOWNSTREAM CHANNELS" and "SPEEDS UP TO 1.4 GBPS." The representations and statements described above in this ¶ 20 were material to Plaintiff Breslin. None of these representations or statements disclosed that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. The representations and statements further failed to disclose that the Modem would only support 24 download channels on Plaintiff Breslin's ISP network, Comcast. Based on the foregoing representations and omissions, at the time of his purchase, Plaintiff Breslin believed the Modem was a fast, reliable modem suitable for online activities. At the time he purchased his Modem, Plaintiff

1   Breslin did not know that the Modem suffered from high network latency, unreliable Internet

2   connectivity, and other related performance problems. Nor did he know that the Modem was

3   only capable of 24 downstream channels on his ISP, Comcast. At various times during the

4   operation of the Modem, Plaintiff Breslin experienced high network latency, unreliable internet

5   connectivity, slow internet speeds, or other related performance issues. These Internet

6   slowdowns and freezes disrupted Plaintiff Breslin's use of the Modem for gameplay and, at

7   times, made such gaming impossible. Plaintiff Breslin also experienced frequent and significant

8   issues with internet page loads, gaming lag spikes, and erratic remote access. Had Plaintiff

9   Breslin known that the Modem suffered from high network latency, unreliable Internet

10  connectivity, and other related performance problems—or had he known that the Modem could

11  only achieve 24 downstream channels on Comcast—he would not have purchased the Modem.

12      21.     Plaintiff Noris Onea ("Onea") is a citizen of New York. Plaintiff Onea purchased

13  a Modem on November 21, 2016 from Amazon.com for his parents' home. Prior to his Modem

14  purchase, Plaintiff Onea reviewed the website and information materials of his parents' ISP–

15  EarthLink Internet Services ("EarthLink")– for a list of DOCSIS 3.0 compatible or approved

16  cable modems. This information listed the Modem as compatible and approved for use on

17  EarthLink. Plaintiff Onea purchased a second Modem on April 3, 2017 from Amazon.com for

18  his home. Prior to this Modem purchase, Plaintiff Onea reviewed the website and information

19  materials of his ISP—RCN—for a list of DOCSIS 3.0 compatible or approved cable modems.

20  This information listed his Modem as compatible and approved for use on RCN. In connection

21  with his Modem purchases, Plaintiff Onea reviewed and relied upon the information and

22  materials available on the Amazon.com product page for the Modem, including representations

23  that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM

24  CHANNELS" and "SPEEDS UP TO 1.4 GBPS." The Amazon.com product page also featured

25  a picture of the front of Modem's packaging. Plaintiff Onea also reviewed information and

26  materials on the Amazon.com product page for the Modem appearing under the "From the

27  manufacturer" heading, which was provided by ARRIS for display to consumers. On this section

28  of the Amazon.com website, ARRIS represented that the Modem would "deliver the fastest

speeds" and "most reliable connection to the Internet." Under the Modem's "Product description" heading, Arris further promised "lightning-fast broadband speed" and represented that the Modem would "make[] streaming HD Video, gaming, shopping, downloading, working, high quality voice and video conferencing, and peer-to-peer networking applications far more realistic, faster, and efficient than ever before." These representations and statements described above in this ¶ 21 were material to Plaintiff Onea. Based upon these representations and omissions, at the time of his purchase, Plaintiff Onea believed that the Modem was a fast, reliable modem suitable for online gaming as well as other purposes. Plaintiff Onea also reviewed the Modem's technical specifications in connection with his Modem purchases. In none of the aforementioned advertising and marketing materials did Arris disclose that the Modems suffered from high network latency, unreliable Internet connectivity, and other related performance problems. At the time of his Modem purchases, Plaintiff Onea was unaware of the pendency of this litigation and purchased without knowledge of the claims at issue herein. At various times during his operation of the Modem, Plaintiff Onea experienced high network latency, packet loss, unreliable Internet connectivity, slow Internet speeds, and other related performance issues. These Internet performance issues included significantly slow Internet performance, lags in data transmissions, Internet time-outs, and reports of large amounts of uncorrectable packets in the Modem diagnostics. The Modem's Internet performance issues manifested several times a day and became more persistent over time, which resulted in connectivity hang-ups and degraded the quality of Plaintiff Onea's regular Internet activities. Had Plaintiff Onea known that the Modems suffered from high network latency, unreliable Internet connectivity, and other related performance problems, he would not have purchased either Modem.

22.     Plaintiff Matthew Hopkins ("Hopkins") is a citizen of Ohio. Plaintiff Hopkins purchased a Modem on June 3, 2017 from bestbuy.com. Prior to his Modem purchase, Plaintiff Hopkins reviewed the website and information materials of his ISP—Wide Open West ("WOW")—for a list of DOCSIS 3.0 compatible or approved cable modems. This information listed his Modem as compatible and approved for use on WOW. In connection with his Modem purchase, Plaintiff Hopkins reviewed and relied upon the information and materials available on

the Best Buy product page for the Modem, including representations that the Modem was a "gigabit cable modem," with "32 channels for downloading" and "up to 1.4 GBps download speeds." Best Buy's product page also featured a picture of the front of Modem's packaging. Plaintiff Hopkins also reviewed information and materials on the Best Buy product page for the Modem appearing under the "From the manufacturer" heading, which was provided by Arris for display to consumers. On this section of Best Buy's website, Arris represented that the Modem would "deliver the fastest speeds" and "most reliable connection to the Internet." Under the Modem's "Product Features" heading on the Best Buy webpage, Arris further represented that the Modem was the "First Gigabit+ Cable Modem in retail" and promised that the Modem would allow Plaintiff to "surf faster" for "hardcore gaming" and "real real-time gaming" experiences. These representations and statements described above in this ¶ 22 were material to Plaintiff Hopkins. Based upon these representations and omissions, at the time of his purchase, Plaintiff Hopkins believed that the Modem was a fast, reliable modem suitable for real-time data operations, online gaming, as well as other purposes. Plaintiff Hopkins also reviewed the Modem's technical specifications in connection with his Modem purchases. In none of the aforementioned advertising and marketing materials did Arris disclose that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. At the time of his Modem purchase, Plaintiff Hopkins was unaware of the pendency of this litigation and purchased without knowledge of the claims at issue herein. Almost immediately after purchase, and at various times during his operation of the Modem, Plaintiff Hopkins experienced high network latency, increased jitter, unreliable Internet connectivity, slow Internet speeds, and other related performance issues. These Internet performance issues included significantly slow Internet performance and lags during online gaming activities. These internet slowdowns disrupted Plaintiff Hopkins' gameplay, and, at times, made such gaming impossible. The Modem's Internet performance issues also significantly affected Plaintiff Hopkins' operation of Sling TV—an Internet-dependent television service—resulting in poor streaming quality. Had Plaintiff Hopkins known that the Modem suffered from high network

1  latency, unreliable Internet connectivity, and other related performance problems, he would not

2  have purchased the Modem.

3       23.     Plaintiff Michael Alexander ("M. Alexander") is citizen of Pennsylvania.

4  Plaintiff M. Alexander purchased a Modem on March 10, 2016 at a Best Buy store in

5  Philadelphia, Pennsylvania. Prior to his Modem purchase, Plaintiff M. Alexander reviewed the

6  website and information materials of his ISP—Comcast—for modems compatible with

7  Comcast's premium cable internet. The Modem was listed as compatible with Plaintiff M.

8  Alexander's service. Prior to purchasing the Modem, Plaintiff M. Alexander reviewed the

9  information, materials, specifications, and reviews available on the Amazon.com product page

10 for the Modem, including an image of the front of the Modem's packaging, which represented

11 that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM

12 CHANNELS" and "SPEEDS UP TO 1.4 GBPS." Prior to purchasing the Modem, Plaintiff M.

13 Alexander also visited Arris's website and reviewed the information and technical specifications

14 for the Modem. Arris's website represented that the Modem would "deliver the fastest speeds"

15 and the "most reliable connection to the Internet." The representations and statements described

16 above in this ¶ 23 were material to Plaintiff M. Alexander. None of these representations or

17 statements disclosed that the Modem suffered from high network latency, unreliable Internet

18 connectivity, and other related performance problems. The representations and statements

19 further failed to disclose that the Modem would only support 24 download channels on Plaintiff

20 M. Alexander's ISP network, Comcast. Based on the foregoing representations and omissions,

21 at the time of his purchase, Plaintiff M. Alexander believed the Modem was a fast, reliable

22 modem suitable for online activities. At the time he purchased his Modem, Plaintiff M.

23 Alexander did not know that the Modem suffered from high network latency, unreliable Internet

24 connectivity, and other related performance problems. Nor did he know that the Modem was

25 only capable of 24 downstream channels on his ISP, Comcast. At various times during the

26 operation of the Modem, Plaintiff M. Alexander experienced high network latency, unreliable

27 internet connectivity, slow internet speeds, or other related performance issues. Had Plaintiff M.

28 Alexander known that the Modem suffered from high network latency, unreliable Internet

connectivity, and other related performance problems—or had he known that the Modem could only achieve 24 downstream channels on Comcast—he would not have purchased the Modem.

24. Plaintiff Jean Pierre Crespo ("Crespo") is a citizen of Pennsylvania. Plaintiff Crespo purchased a Modem on June 18, 2016 at bestbuy.com for pickup at a Best Buy retail store in Whitehall, Pennsylvania. Prior to purchasing the Modem, Plaintiff Crespo reviewed the information, materials, specifications, and reviews available on the bestbuy.com product page for the Modem, including an image of the front of the Modem's packaging, which represented that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and "SPEEDS UP TO 1.4 GBPS." Prior to purchasing the Modem, Plaintiff Crespo also visited Arris's website and reviewed the information and technical specifications for the Modem. Arris's website represented that the Modem would "deliver the fastest speeds" and the "most reliable connection to the Internet." The representations and statements described above in this ¶ 24 were material to Plaintiff Crespo. None of these representations or statements disclosed that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. Based on the foregoing representations and omissions, at the time of his purchase, Plaintiff Crespo believed the Modem was a fast, reliable modem suitable for online activities. At the time he purchased his Modem, Plaintiff Crespo did not know that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. At various times during the operation of the Modem, Plaintiff Crespo experienced high network latency, unreliable internet connectivity, slow internet speeds, or other related performance issues. These internet slowdowns disrupted Plaintiff Crespo's use of the Modem for gaming, and, at times, made such gaming impossible. The Modem's Internet performance issues also significantly impaired Plaintiff Crespo's ability to stream online content. Had Plaintiff Crespo known that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems, he would not have purchased the Modem.

25. Plaintiff Callan Christensen ("Christensen") is a citizen of Texas. Plaintiff Christensen purchased a Modem on January 15, 2017 at bestbuy.com for pickup at a Best Buy

retail store in College Station, Texas. Prior to purchasing the Modem, Plaintiff Christensen reviewed the information, materials, specifications, and reviews available on the bestbuy.com product page for the Modem, including an image of the front of the Modem's packaging, which represented that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and "SPEEDS UP TO 1.4 GBPS." Prior to purchasing the Modem, Plaintiff Christensen also visited Arris's website and reviewed the information and technical specifications for the Modem. Arris's website represented that the Modem would "deliver the fastest speeds" and the "most reliable connection to the Internet." The representations and statements described above in this ¶ 25 were material to Plaintiff Christensen. None of these representations or statements disclosed that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. Based on the foregoing representations and omissions, at the time of his purchase, Plaintiff Christensen believed the Modem was a fast, reliable modem suitable for online activities. At the time he purchased his Modem, Plaintiff Christensen did not know that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. At various times during the operation of the Modem, Plaintiff Christensen experienced high network latency, unreliable internet connectivity, slow internet speeds, packet loss, or other related performance issues. These Internet slowdowns disrupted Plaintiff Christensen's use of the Modem for gaming, and, at times, made such gaming impossible. The Modem's Internet performance issues also significantly impaired Plaintiff Christensen's operation of Voice over Internet Protocol ("VoIP")—Internet-dependent telephone service—resulting in call degradation, poor performance, and dropped calls. Had Plaintiff Christensen known that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems, he would not have purchased the Modem.

26.    Plaintiff William Rosenberg ("Rosenberg") is citizen of Texas. Plaintiff Rosenberg purchased a Modem at either a Best Buy or Walmart store in Texas prior to January 6, 2017. Prior to purchasing the Modem, Plaintiff Rosenberg viewed the Modem's packaging. The front of the Modem's packaging represented that the Modem was the "First Gigabit+ Cable

1   Modem," a "DOCSIS 3.0 Cable Modem," with "32 DOWNSTREAM CHANNELS" and
2   "SPEEDS UP TO 1.4 GBPS." The back of the Modem's packaging represented that the Modem
3   provided     "BLAZING-FAST     INTERNET.     ULTIMATE     GAMING.     INSTANT
4   GRATIFICATION," as well as "Unbelievable download speeds and a 600 MHz dual processor."
5   The representations and statements described above in this ¶ 26 were material to Plaintiff
6   Rosenberg. None of these representations or statements disclosed that the Modem suffered from
7   high network latency, unreliable Internet connectivity, and other related performance problems.
8   Based on the foregoing representations and omissions, at the time of his purchase, Plaintiff
9   Rosenberg believed the Modem was a fast, reliable modem suitable for online activities. At the
10  time he purchased his Modem, Plaintiff Rosenberg did not know that the Modem suffered from
11  high network latency, unreliable Internet connectivity, and other related performance problems.
12  At various times during the operation of the Modem, Plaintiff Rosenberg experienced high
13  network latency, unreliable internet connectivity, slow internet speeds, or other related
14  performance issues. These Internet slowdowns and freezes disrupted Plaintiff Rosenberg's use
15  of the Modem for gaming and, at times, made such gaming impossible. Plaintiff Rosenberg also
16  experienced frequent and significant issues with internet page loads. Plaintiff Rosenberg needed
17  to frequently reboot his Modem—as frequently as every two days. Had Plaintiff Rosenberg
18  known that the Modem suffered from high network latency, unreliable Internet connectivity, and
19  other related performance problems, he would not have purchased the Modem.

20          27.     Plaintiff Larry Bavry ("Bavry") is a citizen of Virginia. Plaintiff Bavry purchased
21  a Modem on September 24, 2016 at bestbuy.com for pickup at a Best Buy retail store in Virginia
22  Beach, Virginia. Prior to purchasing the Modem, Plaintiff Bavry reviewed the information,
23  materials, specifications, and reviews available on the bestbuy.com product page for the Modem,
24  including an image of the front of the Modem's packaging, which represented that the Modem
25  was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and
26  "SPEEDS UP TO 1.4 GBPS." The packaging also indicated that purchasers "Get what you pay
27  for – supports Gigabit service tiers." The representations and statements described above in this
28  ¶ 27 were material to Plaintiff Bavry. None of these representations or statements disclosed that

the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. Based on the foregoing representations and omissions, at the time of his purchase, Plaintiff Bavry believed the Modem was a fast, reliable modem suitable for online activities. At the time he purchased his Modem, Plaintiff Bavry did not know that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. At various times during the operation of the Modem, Plaintiff Bavry experienced high network latency, unreliable internet connectivity, slow internet speeds, or other related performance issues. Plaintiff Bavry uses AT&T Microcell for home cellular service. AT&T Microcell is a VoIP— Internet-dependent telephone service—which uses an ethernet connect to connect to AT&T servers. Upon startup, the Microcell tests the Internet connection for speed and latency, and if the Internet does not pass the test, the Microcell will not initialize. The Modem's Internet performance issues significantly impaired Plaintiff Bavry's ability to use Microcell. On many occasions, Microcell would not initialize, or if it did initialize it would shut down, indicating a loss of Internet connection. In addition, because of the Modem's Internet performance, Plaintiff Bavry experienced call degradation, poor performance, and dropped calls. These Internet slowdowns also significantly impaired Plaintiff Bavry's ability to stream online content. Had Plaintiff Bavry known that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems, he would not have purchased the Modem.

28.     Plaintiff Matthew Winkelman ("Winkelman") is a citizen of Virginia. Plaintiff Winkelman purchased a Modem on January 5, 2018 from bestbuy.com. In connection with his Modem purchase, Plaintiff Winkelman reviewed and relied upon the information and materials available on the Best Buy product page for the Modem, including representations that the Modem was a "gigabit cable modem," with "32 channels for downloading" and "up to 1.4 GBps download speeds." Best Buy's product page also featured a picture of the front of Modem's packaging. Plaintiff Winkelman also reviewed information and materials on the bestbuy.com product page for the Modem appearing under the "From the manufacturer" heading, which was provided by Arris for display to consumers. On this section of Best Buy's website, Arris

represented that the Modem would "deliver the fastest speeds" and "most reliable connection to the Internet." Under the Modem's "Product Features" heading on the Best Buy webpage, Arris further represented that the Modem was the "First Gigabit+ Cable Modem in retail" and promised that the Modem would allow Plaintiff to "surf faster" for "hardcore gaming" and "real real-time gaming" experiences. These representations and statements described above in this ¶ 28 were material to Plaintiff Winkelman. Based upon these representations and omissions, at the time of his purchase, Plaintiff Winkelman believed that the Modem was a fast, reliable modem suitable for real-time data operations, online gaming, as well as other purposes. Plaintiff Winkelman also reviewed the Modem's technical specifications in connection with his Modem purchase. In none of the aforementioned advertising and marketing materials did Arris disclose that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. At the time of his Modem purchase, Plaintiff Winkelman was unaware of the pendency of this litigation and purchased without knowledge of the claims at issue herein. At the time he purchased his Modem, Plaintiff Winkelman did not know that the Modem suffered from high network latency and unreliable Internet connectivity, and he did not know that the Modem was only capable of 24 downstream channels on his Comcast network. At various times during his operation of the Modem, Plaintiff Winkelman experienced high latency, unreliable Internet connectivity, slow Internet speeds, and other related performance issues. These Internet performance issues included significantly slow Internet performance and lags during online gaming activities. Plaintiff Winkelman's operation of online trading platforms was also negatively affected, resulting in unreliable transmissions of quotes and significant lags in the execution of trade orders. On or around November 7, 2018, Plaintiff Winkelman received a replacement Modem from Arris under warranty coverage. Plaintiff Winkelman continues to experience the same performance issues with the replacement Modem. Had Plaintiff Winkelman known that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance issues—or had he known that the Modem could only achieve 24 downstream channels on Comcast—he would not have purchased the Modem.

29.     Plaintiff William Haworth ("Haworth") is a citizen of Washington. Plaintiff Haworth purchased a Modem on May 3, 2017 through eBay.com. The modem was certified refurbished at the time of purchase. Prior to his Modem purchase, Plaintiff Haworth reviewed the website and information materials of his ISP—Comcast—for modems compatible with Comcast's premium cable internet. The Modem was listed as compatible with Plaintiff Haworth's service. Prior to purchasing the Modem, Plaintiff Haworth reviewed the information, materials, and reviews available on the Amazon.com product page for the Modem, including an image of the front of the Modem's packaging, which represented that the Modem was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and "SPEEDS UP TO 1.4 GBPS." Prior to purchasing the Modem, Plaintiff Haworth also reviewed the information and technical specifications set forth on Arris's website. Arris's website represented that the Modem would "deliver the fastest speeds" and the "most reliable connection to the Internet." The representations and statements described above in this ¶ 29 were material to Plaintiff Haworth. None of these representations or statements disclosed that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. The representations and statements further failed to disclose that the Modem would only support 24 download channels on Plaintiff Haworth's ISP network, Comcast. Based on the foregoing representations and omissions, at the time of his purchase, Plaintiff Haworth believed the Modem was a fast, reliable modem suitable for online activities. At the time he purchased his Modem, Plaintiff Haworth did not know that the Modem suffered from high network latency, unreliable Internet connectivity, and other related performance problems. Nor did he know that the Modem was only capable of 24 downstream channels on his ISP, Comcast. At various times during the operation of the Modem, Plaintiff Haworth experienced high network latency, unreliable internet connectivity, slow internet speeds, or other related performance issues. The Modem's Internet performance issues significantly affected Plaintiff Haworth's operation of Skype—an Internet-dependent video and audio-conferencing service—resulting in call degradation, poor performance, and dropped calls. Plaintiff Haworth's operation of a VPN was also regularly impacted by the Modem's Internet performance issues. Had Plaintiff Haworth known that the

1   Modem suffered from high network latency, unreliable Internet connectivity, and other related
2   performance problems—or had he known that the Modem could only achieve 24 downstream
3   channels on Comcast—he would not have purchased the Modem.

4        30.    Plaintiff Damien Probé ("Probé") is a citizen of Washington. Plaintiff Probé
5   purchased a Modem on August 27, 2016 through eBay.com. The modem was "New in Box" at
6   the time of purchase. Prior to purchasing the Modem, Plaintiff Probé reviewed the information,
7   materials, specifications, and reviews available on the eBay.com product page for the Modem,
8   including an image of the front of the Modem's packaging, which represented that the Modem
9   was the "First Gigabit+ Cable Modem," with "32 DOWNSTREAM CHANNELS" and
10  "SPEEDS UP TO 1.4 GBPS." The representations and statements described above in this ¶ 30
11  were material to Plaintiff Probé. None of these representations or statements disclosed that the
12  Modem suffered from high network latency, unreliable Internet connectivity, and other related
13  performance problems. Based on the foregoing representations and omissions, at the time of his
14  purchase, Plaintiff Probé believed the Modem was a fast, reliable modem suitable for online
15  activities. At the time he purchased his Modem, Plaintiff Probé did not know that the Modem
16  suffered from high network latency, unreliable Internet connectivity, and other related
17  performance problems. At various times during the operation of the Modem, Plaintiff Probé
18  experienced high network latency, unreliable internet connectivity, slow internet speeds, or other
19  related performance issues. These internet slowdowns disrupted Plaintiff Probé's use of the
20  Modem for gaming, and, at times, made such gaming impossible. Had Plaintiff Probé known
21  that the Modem suffered from high network latency, unreliable Internet connectivity, and other
22  related performance problems, he would not have purchased the Modem.

23       31.    Defendant Arris is a corporation organized under the laws of England and Wales
24  and maintains its headquarters at 3871 Lakefield Drive, Suwanee, Georgia 30024. Defendant
25  Arris is a citizen of Georgia. As publicly announced on April 4, 2019, Arris is a wholly-owned
26  subsidiary of CommScope Holding Company, Inc., its parent company. In its public statements,
27  Arris describes itself as a "world leader in entertainment and communications technology" and
28  states that it provides "hardware, software, and services across the cloud, network, and home to

power TV and Internet for millions of people around the globe." Arris operates two business segments: Customer Premises Equipment and Network & Cloud. Arris provides equipment and technology, including cable modems, that is used by service providers to deliver media, voice, and data services to their subscribers.

## III.    JURISDICTION AND VENUE

32.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because there are more than 100 proposed Class Members, some members of the proposed class and the Defendant are citizens of different states, and the amount in controversy exceeds $5 million.

33.    This Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts with California such that the exercise of jurisdiction by this Court over Defendant is consistent with notions of fair play and substantial justice. A substantial portion of the wrongdoing alleged in this Fourth Amended Consolidated Class Action Complaint took place in California; Defendant conducts business in California and otherwise avails itself of the protections and benefits of California law through the promotion, marketing, and sale of its Modems in the State; and this action arises out of or relates to these contacts.

34.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant maintains an office in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and a substantial part of the property that is the subject of the action is situated in this District.

35.    Intradistrict Assignment: Pursuant to Civil L.R. 3-2(c) and 3-5(b), assignment to the San Jose Division of the Northern District of California is proper because a substantial part of the events or omissions which give rise to the claim occurred in this Division or a substantial part of the property subject to the action is situated in this Division. One or more of the Plaintiffs resides in this District. Defendant is engaged in the extensive promotion, marketing, distribution, and sale of the products at issue in this Division.

IV.     **SUBSTANTIVE ALLEGATIONS**[1]

    **A.     The Cable Modem Market.**

36.     A cable modem is a device that enables a computer to transmit data over a coaxial cable line. The cable modem is located at the cable subscriber's home, and connects to the cable network to receive and transmit digital information between subscriber-owned devices (such as desktop PCs or routers) and the service provider's headend or central office, providing Internet connectivity for data and/or voice services.

37.     Cable subscribers generally obtain their cable modem for Internet connectivity in one of two ways—they either rent a cable modem that is owned by their cable service provider (for example, Comcast), or they purchase the cable modem at retail. Arris is one of several manufacturers of cable modem hardware and related equipment for service providers and consumers. Other large competitors include Cisco Systems, Inc. and Netgear, Inc.

38.     As of 2016, the cable subscriber base in the United States was approximately 50 million. Due to the size of the cable subscriber base, the market for cable modems is very large. According to Arris's public statements, the markets in which it participates are "dynamic, highly competitive and require companies to react quickly and capitalize on change."

39.     Cable modem capability is measured by a telecommunications standard named Data Over Cable Service Interface Specification ("DOCSIS"). DOCSIS is administered by Cable Television Laboratories, Inc., known as CableLabs, a not-for-profit research and development consortium composed of industry participants. DOCSIS provides cable modem manufacturers and service providers a common method for products to work together in a predictable manner. DOCSIS has evolved over time to support new capabilities, including higher Internet speeds. The cable modems at issue in this case used the DOCSIS 3.0 standard.

40.     Cable modems may be differentiated based on the "bits per second" or "bps" they can process. A "bit" is a basic unit of information in computing and digital communications. The

---

[1] Plaintiffs' Fourth Amended Consolidated Class Action Complaint does not amend the factual allegations set forth in their previously-operative Second Amended Class Action Complaint (Docket No. 59). On information and belief, the following allegations (¶¶ 36-142) were true and correct as of February 5, 2018.

1    term "Gbps" is a measurement in billions of bits per second, "Mbps" is a measurement in

2    millions of bits per second, and "Kbps" is a measurement in thousands of bits per second.

3    Generally speaking, larger bps units denote higher data speed capability. Similarly, cable

4    modems are equipped with "upstream" and "downstream" channels for data. The more channels

5    a cable modem has, the more bps it can handle, improving capability.

6        **B.**      **Arris Markets and Touts the Modems as "Delivering the Fastest
7    Speeds" and the "Most Reliable" Connection to the Internet.**

8        41.    On its website, Arris described its SURFboard line of cable modems as follows:

9            The Internet brings us together. It lets us experience the wealth of our
     global community with friends, family, and the entire world. If you want
10   an unmatched Internet experience, look no further than ARRIS
     SURFboard modems. We're the industry standard and the world's
11   standard—with over 175 million ARRIS modems sold.

12           ARRIS continuously evolves the SURFboard product line to deliver the
     fastest download speeds available.
13

14           When you choose an ARRIS SURFboard, you're joining a 60-year legacy
     of innovation from the company that invented digital TV and brought
15   wireless Internet into the home with the first cable modem gateway. The
     same company that the world's leading service providers choose to
16   connect millions of people around the world to the Internet.

17       42.    During relevant times, Arris prominently marketed and advertised the Modem

18   based on its purported speed and reliability. For example, on its website and on the Amazon e-

19   commerce platform, Arris included the following representation:

20           Introducing the first Gigabit+ Cable Modem available in retail. The
     SURFboard SB6190 is a DOCSIS 3.0 modem [and] is capable of
21   download speeds up to 1.4 Gbps! That's fast enough to download multiple
     HD movies in one minute! Power your home network with the SB6190 to
22   deliver the fastest speeds and most reliable connection to the Internet.
     Own yours today and stop paying rental.
23

24       43.    In addition, on its website, Arris touted the Modem as "the First Gigabit Cable

25   Modem" able to achieve "download speeds up to 1.4 Gbps." Arris further touted the Modem as

26   a "DOCSIS 3.0 Cable Modem" with "32 download and 8 upload channels." Arris stated that the

27   Modem supported the Internet Protocols "IPv4 and IPv6 – the latest Internet standard."

28

---

44.     The Modem's packaging repeated these claims and representations: (a) "32 Downstream Channels, Speeds up to 1.4 Gbps"; (b) "DOCSIS 3.0 Cable Modem"; (c) "32 Download and 8 Upload Channels"; and (d) "Get what you pay for – supports gigabit service tiers." The packaging further contains the statement "First Gigabit+ Cable Modem" and is emblazoned with a seal stating "over 135 million sold" and "#1 selling modem." The Modem's packaging also claimed that the Modem was "Compatible with Major U.S. Cable Providers, Including Xfinity from Comcast" and others.

45.     Pictures of the Modem's original packaging are included on the following pages:



*Figure 1: Front of the Box*



*Figure 2: Back of the Box*

**C.**    **High Network Latency Results in Connection Delays and Prevents Cable Modems from Utilizing their Maximum Advertised Bandwidth.**

46.    In the context of computer networking, network latency refers to delays that occur in data communication over a network. Internet connections with low latency experience only small delay times, while those with high latency suffer from long delays.

47.    Although network speed is frequently only discussed in terms of bandwidth—the data rate supported by a network interface (e.g., 1.4 Gbps)—network latency also affects end users' ability to make use of a device's advertised speeds. Excessive latency creates bottlenecks that prevent data from filling the network pipe, thus decreasing the effective throughput and limiting the maximum effective bandwidth of the connection.

48.    Network latency is measured in milliseconds ("ms"), where the number of milliseconds represents the amount of time each packet of data is delayed. Smaller numbers indicate smaller delays, and larger numbers indicate substantial delays in the connection and a potential problem with the network device.

49.    For a cable modem, typical network latency between a computer and a cable modem ranges from approximately 5ms to 40ms. Latency above this range results in connection delays and prevents a cable modem from utilizing its maximum advertised bandwidth.

**D.**    **Arris Knew About Latency Defects Affecting the Modem During Product Development.**

50.    Beginning sometime in or around January 2015, Arris designed the Modem to include a chipset manufactured by Intel Corporation called the "Puma 6." According to Intel, the Puma 6 chipset is a system on chip ("SoC") which, depending on its configuration and implementation, is capable of bonding up to 32 downstream data channels and supporting data rates of up to 1.6 Gigabits per second ("Gbps").

51.    Despite its purportedly lofty throughput capabilities, the Puma 6 chipset suffers from a complex and multi-faceted series of network latency defects, which Arris and Intel have attempted to mitigate since sometime on or before January 6, 2016.

52.     Arris was aware of at least some of the Puma 6 latency defects while developing the Modem prior to its public release. In one example from December 2016, an Arris quality engineer retrospectively described the cause of a latency defect as follows: "Intel Puma 6 chip has ping latency which was a known condition at design. It was not looked at as an issue. ████████████████████████████ ARRIS0536526.[2]

53.     In another example, in a 2017 presentation slide entitled "Key Quality Issues," the same Arris quality engineer again described the cause of the same latency defect: "Cause: Ping latency for ICMP packet ███████████████████████ This was a known issue by Intel and Arris and was not initially judged to be an issue during development." ARRIS0483493.

54.     Intel also experienced issues with UDP latency with the Puma 6 chipset prior to its release and communicated these issues to Arris. The UDP protocol is used in many real-time Internet applications, including video and audio streaming, videoconferencing, Voice-over-IP ("VoIP") calling, and multiplayer online gaming.

### E.     Arris Received Complaints About High and Erratic Network Latency Almost Immediately After Launching the Modem in November 2015.

55.     Despite having knowledge of some of the latency problems plaguing the Puma 6 chipset, Arris nevertheless proceeded through product development and launched the Modem to the retail market without conducting any comprehensive testing for network latency.

56.     On or around November 6, 2015, Arris obtained retail certification for the Modem from CableLabs, a not-for-profit entity organized by cable industry member companies for the purpose of research, development, and product certification, among other things.[3] ARRIS0001923. Shortly thereafter, Arris commenced sales of the Modem in the retail market.

57.     Arris quickly received complaints from purchasers of high and erratic network latency while using the Modem. On January 6, 2016, at least one purchaser initiated an online

---

[2] Ping is a program used to test whether a particular network destination is online, by sending an Internet Control Message Protocol ("ICMP") echo request and waiting for a response.
[3] See https://www.cablelabs.com/about-cablelabs/.

chat session with an Arris customer service agent and reported the following: "on BOTH my SB6190, and the leased DG2470, I see ping ti9mes [*sic*] ranging from 3ms, to 10ms, to even 100ms or higher, in spikes, which occur very frequently."

58.     Arris's customer service department escalated the Modem user's January 6 complaint to members of Arris's engineering management team, putting them immediately on notice of the defect's impact. ARRIS0404878.

59.     Complaints about erratic latency were also appearing on internet forums and capturing the attention of Internet Service Providers. On or around January 13, 2016, Arris created an official product defect ticket to address the reported latency issues, denoted in its internal tracking system as "PD 12372." Arris summarized the defect as follows: "Comcast reports their users (and forums) being alarmed by erratic ping times when pinging the ██████████████████████ SB6190." ARRIS0127733.

60.     Investigating PD 12372, one senior Arris engineer described his and his colleague's testing of the reported latency spikes: "Bill and I have reproduced this behavior in our lab as well and see somewhat erratic ping times as compared to Broadcom based devices." ARRIS0142870.

61.     Certain key Arris personnel were reluctant to work on the reported latency defects. One senior firmware manager bristled at receiving ownership of PD 12372, believing he and his team had more important issues to address: ████████████████████ ██████████████████████████████████ ██████████████████ ARRIS0139227.

62.     By March 9, 2016, Arris began to receive pressure from Comcast Corporation to resolve the reported latency defect. ARRIS0128146.

63.     ████████████████████████████ ██████████████████████████████ ██████████████████████ ARRIS0128146.

_____
4 ████████████████████████████

**F.      Arris Released Updated Firmware for the Modem in April 2016 That Introduced a DNS Packet Loss Defect in Addition to the Reported Latency Defects.**

64.      After nearly four months of delays, on or around April 29, 2016, Arris finally released updated firmware for the Modem designed in part to fix the latency defects described in PD 12372. The new firmware, denoted in Arris's release nomenclature as 9.1.93N, superseded the previous version, 9.1.93K, which the Modem had contained since launch. ARRIS0123006.

65.      The 9.1.93N firmware fixed only a narrow subset of the latency issues affecting the Modem, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Release notes for the 9.1.93N firmware described the latency defect as follows: "Erratic Ping Times are observed at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ARRIS0123006.

66.      The 9.1.93N firmware release was not successful. While it partially mitigated the reported ping latency issue, in doing so it introduced a new, but still related, latency defect: DNS packet loss.[5]

67.      On May 21, 2016, a Modem user named "train_wreck" posted the following observation to the *DSLReports.com* online forum under the heading "[Firmware] Problems with the new 6190 firmware 9.1.93N":

> Anyone having sporadic packet errors or other issues after getting the new firmware? For 3 days in a row now, my IPsec VPNs go down, complaining about bad packet headers and bad length fields. When this happens, the modem web UI will be very slow to respond. Each time, I reset the modem and traffic restores immediately, only to have issues reappear within 24 hours. Happened right after getting the firmware, nothing else has changed on my end.[6]

---

[5] The Domain Name System ("DNS") is a distributed name and address mechanism used on the Internet. DNS converts or resolves domain names (e.g., xyz.com) to IP addresses (e.g, 123.456.789.000), similar to the way that a phone book is used to look up the address or phone number for the name of a particular brick-and-mortar business.

[6] *See* http://www.dslreports.com/forum/r30771922-Firmware-Problems-with-the-new-6190-firmware-9-1-93N.

---

68.     Another Modem user posted a similar message to Comcast's official Reddit forum. On June 8, 2016, a user named "fredkilbourn" wrote in pertinent part: "Three to six hours after rebooting my modem I experience around 5% packet loss that only stops when I reset my modem again. . . . My SB6190 is running the latest firmware as far as i know (9.1.93N)."[7]

69.     Fredkilbourn's June 8 Reddit post captured the attention of both Comcast and Arris. That day, a principal Comcast engineer sent to his contacts at Arris a link to fredkilbourn's findings, asking if they had seen similar reports. A senior Arris sales engineer responded, "Well this is new." ARRIS0123253.

70.     ████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████ reported to Arris that the user was still experiencing DNS packet loss. ARRIS0123253.

71.     Between June 27 and June 30, 2016, personnel from Arris and Comcast discussed the packet loss issue over email. At one point, the principal Comcast engineer raised the possibility of a connection between the newly observed DNS packet loss issue and the previously reported LAN-side ping latency issue: "Doesn't it seem odd that when that happens, he also completely loses traffic through the modem, as well? It seems like the ping timeouts to the modem are just another symptom of the main problem. Something funky seems to be going on." ARRIS0123253.

72.     On June 30, 2016, Comcast downgraded the firmware on fredkilbourn's modem from 9.1.93N to the previous version, 9.1.93K. According to Comcast, fredkilbourn thereafter reported "17 hours of stability since with no problems" and said that it was "the longest it's been stable in a very long time." ARRIS0123253.

73.     But the relative stability of the 9.1.93K firmware came at a cost: a return to the ping latency defect that had plagued the Modem from the moment it first hit the market.

---

[7] *See* https://www.reddit.com/r/Comcast_Xfinity/comments/4n5iv1/packet_loss_issues_with_new_arris_surfboard_sb6190/.

74.     On August 8, 2016, a modem user named Robert Edmonds authored a blog post in which he described his experience switching between the 9.1.93N and 9.1.93K firmware versions:

> The first modem I tried was the Arris SB6190, which supports 32 downstream channels. It is based on the Intel Puma 6 SoC, and looking at an older release of the SB6190 firmware source reveals that the device runs Linux. This device, running the latest 9.1.93N firmware, goes into a failure mode after several days of uptime which causes it to drop 1-2% of packets.
>
> *       *       *
>
> It didn't drop packets at random, though. Some traffic would be deterministically dropped, such as the parallel A/AAAA DNS lookups generated by the glibc DNS stub resolver.
>
> *       *       *
>
> The Arris SB6190 running firmware 9.1.93N would consistently interfere with these parallel DNS requests, but only when operating in its "degraded" mode. It also didn't matter whether glibc was configured to use an IPv4 or IPv6 nameserver, or which nameserver was being used. Power cycling the modem would fix the issue for a few days.
>
> My ISP offered to downgrade the firmware on the Arris SB6190 to version 9.1.93K. This firmware version doesn't go into a degraded mode after a few days, but it does exhibit higher latency, and more jitter....[8]

**G.      In November 2016, Numerous Additional Reports Confirmed that the Modems Suffered "Severe Latency Spikes."**

75.     On November 9, 2016, Plaintiff Christopher Stephens, a Modem user and Cox Communications subscriber identified online as "xymox1" began a forum thread on *DSLReports.com* under the heading: "[Modem] SB6190 is a terrible modem - Intel Puma 6 / MaxLinear mistake." Xymox1's post articulated a new variant of the ping latency defect, namely one that affected latency *through* the Modem, to and from the Internet—not simply between the Modem and a user's local computer. Xymox1 explained his experience as follows:

> So. I was excited to upgrade from my Arris SB6183 to the Arris SB6190. We have 32 x 8 service in phoenix. While they do not have gigabit turned on yet, the infrastructure is turned on and ready.

---

[8] *See* http://blog.mycre.ws/articles/cable-modems-arris-sb6190-vs-netgear-cm600/.

> I was really surprized [*sic*] when the SB6190 clearly performed noticeably worse. My levels are awesome. My errors on all 32 channels are nil. YET browsing the web was noticeably slower and kinda stuttery. I went back to the SB6183. Way better. Back to the SB6190, clearly worse.
>
> Then I noticed that gaming latency to local servers had doubled ?! And was highly jittery..
>
> I run Multiping doing 3 pings a second to my Cox CMTS and run that 24/7 and chart that. I have for 8 years. I was SHOCKED at what i saw.
>
> A HUGE MESS. Latency thru this modem DOUBLED. Not only that but had 250ms spikes every few seconds.[9]

76. Several additional users chimed in with similar experiences, and the latency defect began to gather steam both online and within Arris and Intel.

77. On November 11, 2016, a senior Arris firmware manager forwarded a link to xymox1's forum thread to several of his Arris colleagues. Over the next several days, the Arris representatives discussed the report and attempted to duplicate the latency defects on their own systems. During the course of their discussion, the Arris representatives questioned whether the newly reported latency defect was related to the earlier latency defect that they claimed to have resolved several months earlier in the investigation surrounding PD 12372. ARRIS0001866.

78. Intel also continued its own work on the latency defects. On or around November 16, 2016, Arris and Intel held a meeting at which they discussed three distinct latency issues: (1) "high ping latency and jitter;"[10] (2) "Modem dropping 1-2% of the DNS packets;" and (3) "SB6190 latency ██████████████████████████████

79. Intel's notes of its November 16 meeting with Arris explicitly described the DNS packet loss issue as a "side effect" of its earlier solution to the LAN-side ping latency problem. ARRIS0470448.

---

[9] *See* http://www.dslreports.com/forum/r31079834-Modem-SB6190-is-a-terrible-modem-Intel-Puma-6-MaxLinear-mistake.

[10] Jitter is the variability in the sending, receiving, and acknowledgment of data. Whereas latency refers to the delay in time to transmit a packet from it source to its destination, jitter refers to the amount that delay varies over time (similar to the statistical concept of standard deviation). High amounts of jitter can results in significantly degraded network performance.

80. These defects, however, were not the only latency defects affecting the Modem. On December 1, 2016, Arris and Intel held another meeting in which the two companies discussed at least five distinct latency defects affecting the Puma 6 chipset: (1) "ping response time;" (2) "UDP [upstream] latency under load traffic;" (3) "HTTP session latency (web page download);" (4) "HTTP response time (HTTP session initialization);" and (5) "DNS resolution time." ARRIS0386751.

81. As concerns on social media about the newly reported latency issues continued to snowball, journalist Karl Bode aggregated the reports into a November 29, 2016 article on *DSLReports* entitled "The Arris SB6190 Modem & Puma 6 Chipset Have Some Major Issues." In it, Bode wrote:

> An electrical engineer and Cox broadband subscriber in our forums recently purchased the Arris SB6190, thinking it would be a notable upgrade from the Arris SB6183 and prepare him for the likely future launch of Cox gigabit broadband service in Arizona. The device, which features the Intel Puma 6 chipset, supports 32 x 8 channel bonding and is supposed to be relatively cutting edge -- at least among DOCSIS 3.0 devices.
>
> Unfortunately for xymox1 [the user], he discovered that this supposed upgrade is in fact a downgrade; one that results in notable connectivity issues and consistently severe latency spikes.
>
> The user, who has been charting home network performance for the better part of eight years, documented . . . just how well this new device performs. As in: it doesn't.
>
> "The problem is extreme and, frankly, horrific," notes the user. "Arris and Intel Puma6/MaxLinear traded off speed for latency thinking no one would notice. They tossed latency out the window to get 32 bonded channels of speed. They tossed users under the bus as no user is really gonna use 1 Gbps, but they will feel the latency and latency jitter in DNS [domain name system] lookups."
>
> In fact, the new modem appears to have doubled his latency before the first packet even leaves his house. The user contacted Cox, but even after ensuring the modem was running the latest firmware the problem persisted.
>
> Curious as to why this problem exists at all, the user opened the device and discovered that Arris appears to have replaced the Broadcom chipset common to the more recent Surfboard modems, with an Intel Puma 6 chipset. There appear to have been more than a few complaints about this particular chipset floating around the internet across North America, most of them regarding the same severe latency and jitter issues xymox1 has so carefully documented.

\*     \*     \*

It's unclear why such a problem wasn't caught earlier by CableLabs during product certification. ***Whatever the cause, posts to our forum appear to indicate that Arris is aware of the problem and currently working on a firmware update. When that updated firmware will arrive in the wild isn't clear.***[11]

82. Arris publicly acknowledged the Modems' severe latency problems discussed in the November 29, 2016 *DSLReports* article. A December 1, 2016 *DSLReports* follow-up article entitled "Arris Tells us It's Working With Intel on SB6190, Puma6 Problems," reported:

Arris tells DSLreports the company is working closely with Intel on a problem in their SB6190 modem (more specifically the Intel Puma 6 Chipset) that causes owners to suffer significant jitter and latency on their connections. As we noted earlier this week the problem results in users seeing significant (250ms+) latency spikes and troubling DNS lookup delays when browsing the internet or gaming.

\*     \*     \*

Arris' statement makes it clear that Intel's Puma 6 chipset does appear to be the culprit in the jitter and latency problem.

"ARRIS has been working actively with Intel to address the issue, which resulted in some SURFboard SB6190 users reporting latency while running high-performance apps," a[n Arris] company spokesperson tells me.

"Intel is providing a firmware fix to correct the condition, and we will issue it as soon as it is available," the company added. "We remain committed to providing the best broadband experience for all users of ARRIS devices and regret any inconvenience this issue caused."

\*     \*     \*

Our forums are filled with complaints from users on various ISPs all with one thing in common: they're using a modem with the Intel Puma 6 chipset as its CPU.

\*     \*     \*

In a statement to DSLreports, CableLabs indicated that the performance issues inherent in the Puma 6 chipset effectively falls outside of its jurisdiction.

"Products submitted for CableLabs certification are tested for compliance with the DOCSIS specifications, which define the interface requirements

---

[11] Karl Bode, *The Arris SB6190 Modem & Puma 6 Chipset Have Some Major Issues* (Nov. 29, 2016), http://www.dslreports.com/shownews/The-Arris-SB6190-Modem-Puma-6-Chipset-Have-Some-Major-Issues-138411 (emphasis added).

that allow devices from different manufacturers to interoperate with each other," the organization said. "The specifications specifically do not address performance requirements, so that manufacturers can differentiate their products through performance and additional features. As a result, CableLabs certification does not include performance testing."[12]

83.     On December 3, 2016, *The Register* posted an article entitled "Why your gigabit broadband lags like hell – blame Intel's chipset," further discussing the Modems' network latency problems. The article stated in part:

> Intel's Puma 6 chipset, used in gigabit broadband modems around the world, suffers from latency jitter so bad it ruins online gaming and other real-time connections.
>
> *                    *                    *
>
> **Modems powered by Intel's Puma 6 chipset that suffer from bursts of game-killing latency include the Arris Surfboard SB6190**, the Hitron CGNV4, and the Compal CH7465-LG, and Puma 6-based modems rebadged by ISPs, such as Virgin Media's Hub 3 and Comcast's top-end Xfinity boxes. There are other brands, such as Linksys and Cisco, that use the system-on-chip that may also be affected.
>
> The surges in lag are experienced by subscribers on various big ISPs, from Comcast, Charter and Cox in the US to Rogers in Canada and Virgin Media in the UK. You don't need a full 1Gbps connection to trigger the latency spikes – just at least a super-fast package and a buggy modem.[13]

84.     The *Register* article reproduced a graph created by "xymox1," the same Modem user quoted in the November 29, 2016 DSLReports article, which demonstrated the Modem's extreme latency spikes:

---

[12] Karl Bode, *Arris Tells us It's Working With Intel on SB6190, Puma6 Problems* (Dec. 1, 2016), http://www.dslreports.com/shownews/Arris-Tells-us-Its-Working-With-Intel-on-SB6190-Puma6-Problems-138434 (emphasis added).

[13] Chris Williams, *Why your gigabit broadband lags like hell – blame Intel's chipset* (Dec. 3, 2016), https://www.theregister.co.uk/2016/12/03/intel_puma_chipset_firmware_fix/ (emphasis added).



85.     By contrast, a similar cable modem manufactured by Arris but using a Broadcom chipset—the SB6183—exhibited no similar latency issues:



86. The *Register* article quoted "xymox1" as follows:

> "I excitedly swapped out my Arris SB1683 Broadcom modem for the new SB6190 Intel one expecting gigabit performance and immediately noticed slower webpage loads," he told *The Register*. "During first-person gaming, I was getting killed way more often for no apparent reason. I looked at an eight-year graph of latency from my home logs, and was horrified. ***Swapping back to my SB6183 solved all the issues.***"

(Emphasis added).

87. Finally, *The Register* article stated that Arris was aware of and acknowledged the network latency problems suffered by Modem users:

> "Arris has been working actively with Intel to address the issue, which resulted in some SURFboard SB6190 users reporting latency concerns," a spokeswoman for Arris said.
>
> "***We plan to quickly issue Intel's firmware updates to resolve any latency***. We remain committed to providing the best broadband experience for all users of Arris devices and regret any inconvenience this issue caused."

(Emphasis added).

88. Despite Arris's awareness and acknowledgement of the Modem's network latency problems and customer complaints in December 2016, to date, Arris continues to fail to disclose the defect in its marketing of the Modems and refuses to repair or replace the Modems.

**H.   Arris Conducted its Own Testing in December 2016 and Easily Reproduced the Reported Latency Defects.**

89. On or around December 1, 2016, Arris conducted its own internal testing of the ping latency defect, utilizing the same "Multiping" testing tool employed by the *DSLReports*.com Modem user xymox1. ARRIS0135052.

90. In testing the Modem, which was then loaded with the 9.1.93N firmware, Arris was quickly able to reproduce the reported latency spikes:

92.     On December 7, 2016, a different Arris engineer once again tested the Modem against the Broadcom-based SB6183. This time, however, Arris ████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ARRIS0135848.

93.     In writing to his colleagues, the Arris engineer described the Modem's ping latency as being ████████████████████████████████████ █ ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████ █ ████████████████████████████████████ ███████████████████████

96.     ████████████████████████████████████████

Arris's graph of ping latency depicted the Modem in red (or the top-most line with the higher spikes) against the much more stable SB6183, depicted in blue (or the bottom-most line):

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

█ ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

**I.      In January 2017, Arris Released Updated Firmware for the Modem That Failed to Resolve the Reported Latency Defects.**

100.    On or around January 10, 2017, Arris released updated firmware that claimed to address only one of the numerous latency defects affecting Modem users. Arris denoted its January 10 firmware release as version 9.1.93T, which superseded the previous version, 9.1.93N.

101.    According to the 9.1.93T firmware release notes, the updated firmware claimed to address an issue with ping latency as well as the corresponding DNS packet loss that Modem users reported after Arris's previous 9.1.93N firmware release. ARRIS0137342.

102.    The release notes for the 9.1.93T firmware version described the ping latency defect as occurring with "high" frequency and having a "service" impact on Modem users. The defect was summarized as follows: "The time interval to receive a response to a transmitted ping is longer than required by subscribers with time-sensitive applications." ARRIS0137342.

103.    As explained in the release notes, the 9.1.93T firmware also purported to address the corresponding DNS packet loss defect: "Under certain conditions, the modem may drop DNS packets, causing the applications to retransmit and increasing latency of DNS queries." ARRIS0137342.

104.    However, Arris's own testing prior to the release of the 9.1.93T firmware update showed that the update was not successful in reducing DNS latency. On or about January 10, 2017, Arris published results of tests conducted on then-forthcoming firmware version 9.1.93T. According to Arris's testing:



ARRIS0001215.

105.    On January 10, 2017, notwithstanding that Arris's own testing showed that the its DNS latency fixes were ineffective, Arris released the 9.1.93T firmware for general availability. In its 9.1.93T firmware release notes, Arris nevertheless included the "DNS Latency Issue" among the list of "Resolved Product Deficiencies" addressed by the release. ARRIS0137342.

106.    Moreover, the 9.1.93T firmware release did not even attempt to fix any of the other myriad latency issues affecting the Modem, leaving these defects unaddressed.

**J.    In March 2017, Arris Released Updated Firmware for the Modem That Still Failed to Resolve the Remaining Latency Defects.**

107.    On or around February 16, 2017, Arris and Intel held a meeting in which their representatives discussed Intel's recent efforts to fix the remaining latency issues. During the meeting, Intel provided Arris with a table showing real-world performance impacts suffered by Modem users ██████████████████████████████████████████ ████████████████████████████████:

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

108.    On or around March 24, 2017, after additional testing and development by Arris and Intel, Arris released updated firmware purportedly designed to address the remaining latency defects. Arris denoted its March 24 firmware release as version 9.1.93V, which superseded the previous version, 9.1.93T.

109.    According to the 9.1.93V firmware release notes, the updated firmware addressed several outstanding latency defects: (1) "UDP upstream delays during rate-limited TCP traffic;" (2) "HTTP delays under heavy TCP Ack load;" (3) "Slow HTTP session initiation;" and (4) "Slow DNS responsiveness." ARRIS1201581.

110.    However, Arris's own testing prior to the release of the 9.1.93T firmware update showed that the update was not successful in resolving TCP and HTTP latency issues. On or around March 24, 2017, Arris published results of tests conducted on then-forthcoming firmware version 9.1.93V. According to Arris's testing:



ARRIS0001233.

111.    On March 24, 2017, notwithstanding the above test report showing the ineffectiveness of its TCP and HTTP latency fixes, Arris released the 9.1.93V firmware for general availability. In its 9.1.93V firmware release notes, Arris nevertheless included the "TCP/UDP/DNS Latency Issues" among the list of "Resolved Product Deficiencies" which, according to its description, also included HTTP latency in addition to TCP, UDP and DNS latency. ARRIS1201581.

112.    In actuality, however, TCP and HTTP latency issues were not "really improved" for Modem customers. Like Arris's previous firmware releases, 9.1.93V was not successful in resolving the continuing latency defects suffered by Modem users. Although it purported to provide multiple latency improvements, even after the 9.1.93V "fix," Modem users continued to

experience new manifestations of the same substandard latency performance that had—and still has[14]—plagued the Modem since its inception.

113.    Sometime on or before April 10, 2017, the *DSLReports.com* forum user xymox1 received and tested the 9.1.93V firmware on his copy of the Modem. Though xymox1 noted some improvements in DNS resolution and DNS packet loss, the Modem user also reported a continuation of the same TCP latency defect experienced on the previous firmware versions.[15]

**K.    Intel Continued to Work on Latency Fixes for the Modem, but Arris Failed to Release Any Additional Updates to Consumers.**

114.    Even after releasing the 9.1.93V firmware, Intel continued work on additional patches to fix the Modem's continuing latency problems.

115.    On or around April 30, 2017, Intel published a presentation entitled "Intel Puma 6 latency issues updated report." Intel's April 30 presentation described ongoing work on a

███████████████████████████████████████

███████████████████████████ 87051DOC000066.

███████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

118.    On or around August 11, 2017, an Intel engineer shared with a large distribution of Arris personnel a presentation describing ongoing improvements designed ██████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████ ARRIS0002208.

_____

[14] Based on current information, 9.1.93V is the most recent firmware available for the Modem.
[15] *See* http://www.dslreports.com/forum/r31122204-SB6190-Puma6-TCP-UDP-Network-Latency-Issue-Discussion~start=2343.

120.

Zafaco describes itself as "a comprehensive, independent and neutral service provider in the areas of benchmarking, business service management and business intelligence with its own measurement technology infrastructure and nearly 52 million test connections per year."[16]

121.    According to Zafaco, "The recording of service quality has to reflect the perspective of the customer as authentically as possible so as to guarantee customer satisfaction.

_____

[16] *See* http://www.zafaco.de/en/company/zafaco/.

Customers perceive the quality of a service as a whole."[17] The Zafaco benchmarking suite is therefore designed to provide a "realistic simulation" of real-world performance. As Zafaco explains, "To be able to perform a realistic simulation of the customer, a realistic mix of the individual services with the corresponding application protocols is required, along with the simulation of a typical user profile, including the necessary authentication which a user passes through before the network provides a desired service."[18]



124.    Intel provided these additional firmware fixes in version 4.5.9.71 GA of the firmware for the Puma 6 chip to Arris on or about December 28, 2017. Arris, however, has failed to release these Intel latency fixes to consumers.

---

[17] *See* http://www.zafaco.de/en/service/benchmarking/summary/
[18] *See id.*

125.     Arris's most recent firmware update, 9.1.93V, was released on March 24, 2017. Over the last ten months, Modem users have continued—and still continue—to experience severe network latency issues. Over that time, Arris has failed provide any updates for the Modem, let alone any firmware updates that resolved or even addressed its outstanding latency issues.

**L.     In April 2017, Arris and Intel Became Distracted from the Latency Defects by a Widespread Denial-of-Service Vulnerability.**

126.     Arris has failed to release firmware for the Modem since March 24, 2017 in significant part because it and Intel have become distracted by a widespread and "trivial to exploit" denial-of-service ("DoS") security vulnerability.

127.     On April 27, 2017, *The Register* published an article describing the discovery of a serious DoS vulnerability affecting all modems containing the Puma 6 chipset—including the Modem. According to *The Register*:

> This week, inquisitive netizens discovered that, when presented with even modest amounts of network traffic – as little as a few thousand packets per second spread across various TCP or UDP ports – modems equipped with a Puma 6 slow to an unusable crawl.

> According to one engineer who spoke to *El Reg* on the issue, the flaw would be "trivial" to exploit in the wild, and would effectively render a targeted box useless for the duration of the attack.

> "You send a stream of 200Kbps of TCP, UDP or maybe even ICMP to different port numbers, and it has a tiny table to keep track of these that fills up. The device becomes immediately unresponsive. It comes back after you stop," our tipster explained.

> "It can be exploited remotely, and there is no way to mitigate the issue."

> This is particularly frustrating for Puma 6 modem owners because the boxes are pitched as gigabit broadband gateways: the devices can be potentially choked and knocked out simply by receiving traffic that's a fraction of the bandwidth their owners are paying for.

128.     Arris and Intel have struggled mightily to ameliorate the Puma 6 DoS vulnerability ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

ARRIS0367125.

129. █████████████████████████████████████

including the Modem. The effect of this discrepancy was to complicate and prolong the process of developing and releasing new firmware for the Modem.

130.    Not only is the Puma 6 DoS vulnerability a significant defect in its own right, but it is also one of the primary reasons that Modem users still do not have fixes available for the remaining latency defects.

131.    On August 3, 2017, a senior Arris sales engineer wrote to several of his Arris colleagues lamenting the lack of recent emphasis on the latency defects due to the DoS vulnerability:

(Emphasis added). ARRIS0002250.

132. █████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

ARRIS0968960.

133.    As Karl Bode of DSLReports recently explained in a news article titled, "Forum Topic: Intel Puma 6 Modem Flaw Still Not Fixed for Many":

> While Intel continues to deal with the fallout from revelations of a massive security flaw impacting most of its CPUs, users in our Arris/Surfboard forum continue to discuss the massive screw up regarding the Intel Puma6 chipset found in many commercial modems. The flaw has resulted in latency spikes and other performance issues for these modems for the

better part of the last year, and most ISPs and hardware vendors have only released what several users say are "cosmetic" fixes for the problem.[19]

134.    As of the filing of this Fourth Amended Consolidated Class Action Complaint, Modem users are still waiting for solutions to the remaining Puma 6 latency defects.

135.    As of the filing of this Fourth Amended Consolidated Class Action Complaint, Arris is still selling the Modem in its retail channels and has failed to warn consumers—or disclose in its product advertising, marketing, or packaging—about the presence of a long-known and multi-faceted product defect affecting the Modem.

**M.    Arris Also Failed to Notify Consumers That the Modem's Advertised 32-Channel, 1.4 Gbps Bandwidth Is Not Available on Comcast's Network.**

136.    As set forth above in ¶¶ 43-44, Arris has consistently touted the Modem throughout its product life as having "32 downstream channels" and "speeds up to 1.4 Gbps." Arris has also consistently advertised the Modem as having "32 download and 8 upload channels." In fact, according to Arris, the message the company was trying to convey with the Modems' product packaging was that it had 32 channels that allowed it to beat the one-gigabit barrier. The Modems' boxes also prominently stated that they were "COMPATABILE WITH MAJOR U.S. CABLE PROVIDERS, INCLUDING: XFINITY from COMCAST."

137.    However, when Modem users connect their device with Internet service from Comcast, their modem is provisioned to use only 24 downstream channels —not the advertised 32 channels of download capability. The Modem, when activated on Comcast, therefore cannot under any circumstances experience speeds equal to or greater than 1 Gbps—even if the Modem user subscribes to 1 Gbps service from Comcast.

138.    Despite advertising that the modem featured 32 downstream channels and was compatible with Comcast, Arris knew that the Modem could only use 24 channels on Comcast.

---

[19]  Karl Bode, *Forum Topic: Intel Puma 6 Modem Flaw Still Not Fixed for Many*, http://www.dslreports.com/shownews/Forum-Topic-Intel-Puma-6-Modem-Flaw-Still-Not-Fixed-for-Many-140994.

Arris, however, never disclosed this fact—and never corrected the false and misleading statements in its advertising, marketing, and product packaging.

139.    On July 15, 2016, in the midst of a discussion regarding whether or not to enter the market with a new product that would achieve 24 download and 8 upload channels ("24x8") —then representing a gap in Arris's product line—senior Arris product manager Jennifer Hays wrote to several colleagues:



(Emphasis added). ARRIS0139775.

140.    A fellow senior Arris product manager replied: "Comcast provisioning is a good comment but I suspect most consumers won't know that."

141.    In fact, in light of the false and misleading statements concerning the number of channels the Modem supported on Comcast, a reasonable consumer would not know that the Modem only supported up to 24, not 32, channels when used on Comcast. A reasonable consumer would also not know that a modem advertised as supporting downloads speeds of 1.4 Gbps was incapable of achieving these speeds on Comcast, because Comcast artificially limited the number of downstream channels it uses.

142.    As a result of these misrepresentations and omissions, and in addition to the widespread latency issues, Modem users paid a premium price to obtain a product with 32 downstream channels and 1.4 Gbps download speeds that was incapable of achieving using these channels or achieving these speeds on Comcast's network.

**N.    Plaintiffs Experience Network Latency Caused by the Modems.**

143.    Plaintiffs each purchased a Modem for personal use, which they used to connect their devices to the Internet.

144.    Plaintiffs' Modems were new and in their original packaging when they each received their Modems.

145.     At various times during his operation of the Modem, Plaintiff Bullard experienced high network latency, packet loss, unreliable internet connectivity, slow internet speeds, or other related performance issues. These Internet performance issues included significantly slow internet speeds during Plaintiff Bullard's online PC gaming activities. These internet slowdowns disrupted Plaintiff Bullard's gameplay, and, at times, made such gaming impossible. The Modem's internet performance issues also significantly affected Plaintiff Bullard's VoIP conversations and calls, resulting in impaired call clarity and related call degradation.

146.     At various times during his operation of the Modem, Plaintiff Penner experienced high network latency, packet errors, unreliable internet connectivity, slow internet speeds, or other related performance issues. These internet performance issues significantly affected Plaintiff Penner's operation of Skype and Go To Meeting conversations and calls, resulting in impaired call clarity and related call degradation. The Modem's internet performance issues also significantly affected Plaintiff Penner's online television streaming.

147.     At various times during his operation of the Modem, Plaintiff Stephens experienced high network latency, packet loss, unreliable Internet connectivity, or other related performance issues. These Internet network performance issues included considerable lag, stalling, and timeouts while wirelessly browsing the Internet and loading webpages, as well as interrupted VoIP calls, delayed Internet downloads, and intermittent inability to remotely access files.

148.     At various times during his operation of the Modem, Plaintiff B. Alexander experienced high network latency, packet loss, unreliable Internet connectivity, or other related performance issues. These Internet network performance issues included stuttering and lag during Plaintiff B. Alexander's online PC gaming activities and also impacted Plaintiff B. Alexander's operation of other Internet-dependent applications and services. These performance issues disrupted Plaintiff B. Alexander's gameplay and, at times, made such gaming impossible.

149.     At various times during his operation of the Modem, Plaintiff Knowles experienced high network latency, packet loss, unreliable internet connectivity, slow internet speeds, or other related performance issues. These internet performance issues included

1    significantly slow Internet performance during Plaintiff Knowles's online PC gaming activities.

2    These internet slowdowns disrupted Plaintiff Knowles's gameplay, and, at times, made such

3    gaming impossible. The Modem's Internet performance issues also significantly affected

4    Plaintiff Knowles's operation of Skype—an Internet-dependent video and audio-conferencing

5    service—resulting in call degradation and poor performance.

6           150.    At various times during his operation of the Modem, Plaintiff Kaflik experienced

7    high network latency, packet errors, unreliable internet connectivity, or other related

8    performance issues. These Internet performance issues included large latency spikes during

9    Plaintiff Kaflik's online gaming activities, which disrupted competitive play, and at times, made

10   such gaming impossible. Plaintiff Kaflik also frequently experienced dropped packages and

11   losses in Internet connection to the upstream ISP router, which at times recurred every fifteen to

12   twenty minutes. Through the Modem's interface, Plaintiff Kaflik observed dropped connections

13   on multiple channels, which prompted the Modem to disconnect and reboot itself. These Internet

14   performance issues further resulted in constant VPN connection losses, which disrupted remote

15   work operations, degraded VoIP quality, and resulted in other persistent downgrades in the

16   quality of streamed content, such as with Netflix.

17          151.    At various times during the operation of the Modem, Plaintiff Greenfield

18   experienced high network latency, packet errors, unreliable internet connectivity, or other related

19   performance issues. These Internet performance issues included significantly slow Internet

20   performance, connectivity hang-ups, and lags during data operations activities on a weekly and

21   increasingly daily basis. Plaintiff Greenfield's persistent performance problems with the Modem

22   required frequent reboots of peripheral equipment.

23          152.    At various times during his operation of the Modem, Plaintiff Murphy

24   experienced high network latency, packet errors, unreliable internet connectivity, slow internet

25   speeds, or other related performance issues. These internet performance issues included

26   significantly slow internet speeds during Plaintiff Murphy's online PC gaming activities. These

27   internet slowdowns disrupted Plaintiff Murphy's gameplay, and, at times, made such gaming

28   impossible.

153.    At various times during his operation of the Modem, Plaintiff Romeo experienced high network latency, packet errors, unreliable internet connectivity, slow internet speeds, or other related performance issues. The Modem's Internet performance issues significantly affected Plaintiff Romeo's use of the modem. These internet performance issues included significantly slow internet speeds during Plaintiff Romeo's online PC gaming activities. These internet slowdowns disrupted Plaintiff Romeo's gameplay, and, at times, made such gaming impossible.

154.    At various times during his operation of the Modem, Plaintiff Fernandez experienced high network latency, packet errors, unreliable internet connectivity, slow internet speeds, or other related performance issues. These internet performance issues included significantly slow internet speeds during Plaintiff Fernandez's online PC gaming activities. These internet slowdowns and freezes disrupted Plaintiff Fernandez's gameplay, and, at times, made such gaming impossible.

155.    At various times during his operation of the Modem, Plaintiff Coyle experienced high network latency, unreliable Internet connectivity, and other related performance problems. Specifically, Plaintiff Coyle experience marked slowdowns in Internet speed and high latency, which caused critical lags and quality issues with online gaming play. Plaintiff Coyle also noticed constant dropped connections and reboots with the Modem, as well as timeout errors and packet losses.

156.    At various times during his operation of the Modem, Plaintiff Bryant experienced high network latency, packet errors, unreliable internet connectivity, slow internet speeds, or other related performance issues. These internet performance issues included significantly slow internet speeds and freezing during Plaintiff Bryant's online PC gaming activities. These internet slowdowns disrupted Plaintiff Bryant's gameplay, and, at times, made such gaming impossible. The Modem's internet performance issues also significantly affected Plaintiff Bryant's Internet-dependent conferencing services, resulting in call degrading and dropped calls.

157.    At various times during his operation of the Modem, Plaintiff Oefelein experienced high network latency, packet errors, unreliable internet connectivity, slow internet

speeds, or other related performance issues. The Modem's internet performance issues also significantly affected Plaintiff Oefelein's Skype conversations and calls, resulting in impaired call clarity and related call degradation. Plaintiff Oefelein's operation of a VPN and use of a remote desktop connection, both of which Plaintiff Oefelein utilized in connection with work, were also regularly impacted by the Modem's internet performance issues.

158.    At various times during his operation of the Modem, Plaintiff Rees experienced high network latency, packet errors, unreliable Internet connectivity, or other related performance issues. These Internet performance issues included large latency spikes during Plaintiff Rees' online gaming activities, which disrupted competitive play, and at times, made such gaming impossible. Plaintiff Rees also frequently experienced severe lags in Internet connection during regular Internet activities, such as browsing. These Internet performance issues further resulted in constant VPN connection losses, which disrupted remote work operations, and caused other persistent downgrades in the quality of streamed content, such as streamed content from Netflix.

159.    At various times during his operation of the Modem, Plaintiff Breslin experienced high network latency, packet errors, unreliable internet connectivity, slow internet speeds, or other related performance issues. These internet performance issues included significantly slow internet speeds during Plaintiff Breslin's online PC gaming activities. These internet slowdowns and freezes disrupted Plaintiff Breslin's gameplay, and, at times, made such gaming impossible. The Modem's Internet performance issues also significantly affected Internet page loads, resulted in gaming lag spikes, and caused erratic remote access.

160.    At various times during his operation of the Modem, Plaintiff Onea experienced high network latency, packet errors, unreliable Internet connectivity, or other related performance issues. These Internet performance issues included large latency spikes and stutters during Plaintiff Onea's online gaming activities, which disrupted competitive play, and at times, made such gaming impossible. Plaintiff Onea also frequently experienced slowdowns in Internet speed, connection timeouts, and observed large amounts of corrected or uncorrectable packets through the Modem's diagnostics These Internet performance issues further resulted in constant

reboots of the Modem, which took five to ten minutes to resolve each time, and which disrupted work operations and caused other persistent downgrades in the quality of streamed content, such streamed content from Netflix.

161.    At various times during his operation of the Modem, Plaintiff Hopkins experienced high network latency, packet errors, unreliable Internet connectivity, or other related performance issues. These Internet performance issues included large latency spikes during Plaintiff Hopkin's online gaming activities, which disrupted competitive play, and at times, made such gaming impossible. Plaintiff Hopkins also experienced frequent drops in Internet connection, poor VoIP quality, and other persistent downgrades in the quality of streamed content, such as content streamed through Netflix and Hulu.

162.    At various times during his operation of the Modem, Plaintiff M. Alexander experienced high network latency, unreliable internet connectivity, slow internet speeds, or other related performance issues. These Internet performance issues included significantly slow internet speeds during Plaintiff M. Alexander's online PC gaming activities. These Internet slowdowns disrupted Plaintiff M. Alexander's gameplay, and, at times, made such gaming impossible.

163.    At various times during his operation of the Modem, Plaintiff Crespo experienced high network latency, unreliable Internet connectivity, slow Internet speeds, or other related performance issues. These Internet performance issues included significantly slow Internet speeds during Plaintiff Crespo's online PC gaming activities. These internet slowdowns disrupted Plaintiff Crespo's gameplay, and, at times, made such gaming impossible. The Modem's internet performance issues also significantly impaired Plaintiff Crespo's ability to stream online content.

164.    At various times during his operation of the Modem, Plaintiff Christensen experienced high network latency, packet errors, unreliable Internet connectivity, slow Internet speeds, or other related performance issues. These Internet performance issues included significantly slow Internet speeds during Plaintiff Christensen's online PC gaming activities.

These Internet slowdowns disrupted Plaintiff Christensen's gameplay, and, at times, made such gaming impossible.

165.    At various times during his operation of the Modem, Plaintiff Rosenberg experienced high network latency, unreliable Internet connectivity, slow Internet speeds, or other related performance issues. These Internet performance issues included significantly slow Internet speeds and freezes during Plaintiff Rosenberg's online PC gaming activities. These Internet slowdowns disrupted Plaintiff Rosenberg's gameplay, and, at times, made such gaming impossible.

166.    At various times during his operation of the Modem, Plaintiff Bavry experienced high network latency, packet errors, unreliable Internet connectivity, slow Internet speeds, or other related performance issues. The Modem's Internet performance issues also significantly affected Plaintiff Bavry's Microcell VoIP service, resulting in dropped calls and related call degradation.

167.    At various times during his operation of the Modem, Plaintiff Winkelman experienced high network latency, packet errors, unreliable Internet connectivity, or other related performance issues. These Internet performance issues included large latency spikes during online gaming activities, which disrupted competitive play, and at times, made such gaming impossible. Plaintiff Winkelman also frequently experienced severe lags in Internet connection and slowdowns in Internet speed during stock trading and related activities, such as the transmission of quotes on Plaintiff Winkelman's TD Ameritrade Think or Swim trading platform. As a result, Plaintiff Winkelman received delayed quotes or was otherwise unable to receive real-time quotes from his broker, and thus, was unable to execute stop orders during trade close sessions.

168.    At various times during his operation of the Modem, Plaintiff Haworth experienced high network latency, unreliable Internet connectivity, slow Internet speeds, or other related performance issues. The Modem's Internet performance issues also significantly affected Plaintiff Haworth's Skype conversations and calls, resulting in impaired call clarity and related

1  call degradation. Plaintiff Haworth's operation of a VPN was also regularly impacted by the

2  Modem's Internet performance issues.

3       169.    At various times during his operation of the Modem, Plaintiff Probé experienced

4  high network latency, unreliable Internet connectivity, slow Internet speeds, or other related

5  performance issues. These Internet performance issues included significantly slow Internet

6  speeds during Plaintiff Probé's online PC gaming activities. These Internet slowdowns disrupted

7  Plaintiff Probé's gameplay, and, at times, made such gaming impossible.

8       170.    Plaintiffs relied on the statements that Arris made about the Modems, as

9  specifically described in § II, above. Based on those statements, Plaintiffs believed that the

10  Modems were reliable cable modems that would perform as represented, including that they

11  provided the "fastest speeds" and the "most reliable connection" to the Internet. At the time each

12  Plaintiff purchased his or her Modem, each Plaintiff did not know that the Modems suffered

13  from abnormally high network latency and unreliable Internet connectivity.

14       171.    As alleged herein, since their purchases of the Modems, Plaintiffs repeatedly

15  suffered abnormally high network latency and unreliable Internet connectivity, and continue to

16  do so. Had Plaintiffs known that the Modems suffered from these defects, they would not have

17  purchased the Modems.

18  **V.     CLASS ACTION ALLEGATIONS**

19       172.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3)

20  of the Federal Rules of Civil Procedure, on behalf of themselves and proposed classes defined

21  as follows:

22                  All persons who purchased an Arris SURFboard SB6190 cable modem in
                the United States on or after October 1, 2015 (the "Nationwide Class")

23

24       173.    Within the Nationwide Class, there are twenty Subclasses defined as follows:

25                  All persons who purchased an Arris SURFboard SB6190 cable modem in
                Alabama on or after October 1, 2015 (the "Alabama Class").

26

27                  All persons who purchased an Arris SURFboard SB6190 cable modem in
                Arizona on or after October 1, 2015 (the "Arizona Class").

28

All persons who purchased an Arris SURFboard SB6190 cable modem in California on or after October 1, 2015 (the "California Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Connecticut on or after the period commencing three years prior to the filing of this Fourth Amended Consolidated Class Action Complaint (the "Connecticut Class).

All persons who purchased an Arris SURFboard SB6190 cable modem in Florida on or after the period commencing four years prior to the filing of this Fourth Amended Consolidated Class Action Complaint (the "Florida Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Georgia on or after October 1, 2015 (the "Georgia Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Hawaii on or after October 1, 2015 (the "Hawaii Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Illinois on or after October 1, 2015 (the "Illinois Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Iowa on or after the period commencing two years prior to the filing of this Fourth Amended Consolidated Class Action Complaint (the "Iowa Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Kansas on or after October 1, 2015 (the "Kansas Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Louisiana on or after October 1, 2015 (the "Louisiana Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Massachusetts on or after October 1, 2015 (the "Massachusetts Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in New Jersey on or after October 1, 2015 (the "New Jersey Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in New York on or after October 1, 2015 (the "New York Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Ohio on or after October 1, 2015 (the "Ohio Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Pennsylvania on or after October 1, 2015 (the "Pennsylvania Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Texas on or after October 1, 2015 (the "Texas Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Virginia on or after October 1, 2015 (the "Virginia Class").

All persons who purchased an Arris SURFboard SB6190 cable modem in Washington on or after October 1, 2015 (the "Washington Class").

174.    Within the California Class, there is one subclass for purposes of Plaintiffs' claims under the Song-Beverly Consumer Warranty Act and the Consumer Legal Remedies Act (the "California Subclass"). The proposed California Subclass is defined as follows:

> All persons who purchased an Arris SURFboard SB6190 cable modem in California for personal, family, or household purposes on or after October 1, 2015.

175.    Excluded from the Nationwide Class and Subclasses are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Nationwide Class and Subclasses are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

176.    This action is brought and may be properly maintained as a class action pursuant to Rule 23. This action satisfies the requirements of Rule 23, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

177.    ***Numerosity.*** The Nationwide Class and Subclasses are so numerous that the individual joinder of all members is impracticable. While the Nationwide Class and Subclasses' exact number are currently unknown and can only be ascertained through appropriate discovery, Plaintiffs, on information and belief, allege that the Nationwide Class and Subclasses include at least thousands of persons.

178.    ***Commonality.*** Common legal and factual questions exist that predominate over any questions affecting only individual Nationwide Class or Subclass Members. These common questions, which do not vary among Nationwide Class or Subclass Members and which may be determined without reference to any Nationwide Class or Subclass Member's individual circumstances, include, but are not limited to:

a.    Whether the Modem contains a defect that causes abnormally high network latency;

b.    Whether the Modem supports 32 downstream channels and 1.4 Gbps download speeds on compatible U.S. cable providers;

c.    Whether the Modem is of the same quality as those generally acceptable in the market;

d.    Whether the Modem is fit for the ordinary purposes for which the goods are used;

e.    Whether the Modem was adequately contained, packaged, and labeled;

f.    Whether Arris breached its implied warranty of merchantability;

g.    Whether Arris represented that the Modems have characteristics, uses, or benefits that they do not have;

h.    Whether Arris represented that the Modems are of a particular standard, quality, or grade when they are of another;

i.    Whether Arris's representations and omissions regarding the Modems were false and misleading and constitute false advertising;

j.    Whether Arris engaged in unlawful, fraudulent, or unfair business practices;

k.    Whether Plaintiffs and the Nationwide Class or Subclasses have been damaged by the wrongs alleged and are entitled to compensatory or punitive damages;

l.    Whether Plaintiffs and the Nationwide Class or Subclasses are entitled to injunctive or other equitable relief, including restitution.

179.    Each of these common questions is also susceptible to a common answer that is capable of class-wide resolution and will resolve an issue central to the validity of the claims.

180.    ***Adequacy of Representation.*** Plaintiffs are adequate Nationwide Class and Subclass representatives because they are Nationwide Class and Subclass Members, and their interests do not conflict with the Nationwide Class or Subclasses' interests. Plaintiffs retained counsel who are competent and experienced in consumer-protection class actions. Plaintiffs and

1  their counsel intend to prosecute this action vigorously for the Nationwide Class and Subclasses'

2  benefit and will fairly and adequately protect their interests.

3       181.  ***Predominance and Superiority.*** The Nationwide Class and Subclasses can be

4  properly maintained because the above common questions of law and fact predominate over any

5  questions affecting individual Nationwide Class or Subclass Members. A class action is also

6  superior to other available methods for the fair and efficient adjudication of this litigation

7  because individual litigation of each Nationwide Class and Subclass Member's claim is

8  impracticable. Even if each Nationwide Class or Subclass Member could afford individual

9  litigation, the court system could not. It would be unduly burdensome if thousands of individual

10  cases proceed. Individual litigation also presents the potential for inconsistent or contradictory

11  judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of

12  recovery among those with equally meritorious claims. Individual litigation would increase the

13  expense and delay to all parties and the courts because it requires individual resolution of

14  common legal and factual questions. By contrast, the class-action device presents far fewer

15  management difficulties and provides the benefit of a single adjudication, economies of scale,

16  and comprehensive supervision by a single court.

17

18  **VI.    CLAIMS FOR RELIEF**

19  <u>**First Claim for Relief**</u>

20  **Violation of Alabama Deceptive Trade Practices Act,**

21  **ALA. CODE §§ 8-19-1 *et seq.***

22  ***On Behalf of the Plaintiff Bullard and the Alabama Class***

23       182.  Plaintiff Bullard, individually and on behalf of the Alabama Class, incorporates

24  by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended

25  Consolidated Class Action Complaint as if fully set forth herein.

26       183.  Plaintiff Bullard brings this claim individually and on behalf of the Alabama

27  Class against Defendant.

28

---

184.    Plaintiff Bullard and the Alabama Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

185.    Plaintiff Bullard and the Alabama Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

186.    Plaintiff Bullard and the Alabama Class are "consumers" within the meaning of ALA. CODE § 8-19-3(2).

187.    Plaintiff Bullard, the Alabama Class, and Defendant are "persons" within the meaning of ALA. CODE § 8-19-3(5).

188.    The Modems are "goods" within the meaning of ALA. CODE § 8-19-3(3).

189.    Defendant was and is engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

190.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE. § 8-19-5.

191.    In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Modems.

192.    Arris knew about the Modems' defects at the time of sale. Arris acquired additional information concerning the defects after the Modems were sold, but concealed all of that information until it was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects in the Modems, Arris engaged in unfair and deceptive business practices in violation of the Alabama DTPA.

193.    By failing to disclose and by actively concealing the defects in the Modems, which it marketed as reliable and of high quality, Arris engaged in unfair and deceptive business practices in violation of the Alabama DTPA.

194.    Arris's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Bullard and the Alabama Class, about the true reliability of their Modems. Arris intentionally and knowingly misrepresented material facts regarding the Modems with the intent to mislead Plaintiff Bullard and the Alabama Class.

195.    Arris knew or should have known that its conduct violated the Alabama DTPA.

196.    As alleged above, Arris made material statements about the reliability of the Modems that were either false or misleading. Arris owed Plaintiff Bullard and the Alabama Class a duty to disclose the true safety and reliability of the Modems, because Arris: (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiff Bullard; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiff Bullard and the Alabama Class that contradicted these representations.

197.    Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiff Bullard and the Alabama Class had to spend their time and money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

198.    As a direct and proximate result of Arris's violations of the Alabama DTPA, Plaintiff Bullard and the Alabama Class have suffered injury-in-fact and/or actual damage, as alleged above. As a result of the foregoing wrongful conduct of Arris, Plaintiff Bullard and the Alabama Class have been damaged in an amount to be proven at trial. Pursuant to ALA. CODE § 8-19-10, Plaintiff Bullard and the Alabama Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff and each Alabama Class Member.

1  Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices,

2  attorneys' fees, and any other just and proper relief available under the ALA. CODE § 8-19-1 *et*

3  *seq.*

4       199.   On May 30, 2017, Plaintiff Bullard sent a letter complying with ALA. CODE § 8-

5  19-10(e). Because Arris failed to remedy its unlawful conduct within the requisite time period,

6  Plaintiff Bullard and the Alabama Class seek all damages and relief to which they are entitled.

7  **<u>Second Claim for Relief</u>**

8  **Violation of Arizona Consumer Fraud Act,**

9  **ARIZ. REV. STAT §§ 44-1521 *et seq.***

10  ***On Behalf of Plaintiffs Penner, Stephens, and the Arizona Class***

11       200.   Plaintiffs Penner and Stephens, individually and on behalf of the Arizona Class,

12  incorporate by reference all of the allegations contained in the preceding paragraphs of this

13  Fourth Amended Consolidated Class Action Complaint.

14       201.   Plaintiffs Penner and Stephens bring this claim individually and on behalf of the

15  Arizona Class against Defendant.

16       202.   Plaintiffs Penner and Stephens and the Arizona Class purchased the SB6190

17  Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

18       203.   Plaintiffs and the Arizona Class purchased the SB6190 Modem new and in its

19  original packaging and did not alter their Modems.

20       204.   Arris and Plaintiffs are "persons" within the meaning of the Arizona Consumer

21  Fraud Act ("Arizona CFA"), ARIZ. REV. STAT. § 44-1521(6). The Modems are "merchandise"

22  within the meaning of ARIZ. REV. STAT. § 44-1521(5).

23       205.   The Arizona CFA provides that "[t]he act, use or employment by any person of

24  any deception, deceptive act or practice, fraud, ... misrepresentation, or concealment, suppression

25  or omission of any material fact with intent that others rely upon such concealment, suppression

26  or omission, in connection with the sale ... of any merchandise whether or not any person has in

27  fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ.

28  REV. STAT. § 44-1522(A).

---

206.     Arris's actions occurred in the conduct of trade or commerce. In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Modems. The suppressed or omitted information would be material to a reasonable consumer.

207.     Arris knew about the Modems' defects. Arris acquired additional information concerning the defects after the Modems were sold, but concealed all of that information until it was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects in the Modems, Arris engaged in unfair and deceptive business practices in violation of the Arizona CFA.

208.     Arris's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs Penner and Stephens and members of the Arizona Class, about the true reliability of their Modems. Arris intentionally and knowingly misrepresented material facts regarding the defective Modems with the intent to mislead Plaintiffs Penner and Stephens and the Arizona Class.

209.     Arris knew or should have known that its conduct violated the Arizona CFA. As alleged above, Arris made material statements about the reliability of the Modems that were either false or misleading.

210.     Arris owed Plaintiffs Penner and Stephens and the Arizona Class and a duty to disclose the true reliability of the Modems because Arris: (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiffs; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

211.     Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modem were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiffs

and the Arizona Class had to spend their time and/or money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

212.    As a direct and proximate result of Arris's violations of the Arizona CFA, Plaintiffs Penner and Stephens and the Arizona Class have suffered injury-in-fact and/or actual damage. Plaintiffs Penner and Stephens and the Arizona Class seek monetary relief against Arris in an amount to be determined at trial. Plaintiffs also seek an order enjoining Arris unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## Third Claim for Relief

### Violation of California Song-Beverly Consumer Warranty Act,

### CAL. CIV. CODE §§ 1790 *et seq.*

### *On Behalf of Plaintiffs B. Alexander, Knowles, and the California Subclass*

213.    Plaintiffs B. Alexander and Knowles, individually and on behalf of the California Subclass, incorporate by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

214.    Plaintiffs B. Alexander and Knowles bring this claim individually and on behalf of the California Subclass against Defendant.

215.    Plaintiffs B. Alexander, Knowles, and the California Subclass purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

216.    Plaintiffs B. Alexander, Knowles, and the California Subclass purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

217.    At the time of purchase, Defendant was in the business of manufacturing and selling cable modems, including the SB6190 Modem.

218.    The SB6190 Modems were used and bought primarily for personal, family, or household purposes and are therefore consumer goods.

219.    Arris's SB6190 Modem contained a defect that causes severe network latency.

220.     Arris's SB6190 Modem also contained a defect that does not permit the Modems to achieve their advertised 32 downstream channels and 1.4 Gbps speeds when provisioned on Comcast's network.

221.     These defects were present in Arris's SB6190 Modems when they left the exclusive control of Defendant and therefore existed during the duration of the warranty period.

222.     Arris's SB6190 Modems were not of the same quality as those generally acceptable in the trade; were not fit for the ordinary purposes of fast and reliable Internet connectivity for which the goods are used; were not adequately contained, packaged, and labeled; and did not conform to the promises and facts stated on the container and label.

223.     Defendant, therefore, breached the implied warranty of merchantability, which by law is provided in every consumer agreement for the sale of goods, including for the sale of Arris's SB6190 Modem.

224.     As a direct and proximate cause of Defendant's breach of the implied warranty of merchantability, Plaintiffs B. Alexander, Knowles, and the California Subclass have been damaged by receiving an inferior product from that which they were promised. Plaintiffs B. Alexander, Knowles, and the California Subclass, therefore, have the right to cancel and recover the purchase price of their SB6190 Modem.

## **Fourth Claim for Relief**

### **Violation of California Consumer Legal Remedies Act,**

### **CAL. CIV. CODE §§ 1750 *et seq.***

### ***On Behalf of Plaintiffs B. Alexander, Knowles, and the California Subclass***

225.     Plaintiffs B. Alexander and Knowles, individually and on behalf of the California Subclass, incorporate by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

226.     Plaintiffs B. Alexander and Knowles bring this claim individually and on behalf of the California Subclass against Defendant.

227.     Defendant is a "person" as defined in CAL. CIV. CODE § 1761(c).

228.    Plaintiffs B. Alexander, Knowles, and the California Subclass acquired and purchased the SB6190 Modem for personal, family, or household purposes and are therefore "consumers" as defined in CAL. CIV. CODE § 1761(d).

229.    The SB6190 Modems that Plaintiffs B. Alexander, Knowles, and the California Subclass purchased from Defendant are "goods" as defined by CAL. CIV. CODE § 1761(a).

230.    The purchases by Plaintiffs B. Alexander, Knowles, and the California Subclass of the goods sold by Defendant constitute "transactions" as defined by CAL. CIV. CODE §§ 1761(e) and 1770.

231.    In connection with its sale of goods to Plaintiffs B. Alexander, Knowles, and the California Subclass, Defendant violated the CLRA by:

a.    Misrepresenting to Plaintiffs B. Alexander, Knowles, and the California Subclass that the SB6190 Modems were reliable cable modems, when in fact, they have a defect that causes severe network latency, in violation of CAL. CIV. CODE §§ 1770(a)(5), (7), (9), and (16);

b.    Misrepresenting to Plaintiffs B. Alexander, Knowles, and the California Subclass that the SB6190 Modems supported 32 downstream channels and speeds of 1.4 Gbps and were compatible with Comcast, when in fact, they do not support 32 downstream channels and speeds of 1.4 Gbps when provisioned on Comcast's network, in violation of CAL. CIV. CODE §§ 1770(a)(5), (7), (9), and (16);

c.    Misrepresenting to Plaintiffs B. Alexander, Knowles, and the California Subclass that Defendant's goods had characteristics, uses, and benefits that they did not have, in violation of CAL. CIV. CODE § 1770(a)(5);

d.    Representing to Plaintiffs B. Alexander, Knowles, and the California Subclass that Defendant's goods were of a particular standard, quality, or grade, when they were of another in violation of CAL. CIV. CODE § 1770(a)(7);

e.     Advertising goods to Plaintiffs B. Alexander, Knowles, and the California Subclass with the intent not to sell them as advertised, in violation of CAL. CIV. CODE § 1770(a)(9); and

f.     Misrepresenting to Plaintiffs B. Alexander, Knowles, and the California Subclass that the subject of a transaction has been supplied in accordance with a previous representation when it had not, in violation of CAL. CIV. CODE § 1770(a)(16).

232.    In addition, under California law, a duty to disclose arises in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.

233.    Defendant had a duty to disclose to Plaintiffs B. Alexander, Knowles, and the California Subclass that the SB6190 Modems contains a defect that causes them to fail for the following three independent reasons: (a) Defendant had exclusive knowledge of the information at the time of sale; (b) Defendant actively concealed from Plaintiffs B. Alexander, Knowles, and the California Subclass this defect, which causes substantial Internet connectivity failures and is important to customers; and (c) Defendant made partial representations to Plaintiffs B. Alexander, Knowles, and the California Subclass regarding the speed and reliability of the Modem.

234.    Defendant also had a duty to disclose to Plaintiffs B. Alexander, Knowles, and the California Subclass that the SB6190 Modems did not support 32 downstream channels and speeds of 1.4 Gbps when provisioned on Comcast's network for the following three independent reasons: (a) Defendant had exclusive knowledge of the information at the time of sale; (b) Defendant actively concealed from Plaintiffs B. Alexander, Knowles, and the California Subclass this information, which causes substantially slower Internet speeds and is important to customers; and (c) Defendant made partial representations to Plaintiffs B. Alexander, Knowles, and the California Subclass regarding the speed and features of the Modem.

235.    Defendant violated the CLRA by supplying defective Modems and by further concealing these defects from Plaintiffs B. Alexander, Knowles, and the California Subclass.

236.    Defendant's misrepresentations and omissions in violation of the CLRA were likely to mislead an ordinary consumer. Plaintiffs B. Alexander, Knowles, and the California Subclass reasonably understood Defendant's representations and omissions to mean that the SB6190 Modems were reliable for typical consumer use and did not contain a defect that would hamper their performance. Plaintiffs B. Alexander, Knowles, and the California Subclass also reasonably understood Defendant's representations and omissions to mean that the SB6190 Modems supported 32 downstream channels and speeds of 1.4 Gbps when provisioned with the corresponding service on Comcast's network.

237.    Defendant's misrepresentations and omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

238.    Plaintiffs B. Alexander, Knowles, and the California Subclass relied to their detriment on Defendant's misrepresentations and omissions in purchasing the Modems.

239.    Plaintiffs B. Alexander and Knowles, on behalf of themselves and the California Subclass, demand judgment against Defendant under the CLRA for injunctive relief.

240.    Pursuant to CAL. CIV. CODE § 1782(a), Defendant was served with notice of its alleged violations of the CLRA by certified mail return receipt requested on April 11, 2017. Because Arris failed to remedy its unlawful conduct within the requisite time period, Plaintiffs B. Alexander, Knowles, and the California Subclass seek all compensatory damages and relief to which they are entitled.

241.    In light of Defendant's oppression, fraud, and malice, Plaintiffs, on behalf of themselves and the Subclass, also seek punitive damages under Cal. Civ. Code § 3294 in an amount to be proven at trial.

**Fifth Claim for Relief**

**Violation of California False Advertising Law,**

**CAL. BUS. & PROF. CODE §§ 17500 *et seq.***

***On Behalf of Plaintiffs B. Alexander, Knowles, and the California Class***

242.     Plaintiffs B. Alexander and Knowles, individually, and on behalf of the California Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

243.     Plaintiffs B. Alexander and Knowles bring this claim individually and on behalf of the California Class against Defendant.

244.     Defendant engaged in advertising and marketing to the public and offered for sale the SB6190 Modem.

245.     Defendant engaged in the advertising and marketing alleged herein with the intent to induce the sale of the Modems to consumers like Plaintiffs B. Alexander, Knowles, and the California Class.

246.     Defendant's advertising and marketing representations regarding its SB6190 Modems were false, misleading, and deceptive as set forth in detail above. Defendant concealed the material information from consumers that these cable modems contained a defect that causes severe network latency and unreliable Internet connectivity. Defendant also concealed the material information from consumers that these cable modems did not support 32 downstream channels and speeds of 1.4 Gbps when provisioned on Comcast's network.

247.     Defendant's misrepresentations and omissions alleged herein deceive or have the tendency to deceive the general public regarding the reliability of its SB6190 Modems for ordinary consumer use.

248.     Defendant's misrepresentations and omissions alleged herein were the type of misrepresentations that are material, i.e., a reasonable person would attach importance to them and would be induced to act on the information in making purchase decisions.

249.     Defendant's misrepresentations and omissions alleged herein are objectively material to a reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

250.     At the time Defendant made the misrepresentations and omissions alleged herein, Defendant knew or should have known that they were untrue or misleading and acted in violation of CAL. BUS. & PROF. CODE §§ 17500 *et seq.*

251.     Unless restrained by this Court, Defendant will continue to engage in untrue and misleading advertising in violation of CAL. BUS. & PROF CODE §§ 17500 *et seq.*

252.     As a result, Plaintiffs B. Alexander, Knowles, and each member of the California Class have been injured, have lost money or property, and are entitled to relief. Plaintiffs B. Alexander, Knowles, and the California Class seek restitution, injunctive relief, and all other relief permitted under CAL. BUS. & PROF. CODE §§ 17500 *et seq.*

## Sixth Claim for Relief

### Violation of California Unfair Competition Law,

### CAL. BUS. & PROF. §§ 17200 *et seq.*

### *On Behalf of Plaintiffs B. Alexander, Knowles, and the California Class*

253.     Plaintiffs B. Alexander and Knowles, individually and on behalf of the California Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

254.     Plaintiffs B. Alexander and Knowles bring this claim individually and on behalf of the California Class against Defendant.

255.     Plaintiffs B. Alexander and Knowles have standing to pursue this claim because they have suffered injury in fact and have lost money or property as a result of Defendant's actions as described *supra*. All California Class Members overpaid for the SB6190 Modem due to Defendant's concealment of a defect with the Modem and Defendant's concealment that the Modem did not support 32 downstream channels and speeds of 1.4 Gbps when provisioned on Comcast's network.

256. Defendant's actions as alleged herein constitute an "unlawful" practice as encompassed by CAL. BUS. & PROF. CODE §§ 17200 *et seq.* (the "UCL") because Defendant breached the implied warranty of merchantability in violation of the California Song-Beverly Consumer Warranty Act, CAL. CIV. CODE §§ 1790 *et seq.* and further violated the CLRA, CAL. CIV. CODE §§ 1750 *et seq.* and the FAL, CAL. BUS. & PROF. CODE §§ 17500 *et seq.*

257. Defendant's actions as alleged herein constitute a "fraudulent" practice because, by representing that the SB6190 Modems were reliable for ordinary consumer use but concealing that the cable modems actually contained a defect, Defendant's conduct was likely to deceive consumers. Defendant's actions as alleged herein also constitute a "fraudulent" practice because, by representing that the SB6190 Modems supported 32 downstream channels and 1.4 Gbps speeds and were compatible with Comcast's network but concealing the fact that the Modems did not support 32 downstream channels and speeds of 1.4 Gbps when provisioned on Comcast's network, Defendant's conduct was likely to deceive consumers. Defendant's failure to disclose these defects, especially in light of its claims about speed and reliability, constitute material omissions in violation of the UCL.

258. Defendant's actions as alleged in this Fourth Amended Consolidated Class Action Complaint constitute an "unfair" practice, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Arris's customers. The harm caused by Arris's wrongful conduct outweighs any utility of such conduct and has caused—and will continue to cause—substantial injury to Plaintiffs B. Alexander, Knowles, and the California Class. Arris could and should have chosen one of many reasonably available alternatives, including not selling cable modems that contained a defect, disclosing the defect to prospective purchasers, and/or not representing that its cable modems were suitable for consumer use. Additionally, Defendant's conduct was "unfair," because it violated the legislatively declared policies reflected by California's strong consumer protection, consumer warranty, and false advertising laws, including the California Song-Beverly Consumer Warranty Act, CAL. CIV. CODE §§ 1790 *et seq.*, the CLRA, CAL. CIV. CODE §§ 1750 *et seq.*, and the FAL, CAL. BUS. & PROF. CODE §§ 17500 *et seq.*

259.    As a result of Defendant's unlawful, fraudulent, and unfair conduct, Plaintiffs B. Alexander, Knowles, and the California Class were damaged. Plaintiffs B. Alexander, Knowles, and the California Class received an inferior product from that which they were promised. Had Defendant disclosed the defects with the SB6190 Modems, Plaintiffs B. Alexander, Knowles, and the California Class would not have purchased the cable modems or would have paid substantially less.

260.    Defendant's wrongful business practices constitute a continuing course of unfair competition because it continues to represent that the SB6190 is reliable, continues to fail to disclose the defects, and continues to refuse to repair or replace the modems. Plaintiffs B. Alexander, Knowles, and the California Class, therefore, seek equitable relief to remedy Arris's deceptive marketing, advertising, and packaging and to recall all affected cable modems.

261.    Plaintiffs B. Alexander, Knowles, and the California Class also seek an order requiring Defendant to make full restitution of all monies they have wrongfully obtained from California Class Members, as well as all other relief permitted under the UCL.

## Seventh Claim for Relief

### Violation of Connecticut Unfair Trade Practices Act ("CUTPA")

### CONN. GEN. STAT. §§ 42-110a, *et seq.*

### *On Behalf of Plaintiff Kaflik and the Connecticut Class*

262.    Plaintiff Kaflik, individually and on behalf of the Connecticut Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

263.    Plaintiff Kaflik brings this claim individually and on behalf of the Connecticut Class against Defendant.

264.    The CUTPA prohibits any person from "engag[ing] in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

265.    Defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

266.     Defendant is engaged in "trade" or "commerce" in Connecticut within the meaning of Conn. Gen. Stat. § 42-110a(4).

267.     Plaintiff Kaflik and the Connecticut Class purchased the SB6190 Modems new and in its original packaging and did not alter their Modems.

268.     In the course of its primary business of manufacturing and selling telecommunications equipment, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Modems.

269.     Arris knew about the Modems' defects at the time of sale. Arris acquired additional information concerning the defects after the Modems were sold but concealed all of that information until it was revealed by Modem purchasers.

270.     By failing to disclose and by actively concealing the defects in the Modems, which it marketed as reliable and of high quality, Arris engaged in deceptive business practices in violation of the CUTPA. Arris's deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiff Kaflik, about the true reliability of their Modems.

271.     Arris's acts and practices are also unfair because they are contrary to Connecticut law and public policy and further constitute immoral, unethical, oppressive, and unscrupulous business practices that caused substantial injury to Plaintiff Kaflik and members of the Connecticut Class. The harm caused by Arris's unfair acts and practices outweighs any utility of such conduct.

272.     The practice of selling defective Modems without providing an adequate remedy to cure the defects has harmed Plaintiff Kaflik and the Connecticut Class. Arris could have and should have chosen one of many reasonably available alternatives, including the alteration of its packaging and labeling to prominently discloses the true reliability of their Modems. The harm from Defendant's unfair conduct was not reasonably avoidable by consumers.

273.    As alleged above, Arris made material statements about the reliability of the Modems that were either false or misleading. Arris owed Plaintiff Kaflik and the Connecticut Class a duty to disclose the true safety and reliability of the Modems, because Arris: (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiff Kaflik and the Connecticut Class; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiff Kaflik and the Connecticut Class that contradicted these representations.

274.    Arris intentionally and knowingly misrepresented material facts regarding the Modems with the intent to mislead Plaintiff Kaflik and the Connecticut Class. Arris knew or should have known that its conduct violated the CUTPA.

275.    As a direct and proximate result of ARRIS's unfair and deceptive conduct, Plaintiff Kaflik and the Connecticut Class members have suffered injury, ascertainable losses of money or property, and monetary and nonmonetary damages. Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiff Kaflik and members of the Connecticut Class had to spend their time and money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have purchased the Modems or would have paid less for them.

276.    Defendant's violations caused ascertainable injury to Plaintiff Kaflik and the Connecticut Class, as well as to the general public. Defendant's unlawful acts and practices alleged herein negatively affect the public interest, and there are no countervailing benefits to consumers that outweigh the harm caused by Arris's conduct.

277.    Pursuant to Conn. Gen. Stat. §§ 42-110g and 42-110o, Plaintiff Kaflik and the Connecticut Class seek an order enjoining Arris's unfair and/or deceptive acts or practices and awarding actual damages, punitive damages, attorneys' fees, and any other just and proper relief under the CUTPA the Court deems necessary to protect the public from further violations of the CUTPA.

278.     A copy of this complaint will be mailed to the Attorney General and the Commissioner of Consumer Protection pursuant to Conn. Gen. § 42-110g(c) upon its filing.

### Eighth Claim for Relief

**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**

**FLA. STAT. §§ 501.201, *et seq.***

***On Behalf of Plaintiff Greenfield and the Florida Class***

279.     Plaintiff Greenfield, individually and on behalf of the Florida Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

280.     Plaintiff Greenfield brings this claim individually and on behalf of the Florida Class against Defendant.

281.     The stated purpose of the FDUTPA is "[t]o protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

282.     The FDUTPA further prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

283.     Plaintiff Greenfield and members of the Florida Class are "consumers" within the meaning of Fla. Stat. § 501.203(7).

284.     Defendant engaged in "trade and commerce" in Florida within the meaning of Fla. Stat. § 501.203(8).

285.     Plaintiff Greenfield and the Florida Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

286.     In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that

others rely upon such concealment, suppression or omission, in connection with the sale of the Modems.

287.     Arris knew about the Modems' defects at the time of sale. Arris acquired additional information concerning the defects after the Modems were sold but concealed all of that information until it was revealed by Modem purchasers.

288.     By failing to disclose and by actively concealing the defects in the Modems, which it marketed as reliable and of high quality, Arris engaged in deceptive business practices in violation of the FDUTPA. Arris's deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiff Greenfield, about the true reliability of their Modems.

289.     Arris's acts and practices are also unfair because they are contrary to Florida law and public policy and further constitute immoral, unethical, oppressive, and unscrupulous business practices that caused substantial injury to Plaintiff Greenfield and members of the Florida Class. The harm caused by Arris's unfair acts and practices outweighs any utility of such conduct.

290.     The practice of selling defective Modems without providing an adequate remedy to cure the defects has harmed Plaintiff Greenfield and the Florida Class. Arris could have and should have chosen one of many reasonably available alternatives, including the alteration of its packaging and labeling to prominently discloses the true reliability of their Modems. The harm from Defendant's unfair conduct was not reasonably avoidable by consumers.

291.     As alleged above, Arris made material statements about the reliability of the Modems that were either false or misleading. Arris owed Plaintiff Greenfield and the Florida Class a duty to disclose the true safety and reliability of the Modems, because Arris: (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiff Greenfield and the Florida Class; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiff Greenfield and the Florida Class that contradicted these representations.

292.    Arris intentionally and knowingly misrepresented material facts regarding the Modems with the intent to mislead Plaintiff Greenfield and the Florida Class. Arris knew or should have known that its conduct violated the FDUTPA.

293.    As a direct and proximate result of Arris's unfair and deceptive conduct, Plaintiff Greenfield and the Florida Class members have suffered injury, ascertainable losses of money or property, and monetary and nonmonetary damages. Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiff Greenfield and members of the Florida Class had to spend their time and money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

294.    Defendant's violations caused ascertainable injury to Plaintiff Greenfield and the Florida Class, as well as to the general public. Defendant's unlawful acts and practices alleged herein negatively affect the public interest, and there are no countervailing benefits to consumers that outweigh the harm caused by Arris's conduct.

295.    Pursuant to Fla. Stat. §§ 501.211 and 501.2105, Plaintiff Greenfield and the Florida Class seek an order enjoining Arris's unfair and/or deceptive acts or practices and awarding actual damages, attorneys' fees, and any other just and proper relief under the FDUTPA the Court deems necessary to protect the public from further violations of the FDUTPA.

## Ninth Claim for Relief

### Violation of Georgia Fair Business Practices Act,

### GA. CODE ANN. § 10-1-390 *et seq.*

### *On Behalf of Plaintiff Murphy and the Georgia Class*

296.    Plaintiff Murphy, individually and on behalf of the Georgia Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

297.    Plaintiff Murphy brings this claim individually and on behalf of the Georgia Class against Defendant.

298.    Plaintiff Murphy and the Georgia Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

299.    Plaintiff Murphy and the Georgia Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

300.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," GA. CODE. ANN. § 10-1-393(b).

301.    In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Modems.

302.    Arris knew about the Modems' defects at the time of sale. Arris acquired additional information concerning the defects after the Modems were sold, but concealed all of that information until it was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects in the Modems, Arris engaged in unfair and deceptive business practices in violation of the Georgia FBPA.

303.    By failing to disclose and by actively concealing the defects in the Modems, which it marketed as reliable and of high quality, Arris engaged in unfair and deceptive business practices in violation of the Georgia FBPA.

304.     Arris's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Murphy and the Georgia Class, about the true reliability of their Modems. Arris intentionally and knowingly misrepresented material facts regarding the Modems with the intent to mislead Plaintiff Murphy and the Georgia Class.

305.     Arris knew or should have known that its conduct violated the Georgia FBPA.

306.     As alleged above, Arris made material statements about the reliability of the Modems that were either false or misleading. Arris owed Plaintiff Murphy and the Georgia Class a duty to disclose the true safety and reliability of the Modems, because Arris: (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiff Murphy; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiff Murphy and the Georgia Class that contradicted these representations.

307.     Defendant thus violated the Georgia FBPA by, at a minimum: (1) representing that the Modems have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Modems are of a particular standard, quality, and grade when they are not; and (3) advertising the Modems with the intent not to sell them as advertised.

308.     Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiff Murphy and the Georgia Class had to spend their time and money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

309.     As a direct and proximate result of Arris's violations of the Georgia FBPA, Plaintiff Murphy and the Georgia Class have suffered injury-in-fact and/or actual damage, as alleged above. Plaintiff Murphy and the Georgia Class are entitled to recover damages and exemplary damages (for intentional violations) pursuant to GA. CODE. ANN. § 10-1-399(a).

310.    Plaintiff Murphy and the Georgia Class also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA pursuant to GA. CODE. ANN. § 10-1-399.

311.    On May 30, 2017, Plaintiff Murphy sent a letter complying with Ga. Code. Ann. § 10-1-399(b). Because Arris failed to remedy its unlawful conduct within the requisite time period, Plaintiff Murphy and the Georgia Subclass seek all damages and relief to which they are entitled.

**Tenth Claim for Relief**

**Unfair and Deceptive Acts in Violation of Hawaii Law**

**HAW. REV. STAT. § 480 *et seq.***

***On Behalf of Plaintiff Romeo and the Hawaii Class***

312.    Plaintiff Romeo, individually and on behalf of the Hawaii Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

313.    Plaintiff Romeo brings this claim individually and on behalf of the Hawaii Class against Defendant.

314.    Plaintiff Romeo and the Hawaii Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

315.    Plaintiff Romeo and the Hawaii Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

316.    Arris is a "person" under HAW. REV. STAT. § 480-1. Plaintiff Romeo and the Hawaii Class are "consumer[s]" as defined by HAW. REV. STAT. § 480-1, who purchased a Modem.

317.    Arris's acts or practices as set forth above occurred in the conduct of trade or commerce. Among other things, the Hawaii Act § 480-2(a) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce...." For the avoidance of doubt, Plaintiff Romeo and the Hawaii Class only allege herein that Defendant enaged in "unfair or deceptive

1   acts or practices" in violation of the Hawaii Act. Plaintiff Romeo and the Hawaii Class do not

2   allege that Defendant engaged in "unfair methods of competition" under the Hawaii Act.

3       318.    Pursuant to Hawaii Act § 480-13.3(a), Plaintiff Romeo accordingly has not

4   served a copy of this Fourth Amended Consolidated Class Action Complaint on the Hawaii

5   attorney general because claims only alleging violation of the "unfair or deceptive acts or

6   practices" prong of the Hawaii Act are not subject to any pre-suit notice requirement.

7       319.    In the course of its business, Arris concealed the defects in the Modems and

8   otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in

9   unlawful trade practices by employing deception, deceptive acts or practices, fraud,

10  misrepresentations, or concealment, suppression or omission of any material fact with intent that

11  others rely upon such concealment, suppression or omission, in connection with the sale of the

12  Modems.

13      320.    Arris knew about the Modems' defects at the time of sale. Arris acquired

14  additional information concerning the defects after the Modems were sold, but concealed all of

15  that information until it was revealed by Modem purchasers. By failing to disclose and by

16  actively concealing the defects in the Modems, Arris engaged in unfair and deceptive business

17  practices in violation of the Hawaii Act.

18      321.    By failing to disclose and by actively concealing the defects in the Modems,

19  which it marketed as reliable and of high quality, Arris engaged in unfair and deceptive business

20  practices in violation of the Hawaii Act. Arris's unfair or deceptive acts or practices were likely

21  to and did in fact deceive reasonable consumers, including Plaintiff, about the true reliability of

22  their Modems.

23      322.    Arris intentionally and knowingly misrepresented material facts regarding the

24  Modems with the intent to mislead Plaintiff Romeo and the Hawaii Class. Arris knew or should

25  have known that its conduct violated the Hawaii Act.

26      323.    As alleged above, Arris made material statements about the reliability of the

27  Modems that were either false or misleading. Arris owed Plaintiff Romeo and the Hawaii Class

28  a duty to disclose the true safety and reliability of the Modems, because Arris: (a) possessed

---

exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiff Romeo and the Hawaii Class; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiff Romeo and the Hawaii Class that contradicted these representations.

324. Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiff Romeo and the Hawaii Class had to spend their time and money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

325. As a direct and proximate result of Arris's violations of the Hawaii Act, Plaintiff Romeo and the Hawaii Class have suffered injury-in-fact and/or actual damage as alleged above. Pursuant to HAW. REV. STAT. § 480-13, Plaintiff seeks monetary relief against Arris measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

## Eleventh Claim for Relief

### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 and 720 ILCS 295/1A

#### *On Behalf of Plaintiff Fernandez and the Illinois Class*

326. Plaintiff Fernandez, individually and on behalf of the Illinois Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

327. Plaintiff Fernandez brings this claim individually and on behalf of the Illinois Class against Defendant.

328. Plaintiff Fernandez and the Illinois Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

329. Plaintiff Fernandez and the Illinois Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

330.    Arris is a "person" as that term is defined in 815 ILCS 505/1(c).

331.    Plaintiff Fernandez and the Illinois Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

332.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact ... in the conduct of trade or commerce ... whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

333.    In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Modems.

334.    Arris knew about the Modems' defects at the time of sale. Arris acquired additional information concerning the defects after the Modems were sold, but concealed all of that information until it was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects in the Modems, Arris engaged in unfair and deceptive business practices in violation of the Illinois CFA.

335.    By failing to disclose and by actively concealing the defects in the Modems, which it marketed as reliable and of high quality, Arris engaged in unfair and deceptive business practices in violation of the Illinois CFA. Arris's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Fernandez and the Illinois Class, about the true reliability of their Modems.

336.   Arris intentionally and knowingly misrepresented material facts regarding the Modems with the intent to mislead Plaintiff Fernandez and the Illinois Class. Arris knew or should have known that its conduct violated the Illinois CFA.

337.   As alleged above, Arris made material statements about the reliability of the Modems that were either false or misleading. Arris owed Plaintiff Fernandez and the Illinois Class a duty to disclose the true safety and reliability of the Modems, because Arris: (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiff Fernandez and the Illinois Class; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiff Fernandez and the Illinois that contradicted these representations.

338.   Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiff Fernandez and the Illinois Class had to spend their time and money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

339.   Pursuant to 815 ILCS 505/10a(a), Plaintiff Fernandez and the Illinois Class seek monetary relief against Arris in the amount of actual damages, as well as punitive damages because Arris acted with fraud and/or malice and/or was grossly negligent.

340.   Plaintiff Fernandez and the Illinois Class also seek an order enjoining Arris's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq*.

**Twelfth Claim for Relief**

**Violation of Iowa Private Right of Action for Consumer Frauds Act**

**Iowa Code § 714H.1 *et seq.***

*On Behalf of Plaintiff Coyle and the Iowa Class*

341.    Plaintiff Coyle, individually and on behalf of the Iowa Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

342.    Plaintiff Coyle brings this claim individually and on behalf of the Iowa Class against Defendant.

343.    Plaintiff Coyle and the Iowa Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

344.    Plaintiff Coyle and the Iowa Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

345.    Plaintiff Coyle, Iowa Class members, and Defendant are "persons" within the meaning of Iowa Code § 714H.2(7).

346.    Plaintiff and the Iowa Class members are "consumers" within the meaning of Iowa Code § 714H.2(3), who purchased one or more SB6190 Modems.

347.    Defendant's conduct described herein related to the "sale" or "advertisement" of "merchandise" within the meaning of Iowa Code §§ 714H.2(2), (6), and (8).

348.    The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits a person from engaging in a "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale or lease of consumer merchandise." Iowa Code § 714H.3.

349.    In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in

1   unlawful trade practices by employing deception, deceptive acts or practices, fraud,

2   misrepresentations, or concealment, suppression or omission of any material fact with intent that

3   others rely upon such concealment, suppression or omission, in connection with the sale of the

4   Modems.

5   350.   Arris knew about the Modems' defects at the time of sale. Arris acquired additional

6   information concerning the defects after the Modems were sold, but concealed all of that

7   information until it was revealed by Modem purchasers.

8   351.   By failing to disclose and by actively concealing the defects in the Modems, which

9   it marketed as reliable and of high quality, Arris engaged in unfair and deceptive business

10   practices in violation of the Iowa CFA Act. Arris's unfair or deceptive acts or practices were

11   likely to and did in fact deceive reasonable consumers, including Plaintiff Coyle, about the true

12   reliability of their Modems.

13   352.   Arris intentionally and knowingly misrepresented material facts regarding the

14   Modems with the intent to mislead Plaintiff Coyle and the Iowa Class. Arris knew or should have

15   known that its conduct violated the Iowa CFA.

16   353.   As alleged above, Arris made material statements about the reliability of the

17   Modems that were either false or misleading. Arris owed Plaintiff Coyle and the Iowa Class a

18   duty to disclose the true safety and reliability of the Modems, because Arris: (a) possessed

19   exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing

20   from Plaintiff Coyle and the Iowa Class; and (c) made incomplete representations about the

21   reliability of the Modems, while purposefully withholding material facts from Plaintiff Coyle and

22   the Iowa Class that contradicted these representations.

23   354.   As a direct and proximate result of Arris's unfair, deceptive, and unconscionable

24   conduct, Plaintiff Coyle and the Iowa Class members have suffered and will continue to suffer

25   injury, ascertainable losses of money or property, and monetary and nonmonetary damages.

26   Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were

27   deprived of the benefit of their bargain since the cable modems they purchased were worth less

28   than they would have been if they were free from defects. Furthermore, Plaintiff Coyle and the

Iowa Class had to spend their time and money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

355.   Defendant's violations present a continuing risk to Plaintiff Coyle and the Iowa Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

356.   Prior to filing this Fourth Amended Consolidated Class Action Complaint, by certified mail dated February 19, 2019, Plaintiff Coyle sought approval from the Iowa Attorney General to file a class action claim under the Iowa CFA. Plaintiff Coyle received approval from the Office of the Attorney General in a letter dated March 7, 2019.

357.   Pursuant to Iowa Code § 714H.5, Plaintiff Coyle and the Iowa Class seek an order enjoining Defendant's unfair and/or deceptive acts or practices, and awarding actual damages, treble or punitive damages, attorneys' fees, and any other just and proper relief under the Iowa CFA the Court deems necessary to protect the public from further violations of the Iowa CFA.

## Thirteenth Claim for Relief

### Violations of the Kansas Consumer Protection Act,

### KAN. STAT. ANN. § 50-623 *et seq.*

### *On Behalf of Plaintiff Bryant and the Kansas Class*

358.   Plaintiff Bryant, individually and on behalf of the Kansas Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

359.   Plaintiff Bryant brings this claim individually and on behalf of the Kansas Class against Defendant.

360.   Plaintiff Bryant and the Kansas Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

361.   Plaintiff Bryant and the Kansas Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

362.    Arris is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), KAN. STAT. ANN. § 50-624(l).

363.    Plaintiff Bryant and the Kansas Class are "consumers," within the meaning of KAN. STAT. ANN. § 50-624(b), who purchased Modems.

364.    The sales of the Modems to Plaintiff Bryant and the Kansas Class were "consumer transactions" within the meaning of KAN. STAT. ANN. § 50-624(c).

365.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," KAN. STAT. ANN. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;""(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." KAN. STAT. ANN. § 50-627(a).

366.    In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Modems.

367.    Arris knew about the Modems' defects at the time of sale. Arris acquired additional information concerning the defects after the Modems were sold, but concealed all of that information until it was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects in the Modems, Arris engaged in unfair and deceptive business practices in violation of the Kansas CPA.

368.     By failing to disclose and by actively concealing the defects in the Modems, which it marketed as reliable and of high quality, Arris engaged in unfair and deceptive business practices in violation of the Kansas CPA. Arris's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Bryant and the Kansas Class, about the true reliability of their Modems.

369.     Arris intentionally and knowingly misrepresented material facts regarding the Modems with the intent to mislead Plaintiff Bryant and the Kansas Class. Arris knew or should have known that its conduct violated the Kansas CPA.

370.     As alleged above, Arris made material statements about the reliability of the Modems that were either false or misleading. Arris owed Plaintiff Bryant and the Kansas Class a duty to disclose the true safety and reliability of the Modems, because Arris: (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiff Bryant and the Kansas Class; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiff Bryant and the Kansas Class that contradicted these representations.

371.     Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiff Bryant and the Kansas Class had to spend their time and money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

372.     Pursuant to KAN. STAT. ANN. § 50-634, Plaintiff Bryant and the Kansas Class seek monetary relief against Arris in the amount of actual damages, as well as an order enjoining Arris's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under KAN. STAT. ANN. § 50-623 *et seq*.

**Fourteenth Claim for Relief**

**Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law,**

**LA. REV. STAT. § 51.1401 *et seq.***

***On Behalf of Plaintiff Oefelein and the Louisiana Class***

373.    Plaintiff Oefelein, individually and on behalf of the Louisiana Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

374.    Plaintiff Oefelein brings this claim individually and on behalf of the Louisiana Class against Defendant.

375.    Plaintiff Oefelein and the Louisiana Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

376.    Plaintiff Oefelein and the Louisiana Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

377.    Arris, Plaintiff Oefelein, and the Louisiana Class are "persons" within the meaning of the LA. REV. STAT. § 51:1402(8). Plaintiff Oefelein and the Louisiana Class are "consumers" within the meaning of LA. REV. STAT. § 51:1402(1). Arris engaged in "trade" or "commerce" within the meaning of LA. REV. STAT. § 51:1402(9).

378.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. § 51:1405(A). Arris participated in misleading, false, or deceptive acts that violated the Louisiana CPL. By systematically concealing the defects in Modems, Arris engaged in deceptive business practices prohibited by the Louisiana CPL. The suppressed or omitted information would be material to a reasonable consumer.

379.    In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that

others rely upon such concealment, suppression or omission, in connection with the sale of the Modems.

380.   Arris knew about the Modems' defects. Arris acquired additional information concerning the defects after the Modems were sold, but concealed all of that information until it was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects in the Modems, Arris engaged in unfair and deceptive business practices in violation of the Louisiana CPL.

381.   Arris's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Oefelein and the Louisiana Class, about the true reliability of their Modems.

382.   Arris intentionally and knowingly misrepresented material facts regarding the Modems with the intent to mislead Plaintiff Oefelein and the Louisiana Class.

383.   Arris knew or should have known that its conduct violated the Louisiana CPL.

384.   As alleged above, Arris made material statements about the reliability of the Modems that were either false or misleading. Arris owed Plaintiff Oefelein and the Louisiana Class a duty to disclose the true reliability of the Modems because Arris: (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiff Oefelein and the Louisiana Class; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiff Oefelein and the Louisiana Class that contradicted these representations.

385.   Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiff Oefelein and the Louisiana Class had to spend their time and/or money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

386.   As a direct and proximate result of Arris's violations of the Louisiana CPL, Plaintiff Oefelein and the Louisiana Class have suffered injury-in-fact and/or actual damage.

1    Pursuant to LA. REV. STAT. § 51:1409, Plaintiff Oefelein and the Louisiana Class seek to recover

2    actual damages in an amount to be determined at trial; treble damages for Arris's knowing

3    violations of the Louisiana CPL; an order enjoining Arris's unfair, unlawful, and/or deceptive

4    practices; declaratory relief; attorneys' fees; and any other just and proper relief available under

5    LA. REV. STAT. § 51:1409.

**Fifteenth Claim for Relief**

**Deceptive Acts or Practices Prohibited by Massachusetts Law,**

**MASS. GEN. LAWS Ch. 93a, § 1 *et seq.***

***On Behalf of Plaintiff Rees and the Massachusetts Class***

10    387.    Plaintiff Rees, individually and on behalf of the Massachusetts Class,

11    incorporates by reference all of the allegations contained in the preceding paragraphs of this

12    Fourth Amended Consolidated Class Action Complaint.

13    388.    Plaintiff Rees brings this claim individually and on behalf of the Massachusetts

14    Class against Defendant.

15    389.    Plaintiff Rees and the Massachusetts Class purchased the SB6190 Modem

16    manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

17    390.    Plaintiff Rees and the Massachusetts Class purchased the SB6190 Modem new

18    and in its original packaging and did not alter their Modems.

19    391.    Defendant, Plaintiff Rees, and the Massachusetts Class are "persons" within the

20    meaning of MASS. GEN. LAWS ch. 93A, § 1(a).

21    392.    Arris engaged in "trade" or "commerce" within the meaning of MASS. GEN. LAWS

22    ch. 93A, § 1(b).

23    393.    Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts

24    or practices in the conduct of any trade or commerce." MASS. GEN. LAWS ch. 93A, § 2. Arris

25    participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

26    394.    In the course of its business, Arris concealed the defects in the Modems and

27    otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in

28    unlawful trade practices by employing deception, deceptive acts or practices, fraud,

1   misrepresentations, or concealment, suppression or omission of a material fact with intent that

2   others rely upon such concealment, suppression or omission, in connection with the sale of the

3   Modems.

4       395.   Arris thus violated the Massachusetts Act by, at minimum employing deception,

5   deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission

6   of any material fact with intent that others rely upon such concealment, suppression or omission,

7   in connection with the sale of the Modems.

8       396.   Arris knew about the Modems' defects. Arris acquired additional information

9   concerning the defects after the Modems were sold, but concealed all of that information until it

10  was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects

11  in the Modems, Arris engaged in unfair and deceptive business practices in violation of the

12  Massachusetts Act.

13      397.   Arris's unfair or deceptive acts or practices were likely to and did in fact deceive

14  reasonable consumers, including Plaintiff Rees and the Massachusetts Class, about the true

15  reliability of their Modems.

16      398.   Arris intentionally and knowingly misrepresented material facts regarding the

17  Modems with the intent to mislead Plaintiff Rees and the Massachusetts Class.

18      399.   Arris knew or should have known that its conduct violated the Massachusetts Act.

19      400.   As alleged above, Arris made material statements about the reliability of the

20  Modems that were either false or misleading. Arris owed Plaintiff Rees and the Massachusetts

21  Class a duty to disclose the true reliability of the Modems because Arris: (a) possessed exclusive

22  knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from

23  Plaintiff Rees and the Massachusetts Class; and (c) made incomplete representations about the

24  reliability of the Modems, while purposefully withholding material facts from Plaintiff Rees and

25  the Massachusetts Class that contradicted these representations.

26      401.   Because Arris fraudulently concealed the defects in the Modems, purchasers of

27  the Modems were deprived of the benefit of their bargain since the cable modems they purchased

28  were worth less than they would have been if they were free from defects. Furthermore, Plaintiff

1  Rees and the Massachusetts Class had to spend their time and/or money to resolve their problems

2  with the Modems. Had purchasers of the Modem been aware of the defects in their cable

3  modems, they would have either not have bought the Modems or would have paid less for them.

4    402. Defendant's violations present a continuing risk to Plaintiff Rees and the

5  Massachusetts Class, as well as to the general public. Defendant's unlawful acts and practices

6  complained of herein affect the public interest.

7    403. As a direct and proximate result of Arris's violations of the Massachusetts Act,

8  Plaintiff Rees and the Massachusetts Class have suffered injury-in-fact and/or actual damage.

9  Pursuant to MASS. GEN. LAWS ch. 93A, § 9, Plaintiff Rees and the Massachusetts Class seek

10  monetary relief against Defendant measured as the greater of (a) actual damages in an amount

11  to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff and

12  each Massachusetts Class member. Because Arris's conduct was committed willfully and

13  knowingly, Plaintiff Rees and the Massachusetts Class Members are each entitled to recover, up

14  to three times actual damages, but no less than two times actual damages.

15    404. Plaintiff Rees and the Massachusetts Class also seek an order enjoining Arris's

16  unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any

17  other just and proper relief under the Massachusetts Act.

18    405. By letter dated April 21, 2017, Arris was notified of its unlawful conduct pursuant

19  to MASS. GEN. LAWS ch. 93A, § 9(3). Because Arris failed to remedy its unlawful conduct within

20  the requisite time period, Plaintiff Rees and the Massachusetts Class seek all damages and relief

21  to which they are entitled.

22    406. As a result of Arris's conduct, the amount of its unjust enrichment should be

23  disgorged, in an amount according to proof.

24

25

26

27

28

---

**Sixteenth Claim for Relief**

**Violations of the New Jersey Consumer Fraud Act,**

**N.J. STAT. ANN. §§ 56:8-1 et seq.**

***On Behalf of Plaintiff Breslin and the New Jersey Class***

407.    Plaintiff Breslin, individually and on behalf of the New Jersey Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

408.    Plaintiff Breslin brings this claim individually and on behalf of the New Jersey Class against Defendant.

409.    Plaintiff Breslin and the New Jersey Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

410.    Plaintiff Breslin and the New Jersey Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

411.    Plaintiff Breslin, the New Jersey Class, and Defendant are persons under the New Jersey Consumer Fraud Act, N.J. STAT. § 56:8-1(d).

412.    Arris engaged in "sales" of "merchandise" within the meaning of N.J. STAT. §§ 56:8-1(c), (e). Arris's actions as set forth herein occurred in the conduct of trade or commerce.

413.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. STAT. § 56:8-2.

414.    In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud,

misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Modems.

415.    Arris thus violated the provisions of the New Jersey CFA, at a minimum by: (1) representing that the Modems have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Modems are of a particular standard, quality, and grade when they are not; (3) advertising the Modems with the intent not to sell them as advertised; (4) failing to disclose information concerning the Modems with the intent to induce consumers to purchase the Modems; and (5) otherwise engaging in conduct likely to deceive.

416.    Arris knew about the Modems' defects. Arris acquired additional information concerning the defects after the Modems were sold, but concealed all of that information until it was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects in the Modems, Arris engaged in unfair and deceptive business practices in violation of the New Jersey CFA.

417.    Arris's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Breslin and the New Jersey Class, about the true reliability of their Modems.

418.    Arris intentionally and knowingly misrepresented material facts regarding the Modems with the intent to mislead Plaintiff Breslin and the New Jersey Class.

419.    Arris knew or should have known that its conduct violated the New Jersey CFA.

420.    As alleged above, Arris made material statements about the reliability of the Modems that were either false or misleading. Arris owed Plaintiff Breslin and the New Jersey Class a duty to disclose the true reliability of the Modems because Arris: (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiff Breslin and the New Jersey Class; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiff Breslin and the New Jersey Class that contradicted these representations.

421.    Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiff Breslin and the New Jersey Class had to spend their time and/or money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

422.    Defendant's violations present a continuing risk to Plaintiff Breslin and the New Jersey Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

423.    As a direct and proximate result of Arris's violations of the New Jersey CFA, Plaintiff Breslin and the New Jersey Class have suffered injury-in-fact and/or actual damage. Pursuant to N.J. Stat. § 56:8-19, Plaintiff Breslin and the New Jersey Class seek all just and proper remedies, including, but not limited to, actual and statutory damages in amounts to be proven at trial, treble damages, an order enjoining Defendant's deceptive and unfair conduct, costs and reasonable attorneys' fees.

**Seventeenth Claim for Relief**

**Violation of New York General Business Law § 349,**

**N.Y. GEN. BUS. LAW § 349**

***On Behalf of Plaintiff Onea and the New York Class***

424.    Plaintiff Onea, individually and on behalf of the New York Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

425.    Plaintiff Onea brings this claim individually and on behalf of the New York Class against Defendant.

426.    Plaintiff Onea and the New York Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

427.    Plaintiff Onea and the New York Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

428.    Plaintiff Onea, the New York Class, and Defendant are "persons" under N.Y. GEN. BUS. LAW § 349(h), the New York Deceptive Acts and Practices Act ("New York DAPA").

429.    Defendant's actions as set forth herein occurred in the conduct of trade or commerce under the New York DAPA.

430.    The New York DAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349. Defendant's conduct, as set forth herein, constitutes deceptive acts or practices under this section.

431.    In the course of its business, Arris intentionally or negligently concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Modems.

432.    Arris thus violated the provisions of the New York DAPA by, at a minimum: (1) representing that the Modems have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Modems are of a particular standard, quality, and grade when they are not; (3) advertising the Modems with the intent not to sell them as advertised; (4) failing to disclose information concerning the Modems with the intent to induce consumers to purchase the Modems.

433.    Arris knew about the Modems' defects. Arris acquired additional information concerning the defects after the Modems were sold, but concealed all of that information until it was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects in the Modems, Arris engaged in unfair and deceptive business practices in violation of the New York DAPA.

434.    Arris's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Onea and the New York Class, about the true reliability of their Modems.

435.    Arris intentionally and knowingly misrepresented material facts regarding the Modems with the intent to mislead Plaintiff Onea and the New York Class.

436.    Arris knew or should have known that its conduct violated the New York DAPA.

437.    As alleged above, Arris made material statements about the reliability of the Modems that were either false or misleading. Arris owed Plaintiff Onea and the New York Class a duty to disclose the true reliability of the Modems because Arris: (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiff Onea and the New York Class; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiff Onea and the New York Class that contradicted these representations.

438.    Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiff Onea and the New York Class had to spend their time and/or money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

439.    Defendant's violations present a continuing risk to Plaintiff Onea and the New York Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

440.    As a result of the foregoing willful, knowing, and wrongful conduct of Defendant, Plaintiff Onea and the New York Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendant's deceptive and unfair conduct, and all other just and appropriate relief available under the New York DAPA.

**<u>Eighteenth Claim for Relief</u>**

**Violation of New York General Business Law § 350,**

**N.Y. Gen. Bus. Law § 350**

***On Behalf of Plaintiff Onea and the New York Class***

441.    Plaintiff Onea, individually and on behalf of the New York Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

442.    Plaintiff Onea brings this claim individually and on behalf of the New York Class against Defendant.

443.    Plaintiff Onea and the New York Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

444.    Plaintiff Onea and the New York Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

445.    Defendant engaged in the advertising and marketing alleged herein with the intent to induce the sale of the Modems to consumers like Plaintiff Onea and the New York Class.

446.    Defendant was engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. GEN. BUS. LAW § 350, the New York False Advertising Act ("New York FAA").

447.    The New York FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of …representations [made] with respect to the commodity …." N.Y. GEN. BUS. LAW § 350-a.

448.    Arris caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, and that were known by Arris, or that through the exercise of reasonable care should have been known by Arris, to be untrue and misleading to Plaintiff Onea and the New York class.

449.    Defendant's advertising and marketing representations regarding its SB6190 Modems were false, misleading, and deceptive as set forth in detail above. Defendant also concealed the material information from consumers that these cable modems contained a defect that causes severe network latency and unreliable Internet connectivity.

450.    Defendant's misrepresentations and omissions alleged herein deceive or have the tendency to deceive the general public regarding the reliability of its SB6190 Modems for ordinary consumer use.

451.    Defendant's misrepresentations and omissions alleged herein were the type of misrepresentations that are material, i.e., a reasonable person would attach importance to them and would be induced to act on the information in making purchase decisions.

452.    Defendant's misrepresentations and omissions alleged herein are objectively material to a reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

453.    At the time Defendant made the misrepresentations and omissions alleged herein, Defendant knew or should have known that they were untrue or misleading and acted in violation of N.Y. GEN. BUS. LAW § 350.

454.    Unless restrained by this Court, Defendant will continue to engage in untrue and misleading advertising in violation N.Y. GEN. BUS. LAW § 350.

455.    As a result, Plaintiff Onea and each member of the New York Class have been injured, have lost money or property, and are entitled to relief.  Plaintiff Onea and the New York Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each for New York class members. Because Arris's conduct was committed willingly and knowingly, New York class members are entitled to recover three times actual damages, up to $10,000.

456.    Plaintiff Onea and the New York Class also seek an order enjoining Arris's false advertising, attorneys' fees, and any other just and proper relief under N.Y. GEN. BUS. LAW § 350.

**Nineteenth Claim for Relief**

**Violation of the Consumer Sales Practice Act,**

**OHIO REV. CODE ANN. § 1345.01 *et seq.***

***On Behalf of Plaintiff Hopkins and the Ohio Class***

457.    Plaintiff Hopkins, individually and on behalf of the Ohio Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

458.    Plaintiff Hopkins brings this claim individually and on behalf of the Ohio Class against Defendant.

459.    Plaintiff Hopkins and the Ohio Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

460.    Plaintiff Hopkins and the Ohio Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

461.    Arris is a "supplier" as that term is defined in OHIO REV. CODE ANN. § 1345.01(C). Plaintiff Hopkins and the Ohio Class are "consumers" as that term is defined in OHIO REV. CODE ANN. § 1345.01(D), and their purchases of Modems are "consumer transactions" within the meaning of OHIO REV. CODE ANN. § 1345.01(A).

462.    The Ohio Consumer Sales Practices Act ("Ohio CSPA"), OHIO REV. CODE ANN. §1345.02, prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation, the Ohio CSPA prohibits suppliers from representing (a) that goods have characteristics or uses or benefits which they do not have; (b) that their goods are of a particular quality or grade they are not; and (c) the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.

463.    Arris's conduct as alleged above constitutes unfair and/or deceptive consumer sales practices in violation of OHIO REV. CODE ANN. § 1345.02.

464.    By concealing defects in the Modems, Arris engaged in deceptive business practices prohibited by the Ohio CSPA, including: representing that the Modems have characteristics, uses, benefits, and qualities which they do not have; representing that the

1  Modems are of a particular standard, quality, and grade when they are not; representing that the

2  subject of a transaction involving Modems has been supplied in accordance with a previous

3  representation when it has not; and engaging in other unfair or deceptive acts or practices. The

4  suppressed or omitted information would be material to a reasonable consumer.

5    465.   Arris's actions occurred in the conduct of trade or commerce.

6    466.   In the course of its business, Arris concealed the defects in the Modems and

7  otherwise engaged in activities with a tendency or capacity to deceive. Arris engaged in unlawful

8  trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations,

9  or concealment, suppression or omission of a material fact with intent that others rely upon such

10  concealment, suppression or omission, in connection with the sale of Modems.

11    467.   Arris knew about the Modems' defects at the time of sale. Arris acquired

12  additional information concerning the defects after the Modems were sold, but concealed all of

13  that information until it was revealed by Modem purchasers. By failing to disclose and by

14  actively concealing the defects in the Modems, Arris engaged in unfair and deceptive business

15  practices in violation of the Ohio CSPA.

16    468.   By failing to disclose and by actively concealing the defects in the Modems,

17  which it marketed as reliable and of high quality, Arris engaged in unfair and deceptive business

18  practices in violation of the Ohio CSPA.

19    469.   Arris's unfair or deceptive acts or practices were likely to and did in fact deceive

20  reasonable consumers, including Plaintiff Hopkins and the Ohio Class, about the true reliability

21  of their Modems. Arris intentionally and knowingly misrepresented material facts regarding the

22  Modems with the intent to mislead Plaintiff Hopkins and the Ohio Class.

23    470.   Arris acted intentionally, knowingly, and maliciously to violate the Ohio CSPA

24  and recklessly disregarded Plaintiff Hopkins and the Ohio Class members' rights. Arris's

25  knowledge of the Modem's defects at the time of sale put it on notice that the Modems were not

26  as advertised.

27    471.   As alleged above, Arris made material statements about the reliability of the

28  Modems that were either false or misleading. Arris owed Plaintiff Hopkins and the Ohio Class

1  a duty to disclose the true safety and reliability of the Modems, because Arris: (a) possessed

2  exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing

3  from Plaintiff Hopkins and the Ohio Class; and (c) made incomplete representations about the

4  reliability of the Modems, while purposefully withholding material facts from Plaintiff Hopkins

5  and the Ohio Class that contradicted these representations.

6        472.   Because Arris fraudulently concealed the defects in the Modems, purchasers of

7  the Modems were deprived of the benefit of their bargain since the cable modems they purchased

8  were worth less than they would have been if they were free from defects. Furthermore, Plaintiff

9  Hopkins and the Ohio Class had to spend their time and money to resolve their problems with

10  the Modems. Had purchasers of the Modem been aware of the defects in their cable modems,

11  they would have either not have bought the Modems or would have paid less for them.

12        473.   As a direct and proximate result of Arris's violations of the Ohio CSPA, Plaintiff

13  Hopkins and the Ohio Class have suffered injury-in-fact and/or actual damage, as alleged above.

14  As a result of the foregoing wrongful conduct of Arris, Plaintiff Hopkins and the Ohio Class

15  have been damaged in an amount to be proven at trial, and seek all just and proper remedies,

16  including, but not limited to, actual and statutory damages, an order enjoining Arris's deceptive

17  and unfair conduct, treble damages, court costs and reasonable attorneys' fees, pursuant to OHIO

18  REV. CODE ANN. § 1345.09, *et seq.*

19                         **Twentieth Claim for Relief**

20   **Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law,**

21                          **73 P.S. § 201-1 *et seq.***

22        ***On Behalf of Plaintiffs M. Alexander, Crespo, and the Pennsylvania Class***

23        474.   Plaintiffs M. Alexander and Crespo, individually and on behalf of the

24  Pennsylvania Class, incorporate by reference all of the allegations contained in the preceding

25  paragraphs of this Fourth Amended Consolidated Class Action Complaint.

26        475.   Plaintiffs M. Alexander and Crespo bring this claim individually and on behalf

27  of the Pennsylvania Class against Defendant.

28

---

476.     Plaintiffs M. Alexander and Crespo and the Pennsylvania Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

477.     Plaintiffs M. Alexander and Crespo and the Pennsylvania Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

478.     Arris, Plaintiffs M. Alexander and Crespo, and the Pennsylvania Class are "persons" within the meaning of 73 P.S. § 201-2(2).

479.     Arris is engaged in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

480.     The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." 73 P.S. § 201-3.

481.     In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Modems.

482.     Arris thus violated the provisions of the Pennsylvania UTPA, at a minimum by: (1) representing that the Modems have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Modems are of a particular standard, quality, and grade when they are not; (3) advertising the Modems with the intent not to sell them as advertised; (4) failing to disclose information concerning the Modems with the intent to induce consumers to purchase the Modems.

483.     Arris knew about the Modems' defects. Arris acquired additional information concerning the defects after the Modems were sold, but concealed all of that information until it was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects

1   in the Modems, Arris engaged in unfair and deceptive business practices in violation of the

2   Pennsylvania UTPA.

3          484.    Arris's unfair or deceptive acts or practices were likely to and did in fact deceive

4   reasonable consumers, including Plaintiffs M. Alexander and Crespo and the Pennsylvania

5   Class, about the true reliability of their Modems.

6          485.    Arris intentionally and knowingly misrepresented material facts regarding the

7   Modems with the intent to mislead Plaintiffs M. Alexander and Crespo and the Pennsylvania

8   Class.

9          486.    Arris knew or should have known that its conduct violated the Pennsylvania

10  UTPA.

11         487.    As alleged above, Arris made material statements about the reliability of the

12  Modems that were either false or misleading. Arris owed Plaintiffs M. Alexander and Crespo

13  and the Pennsylvania Class a duty to disclose the true reliability of the Modems because Arris:

14  (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed

15  the foregoing from Plaintiffs M. Alexander and Crespo and the Pennsylvania Class; and (c) made

16  incomplete representations about the reliability of the Modems, while purposefully withholding

17  material facts from Plaintiffs M. Alexander and Crespo and the Pennsylvania Class that

18  contradicted these representations.

19         488.    Because Arris fraudulently concealed the defects in the Modems, purchasers of

20  the Modems were deprived of the benefit of their bargain since the cable modems they purchased

21  were worth less than they would have been if they were free from defects. Furthermore, Plaintiffs

22  M. Alexander and Crespo and the Pennsylvania Class had to spend their time and/or money to

23  resolve their problems with the Modems. Had purchasers of the Modem been aware of the

24  defects in their cable modems, they would have either not have bought the Modems or would

25  have paid less for them.

26         489.    Defendant's violations present a continuing risk to Plaintiffs M. Alexander and

27  Crespo and the Pennsylvania Class, as well as to the general public. Defendant's unlawful acts

28  and practices complained of herein affect the public interest.

490.     As a direct and proximate result of Arris's violations of the Pennsylvania UTPA, Plaintiffs M. Alexander and Crespo and the Pennsylvania Class have suffered injury-in-fact and/or actual damage.  Pursuant to 73 P.S. § 201-9.2(a), Plaintiffs M. Alexander and Crespo and the Pennsylvania Class seek an order enjoining Arris's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Pennsylvania UTPA.

**Twenty-First Claim for Relief**

**Violation of the Texas Deceptive Trade Practice Act – Consumer Protection Act,**

**TEX. BUS. & COM. CODE §§ 17.41 *et seq.***

***On Behalf of Plaintiffs Christensen, Rosenberg, and the Texas Class***

491.     Plaintiffs Christensen and Rosenberg, individually and on behalf of the Texas Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

492.     Plaintiffs Christensen and Rosenberg bring this claim individually and on behalf of the Texas Class against Defendant.

493.     Plaintiffs Christensen and Rosenberg and the Texas Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

494.     Plaintiffs Christensen and Rosenberg and the Texas Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

495.     Plaintiffs Christensen and Rosenberg and the Texas Class are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see TEX. BUS. & COM. CODE § 17.41, and are therefore "consumers" pursuant to TEX. BUS. & COM. CODE § 17.45(4). Defendant is a "person" within the meaning of TEX. BUS. & COM. CODE § 17.45(3).

496.     Arris is engaged in "trade" or "commerce" or "consumer transactions" within the meaning TEX. BUS. & COM. CODE § 17.46(a).

497.     The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade

or commerce," TEX. BUS. & COM. CODE § 17.46(A), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE §§ 17.45(5) and 17.50(a)(3).

498.    In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Modems.

499.    Arris thus violated the provisions of the Texas DTPA, at a minimum by: (1) representing that the Modems have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Modems are of a particular standard, quality, and grade when they are not; (3) advertising the Modems with the intent not to sell them as advertised; (4) failing to disclose information concerning the Modems with the intent to induce consumers to purchase the Modems.

500.    Arris knew about the Modems' defects. Arris acquired additional information concerning the defects after the Modems were sold, but concealed all of that information until it was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects in the Modems, Arris engaged in unfair and deceptive business practices in violation of the Texas DTPA.

501.    Arris's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs Christensen and Rosenberg and the Texas Class, about the true reliability of their Modems.

502.    Arris intentionally and knowingly misrepresented material facts regarding the Modems with the intent to mislead Plaintiffs Christensen and Rosenberg and the Texas Class.

503.    Arris knew or should have known that its conduct violated the Texas DTPA.

504.   As alleged above, Arris made material statements about the reliability of the Modems that were either false or misleading. Arris owed Plaintiffs Christensen and Rosenberg and the Texas Class a duty to disclose the true reliability of the Modems because Arris: (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiffs Christensen and Rosenberg and the Texas Class; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiffs Christensen and Rosenberg and the Texas Class that contradicted these representations.

505.   Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiffs Christensen and Rosenberg and the Texas Class had to spend their time and/or money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

506.   Defendant's violations present a continuing risk to Plaintiffs Christensen and Rosenberg and the Texas Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

507.   As a direct and proximate result of Arris's violations of the Texas DTPA, Plaintiffs Christensen and Rosenberg and the Texas Class have suffered injury-in-fact and/or actual damage. Pursuant to TEX. BUS. & COM. CODE § 17.50, Plaintiffs Christensen and Rosenberg and the Texas Class seek an order enjoining Arris's unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

508.   On May 19, 2017, Plaintiffs Christensen and Rosenberg sent a letter complying with TEX. BUS. & COM. CODE § 17.505(a). Because Arris failed to remedy its unlawful conduct

1   within the requisite time period, Plaintiffs Christensen and Rosenberg and the Texas Class seek

2   all damages and relief to which they are entitled.

3       509.    Pursuant to TEX. BUS. & COM. CODE § 17.501(a), Plaintiffs Christensen and

4   Rosenberg provided notice to the Texas Attorney General's office of the pendency of their

5   claims and this matter by certified mail return receipt requested dated January 30, 2019. Attached

6   therewith was a copy of their earlier May 19, 2017 demand letter and a redacted version of the

7   Second Amended Class Action Complaint (Dkt. No. 71). Plaintiffs Christensen and Rosenberg

8   received return receipt confirmation from the Texas Attorney General's office, but not no other

9   response to this correspondence.

10                          **Twenty-Second Claim for Relief**

11                    **Violation of the Virginia Consumer Protection Act,**

12                         **VA. CODE ANN. §§ 59.1-196 *et seq.***

13            ***On Behalf of Plaintiffs Bavry, Winkelman, and the Virginia Class***

14      510.    Plaintiffs Bavry and Winkelman, individually and on behalf of the Virginia Class,

15   incorporate by reference all of the allegations contained in the preceding paragraphs of this

16   Fourth Amended Consolidated Class Action Complaint.

17      511.    Plaintiffs Bavry and Winkelman bring this claim individually and on behalf of

18   the Virginia Class against Defendant.

19      512.    Plaintiffs Bavry, Winkelman, and the Virginia Class purchased the SB6190

20   Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

21      513.    Plaintiffs Bavry, Winkelman, and the Virginia Class purchased the SB6190

22   Modem new and in its original packaging and did not alter their Modems.

23      514.    Defendant, Plaintiffs Bavry, Winkelman, and the Virginia Class are "persons"

24   within the meaning of VA. CODE § 59.1-198.

25      515.    Arris is a "supplier" within the meaning of VA. CODE § 59.1-198.

26      516.    Arris is engaged in "consumer transactions" with Plaintiffs Bavry, Winkelman,

27   and the other members of the Virginia Class within the meaning of the VA. CODE § 59.1-198.

28

517.   Plaintiffs Bavry, Winkelman, and the other member of the Virginia Class purchased Modems which constitute "goods" within the meaning of VA. CODE § 59.1-198.

518.   The Virginia Consumer Protection Act ("Virginia CPA") makes unlawful "fraudulent acts or practices." Va. Code § 59.1-200(A).

519.   In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Modems.

520.   Arris thus violated the Virginia CPA, at a minimum by: (1) misrepresenting the source, sponsorship, approval, or certification of goods or services; (2) misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; (3) misrepresenting that goods or services are of a particular standard, quality, grade, style or model; (4) advertising goods or services with intent not to sell them as advertised; and (5) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction. VA. CODE § 59.1-200(A).

521.   Arris knew about the Modems' defects. Arris acquired additional information concerning the defects after the Modems were sold, but concealed all of that information until it was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects in the Modems, Arris engaged in unfair and deceptive business practices in violation of the Virginia CPA.

522.   Arris's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs Bavry, Winkelman, and the Virginia Class, about the true reliability of their Modems.

523.   Arris intentionally and knowingly misrepresented material facts regarding the Modems with the intent to mislead Plaintiffs Bavry, Winkelman, and the Virginia Class.

524.   Arris knew or should have known that its conduct violated the Virginia CPA.

525.    As alleged above, Arris made material statements about the reliability of the Modems that were either false or misleading. Arris owed Plaintiffs Bavry, Winkelman, and the Virginia Class a duty to disclose the true reliability of the Modems because Arris: (a) possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the foregoing from Plaintiffs Bavry, Winkelman, and the Virginia Class; and (c) made incomplete representations about the reliability of the Modems, while purposefully withholding material facts from Plaintiffs Bavry, Winkelman, and the Virginia Class that contradicted these representations.

526.    Because Arris fraudulently concealed the defects in the Modems, purchasers of the Modems were deprived of the benefit of their bargain since the cable modems they purchased were worth less than they would have been if they were free from defects. Furthermore, Plaintiffs Bavry, Winkelman, and the Virginia Class had to spend their time and/or money to resolve their problems with the Modems. Had purchasers of the Modem been aware of the defects in their cable modems, they would have either not have bought the Modems or would have paid less for them.

527.    Defendant's violations present a continuing risk to Plaintiffs Bavry, Winkelman, and the Virginia Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

528.    As a direct and proximate result of Arris's violations of the Virginia CPA, Plaintiffs Bavry, Winkelman, and the Virginia Class have suffered injury-in-fact and/or actual damage. Pursuant to VA. CODE § 59.1-204(A)–(B), Plaintiffs Bavry, Winkelman, and the Virginia Class are entitled to the greater of actual damages or $500 for each Virginia Class member, attorneys' fees, and costs. Because Arris's actions were willful, Plaintiffs Bavry, Winkelman, and the Virginia Class should each receive the greater of treble damages or $1,000. *Id.*

**Twenty-Third Claim for Relief**

**Violation of the Washington Consumer Protection Act,**

**Wash. Rev. Code Ann. §§ 19.86.010 *et seq.***

*On Behalf of Plaintiffs Haworth, Probé, and the Washington Class*

529.    Plaintiffs Haworth and Probé, individually and on behalf of the Washington Class, incorporate by reference all of the allegations contained in the preceding paragraphs of this Fourth Amended Consolidated Class Action Complaint.

530.    Plaintiffs Haworth and Probé bring this claim individually and on behalf of the Washington Class against Defendant.

531.    Plaintiffs Haworth and Probé and the Washington Class purchased the SB6190 Modem manufactured by Defendant that was marketed for fast and reliable Internet connectivity.

532.    Plaintiffs Haworth and Probé and the Washington Class purchased the SB6190 Modem new and in its original packaging and did not alter their Modems.

533.    Defendant, Plaintiffs Haworth and Probé, and the Washington Class are "persons" within the meaning of WASH. REV. CODE § 19.86.010(2).

534.    Arris is engaged in "trade" or "commerce" within the meaning of WASH. REV. CODE § 19.86.010(2).

535.    The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE § 19.86.020.

536.    In the course of its business, Arris concealed the defects in the Modems and otherwise engaged in activities with a tendency or capacity to deceive. Arris also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Modems.

537.    Arris's conduct is injurious to the public interest under WASH. REV. CODE § 19.86.093 because it violates WASH. REV. CODE § 19.86.020, violates a statute that contains a

1  specific legislation declaration of public interest impact, and/or injured persons and had and has

2  the capacity to injure persons. The alleged wrongful acts were committed in the ordinary course

3  of Arris's business and are part of its continued pattern alleged herein of misleading consumers

4  about the the quality and characteristics of the Modems. Further, its conduct affected the public

5  interest, including many Washingtonians affected by Arris's deceptive business practices.

6  Arris's course of conduct complained of herein is ongoing and has a substantial likelihood of

7  being repeated.

8       538.    Arris thus violated the Washington CPA, at a minimum by: (1) making direct

9  statements or causing reasonable inferences about the Modems that had the tendency to mislead

10  consumers; (2) engaging in advertising concerning the quality and characteristics of the

11  Modems, the overall impression of which had the tendency to mislead consumers; and (3) failing

12  to make clear and conspicuous disclosures of limitations, disclaimers, qualifications, conditions,

13  exclusions or restrictions of the Modems.

14       539.    Arris knew about the Modems' defects. Arris acquired additional information

15  concerning the defects after the Modems were sold, but concealed all of that information until it

16  was revealed by Modem purchasers. By failing to disclose and by actively concealing the defects

17  in the Modems, Arris engaged in unfair and deceptive business practices in violation of the

18  Washington CPA.

19       540.    Arris's unfair or deceptive acts or practices were likely to and did in fact deceive

20  reasonable consumers, including Plaintiffs Haworth and Probé and the Washington Class, about

21  the true reliability of their Modems.

22       541.    Arris intentionally and knowingly misrepresented material facts regarding the

23  Modems with the intent to mislead Plaintiffs Haworth and Probé and the Washington Class.

24       542.    Arris knew or should have known that its conduct violated the Washington CPA.

25       543.    As alleged above, Arris made material statements about the reliability of the

26  Modems that were either false or misleading. Arris owed Plaintiffs Haworth and Probé and the

27  Washington Class a duty to disclose the true reliability of the Modems because Arris: (a)

28  possessed exclusive knowledge about the defects in the Modems; (b) intentionally concealed the

1  foregoing from Plaintiffs Haworth and Probé and the Washington Class; and (c) made

2  incomplete representations about the reliability of the Modems, while purposefully withholding

3  material facts from Plaintiffs Haworth and Probé and the Washington Class that contradicted

4  these representations.

5       544.  Because Arris fraudulently concealed the defects in the Modems, purchasers of

6  the Modems were deprived of the benefit of their bargain since the cable modems they purchased

7  were worth less than they would have been if they were free from defects. Furthermore, Plaintiffs

8  Haworth and Probé and the Washington Class had to spend their time and/or money to resolve

9  their problems with the Modems. Had purchasers of the Modem been aware of the defects in

10 their cable modems, they would have either not have bought the Modems or would have paid

11 less for them.

12      545.  Defendant's violations present a continuing risk to Plaintiffs Haworth and Probé

13 and the Washington Class, as well as to the general public. Defendant's unlawful acts and

14 practices complained of herein affect the public interest.

15      546.  As a direct and proximate result of Arris's violations of the Washington CPA,

16 Plaintiffs Haworth and Probé and the Washington Class have suffered injury-in-fact and/or

17 actual damage. Pursuant to WASH. REV. CODE § 19.86.090, Plaintiffs Haworth and Probé and

18 the Washington Class seek an order enjoining Arris's unfair and/or deceptive acts or practices,

19 damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief

20 available under the Washington CPA. Because Arris's actions were willful and knowing,

21 Plaintiffs Haworth and Probé and the Washington Class's damages should be trebled. *Id.*

22 **Twenty-Fourth Claim for Relief**

23 **Unjust Enrichment**

24 ***On Behalf of Plaintiffs and the Nationwide Class***

25      547.  Plaintiffs, individually and on behalf of the Nationwide Class, incorporate by

26 reference all of the allegations contained in the preceding paragraphs of this Fourth Amended

27 Consolidated Class Action Complaint as if fully set forth herein.

28

548.     Plaintiffs and Nationwide Class Members conferred non-gratuitous benefits on Defendant by purchasing Modems at a premium price. Defendant appreciated, accepted, and retained such benefits conferred by Plaintiff and members of the Nationwide Class with knowledge and awareness that they were receiving falsely and misleadingly advertised Modems which did not provide fast and reliable Internet connectivity, as advertised.

549.     Retention of such benefits under the circumstances is accordingly unjust and inequitable. Defendant profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiffs and members of the Nationwide Class. Absent Defendant's misleading and deceptive representations regarding the qualities and functionality of the Modems, Plaintiffs and each member of the Nationwide Class would not have purchased the products at issue or would have paid substantially less for such Modems. As such, Plaintiffs and other members of the Nationwide Class conferred an improper windfall upon Defendant, which knew of the windfall and has unjustly retained such benefits.

550.     As a direct and proximate result of Defendant's unjust enrichment, under principles of equity and good conscience, Plaintiffs and the Class are entitled to full disgorgement and restitution of all amounts by which Defendant was enriched through its unlawful or wrongful conduct.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and the Nationwide Class and Subclasses, request that the Court order the following relief and enter judgment against Defendant as follows:

A.     An order certifying the proposed Nationwide Class and Subclasses under Rule 23;

B.     An order appointing Plaintiffs to represent the Nationwide Class and Subclasses;

C.     A declaration that Defendant has engaged in the illegal conduct alleged;

D.     An order that Defendant be permanently enjoined from its improper conduct;

E.     A judgment awarding Plaintiffs and the Nationwide Class and Subclasses restitution and disgorgement of all compensation obtained by Defendant from its wrongful conduct;

1   F.    A judgment awarding Plaintiffs and the Nationwide Class and Subclasses
2         compensatory damages in an amount to be proven at trial;

3   G.    A judgment awarding Plaintiffs and the Nationwide Class and Subclasses
4         compensatory damages, where available, in an amount to be proven at trial;

5   H.    Prejudgment and post-judgment interest at the maximum allowable rate;

6   I.    Attorneys' fees and expenses and the costs of this action; and

7   J.    All other relief that the Court deems necessary, just, and proper.

8

9                          **DEMAND FOR JURY TRIAL**

10  Plaintiffs hereby demand a trial by jury on all claims so triable.

11

12  Dated: June 28, 2019                    **SCHUBERT JONCKHEER & KOLBE LLP**

13                                          /s/ Noah M. Schubert
14                                          ROBERT C. SCHUBERT
                                            WILLEM F. JONCKHEER
15                                          DUSTIN L. SCHUBERT
                                            NOAH M. SCHUBERT
16                                          Three Embarcadero Center, Suite 1650
17                                          San Francisco, California 94111
                                            Telephone:    (415) 788-4220
18                                          Facsimile:    (415) 788-0161

19                                          *Class Counsel*

20

21

22

23

24

25

26

27

28

---