1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GREG KNOWLES, et al.,<br><br>            Plaintiffs,<br><br>      v.<br><br>ARRIS INTERNATIONAL PLC,<br><br>            Defendant. | Case No. 17-CV-01834-LHK<br><br>**ORDER GRANTING ARRIS'S MOTION FOR SUMMARY JUDGMENT**<br><br>Dkt. No. 173<br><br>**PUBLIC REDACTED VERSION** |

Plaintiffs Greg Knowles and Brian Alexander ("Plaintiffs") bring this class action against Defendant Arris International plc ("Arris"), based on Arris's alleged failure to disclose defects with the SB6190 cable modem.  Arris moves for summary judgment on Plaintiffs' California class claims for violation of California's implied warranty of merchantability and false advertising laws and moves to dismiss Plaintiffs' individual unjust enrichment claims.  Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS Arris's motion for summary judgment.

## I.      BACKGROUND

### A.  Arris Cable Modems

Arris manufactures cable modems, which are devices that enable the transmission of data

over the Internet.  ECF No. 172-14, Expert Report of Richard Newman ("Newman Report"), ¶ 24.

A typical home consumer purchases a cable modem or obtains one through the consumer's

Internet service provider.  *Id.* ¶¶ 25–26.  To initiate data transmission, the cable modem

communicates with the Internet service provider's cable modem termination system ("CMTS"),

which connects to additional networks to receive content from the Internet and satellite feeds.  *Id.*

¶ 25.  Communication from the consumer to the CMTS—such as an instruction to upload a file—

is referred to as "upstream" traffic, whereas communication from the CMTS to the consumer—

such as sending content to the consumer—is referred to as "downstream" traffic.  *Id.*

Data exchange over cable modems is measured in megabits per second ("Mbps") or

gigabits per second ("Gbps"), with one gigabit equal to one thousand megabits.  *Id.* ¶ 27.  These

figures reflect the maximum downstream or upstream "throughput," or rate of data transmission,

that the cable modem supports.  *Id.*  In 1997, throughput maxed out at 10 Mbps for upstream

traffic and 40 Mbps for downstream traffic.  *Id.* ¶ 28.  Now, cable modems can support upstream

and downstream speeds of up to 10 Gbps.  *Id.* ¶ 30.  Because the number of channels a cable

modem supports is directly correlated to the data throughput that the cable modem supports, the

process of "channel bonding" aggregates multiple channels to increase data rates.  *Id.* ¶ 34.

In late 2015, Arris publicly launched the SURFboard SB6190 cable modem ("SB6190

Modem").  ECF No. 173-21.  Unlike previous models of Arris's cable modem, the SB6183 and

SB6141, the SB6190 Modem includes a chip from Intel, the Puma 6.  ECF No. 172-26.  Plaintiffs

are a class of California consumers who purchased the SB6190 Modem.  Named California

Plaintiffs Greg Knowles and Brian Alexander bought their SB6190 Modems on August 15, 2016

and December 14, 2016, respectively.  ECF No. 181-43, ¶ 3; ECF No. 181-44 ¶ 3.

**B. Procedural History**

On March 31, 2017, Plaintiff Carlos Reyna filed a putative class action complaint against

Arris.  ECF No. 1.[1]  On May 11, 2017, Knowles and 16 other plaintiffs brought a separate putative

---

[1] All references to the docket refer to Case No. 5:17-CV-1834 unless otherwise specified.

Case No. 17-CV-01834-LHK
ORDER GRANTING ARRIS'S MOTION FOR SUMMARY JUDGMENT

class action against Arris. Case No. 5:17-CV-2740, ECF No. 1. On May 25, 2017, Reyna filed an administrative motion to consider whether his case and the Knowles case should be related. ECF No. 14. On June 5, 2017, the Court granted Reyna's motion to relate the Knowles case. ECF No. 15. On June 30, 2017, the Court granted the parties' stipulation to consolidate the cases. ECF No. 24. On July 5, 2017, the Court approved the parties' stipulation to streamline the cases by adjudicating the California law claims before the claims from other states. ECF No. 26; *see* ECF No. 40 at 5:5-5:17.

On July 21, 2017, Plaintiffs filed the consolidated amended complaint. ECF No. 30. Plaintiffs alleged four causes of action under California law on behalf of the named California Plaintiffs and the California Subclass, including (1) the Song-Beverly Consumer Warranty Act ("Song-Beverly Act"), Cal Civ. Code §§ 1790 *et seq.*; (2) the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*; (3) the False Advertising Law ("FAL"), Cal Bus. & Prof. Code §§ 17500 *et seq.*; and (4) the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.* Plaintiffs individually and on behalf of the Nationwide Class also asserted a claim for unjust enrichment/quasi-contract. *Id.*

On August 21, 2017, Arris filed a motion to dismiss and to strike parts of the consolidated amended complaint. ECF No. 33. On September 18, 2017, Plaintiffs filed an opposition, ECF No. 41, and on October 5, 2017, Arris filed a reply. ECF No. 42. On January 4, 2018, the Court granted Arris's motion to dismiss with leave to amend and denied Arris's motion to strike. ECF No. 54.

On February 5, 2018, Plaintiffs filed a second consolidated amended complaint ("SACC"). ECF No. 59-4. Arris filed an answer and affirmative defenses on February 20, 2018. ECF No. 68.

On May 3, 2018, Plaintiffs filed a motion for class certification. ECF No. 75. Plaintiffs sought certification for their UCL and FAL claims on behalf of the following proposed class: "All persons who purchased an Arris SURFboard SB6190 cable modem in California on or after October 1, 2015." *Id.* at 12. Plaintiffs sought certification of their claims under the Song-Beverly Act and the CLRA on behalf of the following proposed subclass: "All persons who purchased an

1    Arris SURFboard SB6190 cable modem in California for personal, family, or household purposes

2    on or after October 1, 2015."[2]  *Id.*

3            On May 31, 2018, Arris filed an opposition to the motion for class certification.  ECF No.

4    92.  Arris also filed *Daubert* challenges to all three of Plaintiffs' experts, ECF Nos. 94, 96, 98, and

5    motions to strike those experts' declarations, ECF Nos. 95, 97, 99.  Plaintiffs filed oppositions to

6    the *Daubert* motions on June 14, 2018.  ECF Nos. 112, 113, 114.  Arris filed replies in support of

7    its *Daubert* motions on June 21, 2018.  ECF Nos. 118, 119, 120, 121.

8            On June 22, 2018, Plaintiffs filed a reply in support of their motion for class certification.

9    ECF No. 122.  Plaintiffs also filed a *Daubert* challenge against an Arris expert, ECF No. 124,

10   Arris filed an opposition, ECF No. 130, and Plaintiffs filed a reply, ECF No. 135.

11           On August 10, 2018, the Court granted in part and denied in part Plaintiffs' motion for

12   class certification.  ECF No. 136.  The Court also denied both parties' *Daubert* challenges.  *Id.*

13           Although the Court concluded that Plaintiffs Knowles and Alexander satisfied Rule 23(a)'s

14   typicality and adequacy requirements, the Court concluded that two other California Plaintiffs,

15   Walton and Reyna, did not satisfy the typicality and adequacy requirements because Walton sold

16   his modem despite a duty to preserve evidence and because Plaintiffs conceded that Reyna's

17   testimony conflicted with one of Plaintiffs' theories of liability.  *Id.* at 28, 30.

18           Accordingly, the Court certified the following class (which seeks relief under the UCL and

19   FAL) and subclass (which seeks relief under the Song-Beverly Act and CLRA) under Rule

20   23(b)(3):

21           **Class**: All persons who purchased an ARRIS SURFboard SB6190 cable modem in
             California on or after October 1, 2015.
22           **Subclass**: All persons who purchased an ARRIS SURFboard SB6190 cable modem
23           in California for personal, family, or household purposes on or after October 1,
             2015.
24

25   _____

26   [2] Excluded from the class and subclass are "governmental entities, Defendant, any entity in which
     Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal
27   representatives, employees, coconspirators, successors, subsidiaries, and assigns.  Also excluded
     from the Class are any judges, justices, or judicial officers presiding over this matter and the
28   members of their immediate families and judicial staff."  Mot. at 12 n.13.

                                            4
     Case No. 17-CV-01834-LHK
     ORDER GRANTING ARRIS'S MOTION FOR SUMMARY JUDGMENT

*Id.* at 59.  The Court appointed Knowles and Alexander as class representatives.  *Id.* at 60.

On August 24, 2018, Arris petitioned the Ninth Circuit for permission to appeal the Court's class certification order under Federal Rule of Civil Procedure 23(f).  ECF No. 141.  On September 7, 2018, the Court stayed the case pending the Ninth Circuit's ruling on Arris's Rule 23(f) petition.  ECF No. 150.  On November 8, 2018, the Ninth Circuit denied Arris's Rule 23(f) petition.  ECF No. 153.

On December 12, 2018, the Court held a case management conference and lifted the stay in this case.  ECF No. 155.

On April 25, 2019, the parties filed a stipulation to voluntarily dismiss Plaintiffs Carlos Reyna and Jon Walton, the two Plaintiffs that the Court concluded were not typical or adequate.  ECF No. 171.  On April 26, 2019, the Court granted the stipulation to voluntarily dismiss Reyna and Walton as named Plaintiffs.  ECF No. 176.

On April 25, 2019, Arris filed the instant motion for summary judgment.  ECF No. 173 ("Mot.").  On May 10, 2019, Plaintiffs filed their opposition.  ECF No. 181 ("Opp.").  On May 16, 2019, Arris filed its reply.  ECF No. 185 ("Reply").

## II.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial."

Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

## III. DISCUSSION

Arris moves for summary judgment on all four of Plaintiffs' California class claims: the Song-Beverly Act, UCL, FAL, and CLRA. Arris also moves to dismiss Plaintiffs' individual unjust enrichment claims. The Court first addresses Plaintiffs' Song-Beverly Act claim. Then, the Court addresses Plaintiffs' UCL, FAL, and CLRA claims, which both parties agree are all subject to the same legal standard. Mot. at 17; Opp. at 17. Then, the Court addresses Plaintiffs' unjust enrichment claims.

### A. Plaintiffs Allege that Latency Defects Rendered the SB6190 Modem Unmerchantable in Violation of the Song-Beverly Act

Plaintiffs allege that Arris violated the Song-Beverly Act's implied warranty of merchantability because the SB6190 Modem "contained a defect that causes severe network latency." SACC ¶¶ 221–232. Specifically, Plaintiffs contend that latency test results on the SB6190 Modem's performance in four protocols, HTTP, TCP, UDP, and DNS show that the SB6190 Modem was unmerchantable under the Song-Beverly Act. To be unmerchantable, a consumer good must fail to possess even the most basic degree of fitness for ordinary use. Arris argues that although the latency test results show that the SB6190 Modem was milliseconds slower in laboratory test conditions, that evidence does not show that the SB6190 Modem failed to possess a basic degree of fitness for ordinary use. Thus, Arris contends that as a matter of law, the SB6190 Modem was not unmerchantable under the Song-Beverly Act. For the reasons explained below, the Court agrees with Arris.

Case No. 17-CV-01834-LHK
ORDER GRANTING ARRIS'S MOTION FOR SUMMARY JUDGMENT

### 1. To Be Unmerchantable, A Product Must Fail to Possess Even the Most Basic Degree of Fitness for Ordinary Use

The Song-Beverly Act provides that "every sale of consumer goods that are sold in retail in [California] shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." Cal. Civ. Code § 1792. To be merchantable, consumer goods must "(1) [p]ass without objection in the trade under the contract description[;] (2) [be] fit for the ordinary purposes for which such goods are used; (3) [be] adequately contained, packaged, and labeled[; and] (4) [c]onform to the promises or affirmations of fact made on the container or label." Cal. Civ. Code § 1791.1(a). The Song-Beverly Act provides the same substantive protections as the California Commercial Code's implied warranty of merchantability, although the Song-Beverly Act permits additional remedies such as civil penalties and attorney's fees. *See Birdsong v. Apple, Inc.*, 590 F.3d 955, 958 n.2 (9th Cir. 2009) (setting forth the standard under the Commercial Code and holding that "[t]he substantive elements are the same under the Song-Beverly Act"); *see Dominguez v. Am. Suzuki Motor Corp.*, 160 Cal. App. 4th 53, 58 (2008) (explaining that the Song-Beverly Act provides remedies additional to those available under the Commercial Code).

Under either implied warranty statute, "[t]he core test of merchantability is fitness for the ordinary purpose for which such goods are used." *Mexia v. Rinker Boat Co., Inc.*, 174 Cal. App. 4th 1297, 1303 (2009) (internal quotation marks and citation omitted). Thus, the implied warranty of merchantability does not "impose a general requirement that goods precisely fulfill the expectation of the buyer. Instead, it provides for a minimum level of quality." *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1296 (1995) (internal quotation marks and citation omitted); *accord Birdsong*, 590 F.3d at 958. In sum, "a breach of the implied warranty means the product did not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alta Leisure, Inc.*, 114 Cal. App. 4th 402, 406 (2003).

For example, the California Court of Appeal held in *Isip* that "[a] vehicle that smells, lurches, clanks, and emits smoke over an extended period of time is not fit for its intended purpose." *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 27 (2007). The Ninth Circuit

7

has held that although a defect need not render a vehicle completely inoperable to violate the Song-Beverly Act, *Isip* hinged on the fact that the defect "drastically undermined the ordinary operation of the vehicle." *Troup v. Toyota Motor Corp.*, 545 F. App'x 668, 669 (9th Cir. 2013). In contrast to *Isip*, *Troup* involved a defect in the vehicle's fuel system that "merely required the Troups to refuel more often." *Id.* Because that defect "did not compromise the vehicle's safety, render it inoperable, or drastically reduce its mileage range," the plaintiffs had no claim for breach of the implied warranty. *Id.*; *see also In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 947 (N.D. Cal. 2018) (explaining that to support an implied warranty claim, a defect must have "so affected [the products'] safety, reliability, or operability as to render them unfit").

Courts have repeatedly emphasized that a defect must drastically undermine a device's operation to render the device unmerchantable. For example, in *Kent*, the plaintiffs alleged that their computers were "prone to frequent failures, the symptoms of which include the system becoming unresponsive or locking-up within thirty minutes" of startup. *Kent v. Hewlett-Packard Co.*, 2010 WL 2681767, at *1 (N.D. Cal. July 6, 2010). Although the plaintiffs' computers failed to work perfectly, the plaintiffs did "not allege that they have been forced to abandon the use of their computers completely, that the computers freeze multiple times per day, or that they in fact have lost data as a result of the malfunctions." *Id.* at *4. Thus, the plaintiffs failed to allege that the computers lacked even the most basic degree of fitness for ordinary use. *Id.* Similarly, in *Minkler v. Apple, Inc.*, 65 F. Supp. 3d 810 (N.D. Cal. 2014), the district court rejected a plaintiff's implied warranty claim because the plaintiff had not alleged "that Apple Maps failed to work at all or even that it failed to work a majority of the time," such that there was no "fundamental defect" with her smartphone. *Id.* at 819.

This Court has also rejected the contention that a merely slower device is unmerchantable. In *Hauck*, the plaintiffs alleged that their microprocessors worked more slowly due to a defect, with a "ballpark figure of five to 30 percent slow down," according to the plaintiffs' complaint. *Hauck v. Advanced Micro Devices, Inc.*, 2018 WL 5729234, at *9 (N.D. Cal. Oct. 29, 2018) ("*Hauck I*"). As this Court explained, because the plaintiffs' allegations were merely that the

processors were "a little less efficient," like the vehicles in *Troup*, this Court dismissed the implied warranty claim for failure to allege unmerchantability. *Id.* After the plaintiffs amended their allegations, this Court again dismissed the plaintiffs' complaint because the plaintiffs alleged only that their computers ran "more slowly" and could not attain "advertised specifications." *Hauck v. Advanced Micro Devices, Inc.*, 2019 WL 1493356, at *17 (N.D. Cal. Apr. 4, 2019) ("*Hauck II*"). Even if the alleged defect caused the processors to run more slowly, such a defect did not "drastically undermine" the processors' ordinary operation, and thus did not render them unmerchantable. *Id.*

Accordingly, to create a genuine dispute of material fact and survive summary judgment, Plaintiffs must offer evidence from which a jury could conclude that the SB6190 Modem lacks even the most basic degree of fitness for ordinary use.

### 2. Plaintiffs Have Not Identified Evidence that the SB6190 Modem Did Not Possess Even the Most Basic Degree of Fitness for Ordinary Use

Cable modems "provide standardized, interoperable digital data communications over their cable systems." Newman Report ¶ 24. To attempt to show that the SB6190 Modem lacked even a basic degree of fitness for ordinary use, Plaintiffs rely on Arris's and Intel's laboratory tests of latency in the HTTP, TCP, UDP, and DNS protocols, and Plaintiffs' expert Richard Newman's opinions. None of that evidence shows that the SB6190 Modem lacked even a "basic degree of fitness for ordinary use." *Mocek*, 114 Cal. App. 4th at 406. Instead, Plaintiffs' evidence shows only that the SB6190 Modem had a latency defect that would be at most "noticeable" to the end user.

Latency refers to delays in data communications. Newman Report ¶ 64. A latency value measures the time required for data to travel between the cable modem termination system ("CMTS") and the cable modem, and back again. *Id.* The higher the latency value, the slower data travels. Fluctuations between high and low latency values are referred to as "jitter," and high jitter can also decrease data throughput. *Id.* ¶ 67.

The Intel laboratory latency tests, upon which Plaintiffs rely, were conducted by Intel to

Case No. 17-CV-01834-LHK
ORDER GRANTING ARRIS'S MOTION FOR SUMMARY JUDGMENT

1   test software and firmware changes Intel made to the Puma 6 chip. The test results show that the

2   software and firmware changes improved the Puma 6's latency values. Plaintiffs infer from this

3   improvement that prior to these changes, the SB6190 Modem was unmerchantable.

4       The Arris laboratory latency tests, upon which Plaintiffs rely, were conducted by Arris to

5   compare the performance of the SB6190 Modem, which incorporated Intel's Puma 6 chip, to its

6   predecessor, the SB6183, which incorporated Broadcom's chip. In some protocols, the SB6190

7   Modem had superior latency values than the SB6183. In other protocols, the reverse was true.

8   Plaintiffs ignore the superior latency values of the SB6190 Modem, but point to the inferior

9   latency values as evidence that the SB6190 Modem was unmerchantable.

10      The Court analyzes the SB6190 Modem's latency performance in each of the four

11  protocols in turn.

12      **a. HTTP Latency Tests**

13      HTTP, "the primary protocol used by the worldwide web," allows a user to navigate to a

14  webpage. Newman Report ¶ 42. Intel compared HTTP latency before and after Intel

15  implemented a change to the Puma 6's firmware. ECF No. 172-16 at 7. HTTP session

16  initialization time or HTTP latency value—or the time required to connect to HTTP—improved

17  from ■ milliseconds before the change to ■ milliseconds after the change. *Id.*

18      In his deposition, Plaintiffs' expert Richard Newman testified that the 10 millisecond

19  improvement indicated by the Intel test could manifest as a one-second difference in the time

20  required to load a website with 100 linked components, each of which requires initialization of a

21  new HTTP session: "So the difference of 10 milliseconds by itself wouldn't be noticeable, but if

22  you pile 10 milliseconds on 10 milliseconds on 10 milliseconds, after a while you get enough to

23  where it would be – it would be noticeable." Newman Depo. II 101:18-24.

24      Noticeable to a consumer after compounding by 100 linked components is a far cry from

25  lacking even the most basic degree of fitness for ordinary use. *Mocek*, 114 Cal. App. 4th at 406

26  ("a breach of the implied warranty means the product did not possess even the most basic degree

27  of fitness for ordinary use"); *see also Troup*, 545 F. App'x at 669 (holding that a breach of the

28

Case No. 17-CV-01834-LHK
ORDER GRANTING ARRIS'S MOTION FOR SUMMARY JUDGMENT

implied warranty occurs where a defect "drastically undermine[s] the ordinary operation" of the consumer good).

According to Newman, an HTTP latency value of 10 milliseconds in a laboratory test "would be at the edge of acceptability." *Id.* at 97:12-13. Thus, one can infer that the SB6190 Modem's ■ millisecond latency value in a laboratory test is unacceptable to Newman. However, Newman could not identify a standard against which to judge any of the latency test results, which all measured in the milliseconds: "So, to my knowledge, there's no specification that says certain latency is expected from cable modems or other devices of that nature." *Id.* at 71:22-25. Newman also does not opine that the latency value in a laboratory test renders the SB6190 Modem lacking even a most degree of fitness for ordinary use.

Furthermore, Newman himself acknowledged that some latency is inevitable in a data communication system: "So there will always be these delays within the system and – and we expect that to happen. That's part and parcel of – of our experience." Newman Depo. II at 256:14-17.

Moreover, the mere fact that Intel's tests show improvements in HTTP latency values as Intel implemented software and firmware changes to the Puma 6 does not raise an inference that prior to the change, the SB6190 Modem was unmerchantable. Newman explains in his expert report that cable modem throughput has increased over time and that "[t]he firmware loaded on the modem has a major effect on the performance of the modem." Newman Report ¶¶ 28–30, 36. Thus, it is ordinary and expected that a cable modem's latency should decrease over time and with subsequent technical improvements.

In fact, one of Arris's HTTP latency tests, which compared the SB6190 Modem to its predecessor, the SB6183, indicated that the SB6190 Modem was approximately 25% faster than the SB6183. Walston Report ¶¶ 39–40.

**b. TCP Latency Tests**

TCP is a protocol used by "numerous Internet-based applications and services," including email. Newman Report ¶ 45. Plaintiffs rely on TCP latency tests that Arris and Intel conducted

Case No. 17-CV-01834-LHK
ORDER GRANTING ARRIS'S MOTION FOR SUMMARY JUDGMENT

after several bloggers posted the results of TCP latency tests on the forum DSLreports.com. ECF No. 172-26 at 364. In the TCP protocol, Arris's tests indicated that the SB6190 Modem experienced higher jitter—or frequent spikes between high and low latency values—than its predecessor, the SB6183. ECF No. 178-14 at 48.

In a supplemental declaration, Newman opines only that "extreme jitter can cause throughput to decrease by 25% or more, depending on how bad it is and how often large delays are experienced." Newman Supp. ¶ 35. Newman never opines that a 25% decrease in throughput would render a cable modem lacking even a basic degree of fitness for ordinary use. In fact, Newman does not identify what amount of decrease in throughput renders a cable modem lacking even a basic degree of fitness ordinary use.

Moreover, Newman does not categorize the SB6190 Modem's jitter as "extreme." Instead, Newman opines that the jitter in the SB6190 Modem was "very bad." Newman never opines on how "very bad" jitter would decrease throughput and never opines that the SB6190 Modem's "very bad" jitter means that the SB6190 Modem lacks even a basic degree of fitness for ordinary use.

Furthermore, Intel's General Manager of Cable Business, Keith Wehmeyer, conducted his own test of the SB6190 Modem's TCP latency before and after Intel's changes to the Puma 6 chip. Wehmeyer found that any difference in TCP latency at most might be perceptible to a user: "Under the right circumstances, that might be getting to the point where a consumer could notice." Wehmeyer Depo. 178:4-11. As discussed above, noticeable is a far cry from lacking even a basic degree of fitness for ordinary use. *Mocek*, 114 Cal. App. 4th at 406 ("a breach of the implied warranty means the product did not possess even the most basic degree of fitness for ordinary use"); *see also Minkler*, 65 F. Supp. 3d at 819 (holding that where an application did not fail to work even "a majority of the time," the plaintiffs could not maintain an implied warranty of merchantability claim); *Hauck I*, 2018 WL 5729234, at *9 (rejecting claim that a "30 per cent slow down" was a serious enough defect to render a computer processor unmerchantable).

Intel also repeated bloggers' TCP latency tests and demonstrated that any high TCP

12

latency values would not be observable by end users. Intel's Eddy Kvetny reported that although

the TCP latency values were high, he experienced no problems with modem performance: "I don't

feel any problem with browsing, video streaming and my son with gaming." ECF No. 172-26 at

363. Similarly, Intel's Keith Wehmeyer testified that Intel's test environment was more extreme

than ordinary use: "I would consider it to be very robust, far higher bandwidth than what the

typical consumer uses." *Id.* at 175:14-18. Plaintiffs' expert Richard Newman also testified that

the bloggers' TCP latency tests and Intel's tests, which produced high TCP latency values, did not

approximate ordinary use. Newman conceded that "this is an extreme real-life use case."

Newman Depo. II at 229:15-16.

  **c. UDP Latency Tests**

  UDP is a protocol often used for gaming applications. Newman Report ¶ 59. Intel and

Arris tests indicated that the SB6190 Modem experienced occasional UDP latency spikes over ▓▓

milliseconds, from a baseline average of ▓ milliseconds. ECF No. 180-2 at 139 (Arris tests);

ECF No. 172-18 at 7 (Intel tests). In Intel's presentation reporting its UDP test results, Intel stated

that gaming users did not experience adverse effects: "Intensive tests performed by Intel show no

impact of reported issues on user gaming experience, as most gaming traffic is accelerated." ECF

No. 172-18 at 10.

  Nonetheless, Newman testified that the SB6190 Modem's over ▓▓ millisecond UDP

latency spikes during the Intel and Arris tests "can cause significant problems when you're doing

– when you're using UDP," such as in certain video games. Newman Depo. II 134:17-135:17;

209:5-15. For an even higher and thus worse UDP latency spike, Newman describes the result for

end users as annoying and frustrating. Specifically, Newman opines that a latency of "over about

200 milliseconds becomes annoying to the point of materially degrading the experience" of video

and audio conferencing. Newman Supp. Decl. ¶ 40. Such an experience would be "annoying"

and "frustrating." *Id.* None of the Intel or Arris tests show that the SB6190 Modem had UDP

latency values of more than 200 milliseconds.

  Even if the SB6190 Modem had UDP latency values of more than 200 milliseconds, an

annoyance is not tantamount to a defect that renders a consumer good lacking even the most degree of fitness for ordinary use. *Mocek*, 114 Cal. App. 4th at 406 ("a breach of the implied warranty means the product did not possess even the most basic degree of fitness for ordinary use"). If more than 200 milliseconds UDP latency values do not render the SB6190 Modem unmerchantable, then the better latency value of over ███ milliseconds does not as well.

### d. DNS Latency Tests

DNS is a protocol that translates human-friendly domain names, such as google.com, to IP addresses. Newman Report ¶ 60. In an internal document, Arris referred to a "DNS Latency Issue" as follows: "████████████████████████████████████████████████████████████████ ████████████████████████████████████████." ECF No. 181-34 at 7.

In the DNS protocol, Arris's latency tests showed that the SB6190 Modem had an average latency that was, on average, only two milliseconds (or two thousandths of a second) slower than the SB6183. ECF No. 178-14 at 849. Newman testified that even the SB6190 Modem's worst query time in the DNS protocol would cause a delay that was "noticeable, but not horrible." Newman Depo. II 213:21-214:4. As discussed above, noticeable is a far cry from lacking even a basic degree of fitness for ordinary use. *Mocek*, 114 Cal. App. 4th at 406 ("a breach of the implied warranty means the product did not possess even the most basic degree of fitness for ordinary use"); *see also Minkler*, 65 F. Supp. 3d at 819 (holding that where an application did not fail to work even "a majority of the time," the plaintiffs could not maintain an implied warranty of merchantability claim); *Hauck I*, 2018 WL 5729234, at *9 (rejecting claim that a "30 per cent slow down" was a serious enough defect to render a computer processor unmerchantable).

Intel's DNS latency tests demonstrated improvement in the SB6190 Modem's DNS latency values after Intel changed the Puma 6's firmware. ECF No. 172-18 at 4. Newman offers no opinions on Intel's tests. Regardless, the mere fact that Intel's tests show improvements in DNS latency values as Intel implemented a firmware change to the Puma 6 does not raise an inference that prior to the change, the SB6190 Modem was unmerchantable. Newman explains in his expert report that cable modem throughput has increased over time and that "[t]he firmware

14

loaded on the modem has a major effect on the performance of the modem." Newman Report ¶¶ 28–30, 36.

### e. Cumulative Effect

Overall, based on the Intel and Arris tests measuring the SB6190 Modem's latency in the four protocols, Newman opines that the latency defect "would have manifested to end users in the form of slow web browsing and file transfers; less responsive online gaming; glitches in video and audio streaming; and delays in video and audio conferencing." Newman Report ¶ 157. However, as explained below, the named California Plaintiffs did not experience all of those potential effects. Moreover, Newman does not opine that those potential effects render the SB6190 Modem lacking even a basic degree of fitness for ordinary use.

### f. Plaintiffs' Experiences

The named California Plaintiffs' experiences bear out that the latency defect caused, at most, intermittent issues in certain applications, and did not dramatically undermine the SB6190 Modem's operability. For example, Plaintiff Greg Knowles testified about connectivity issues during gaming that "would cause the game to not run smoothly. And occasionally it would get to the point where it completely locked up and then I would have to reboot." Knowles Depo. 39:25-40:3. Plaintiff Brian Alexander testified that when gaming, his Internet "would perform well for a little while, then it would suffer from basically what we call lag, where it would get sometimes packet loss or glitches in the game." Alexander Depo. 21:6-15. On Skype calls, Knowles also experienced intermittent connectivity issues: "I will intermittently get, for what appears to be no causal effect that I can determine where the connection degrades, and will degrade for perhaps a short period of time; occasionally it degrades to the point where the call is disconnected because it gets so poor." Knowles Depo. at 48:20-59.

Those slowdowns with "occasional" disconnections are insufficient to show that the SB6190 Modem lacked even a basic degree of fitness for ordinary use. *Kent* featured much more extreme facts, in which the plaintiffs' computers were "prone to frequent failures, the symptoms of which include the system becoming unresponsive or locking-up within thirty minutes" of

United States District Court
Northern District of California

startup—yet even those facts were insufficient to violate the implied warranty of merchantability. 2010 WL 2681767, at *1, 4. By contrast, Alexander testified that he did not notice any issues when browsing the web or using email using his SB6190 Modem, let alone experience inoperability: "It's – it wasn't really as noticeable. It may be, but because it's not so intense in traffic, it really didn't appear to be noticeable. . . . Just basic Web browsing, looking at e-mails, no." *Id.* at 21:24-22:5. As in *Minkler*, Plaintiffs have failed to adduce evidence that the SB6190 Modem "failed to work at all or even that it failed to work a majority of the time." *Minkler*, 65 F. Supp. 3d at 819.

### g. Conclusion

Plaintiff Alexander's experiences browsing the web and using email diverge from Plaintiff's expert Newman's opinions about the potential effects of the SB6190 Modem's latency defect. Moreover, the latency test results and Newman's opinions do not show that the SB6190 Modem lacked even a basic degree of fitness for ordinary use.

In fact, Arris engineer and expert Allen Walston explains that Intel and Arris had to use special tools to test latency in the four protocols because the latency values measure in the milliseconds and are at most perceptible: "Since these range from marginally perceptible to imperceptible to human beings, special tools were required to measure the differences before and after the software changes; no human could accurately report on whether the changes made a difference." Walston Rebuttal Report ¶18c-d.

Finally, Plaintiffs' reliance on *MyFord Touch* is inapposite, irrespective of the fact that MyFord Touch involved a vehicle and safety concerns, unlike the instant case. *See* 291 F. Supp. 3d at 948. In *MyFord Touch*, the district court denied a motion for summary judgment because the plaintiffs introduced evidence of defects with symptoms that "were so persistent and prevalent that they impaired the reliability or operability of the vehicles class-wide." *Id.* at 947–48. The district court observed that even though the defects did not "impair the mechanical functionality of the vehicle," a reasonable juror "could conclude, for instance, that a rear-view camera whose image spontaneously freezes without warning while a car is moving in reverse . . . may present a

16

hazardous or dangerous condition." *Id.* at 948.

By contrast, Plaintiffs have offered the testimony of two consumers who experienced "occasional" shutdowns while using certain applications, but who experienced no issues with "basic" functions like web browsing—as well as Newman's opinion that the latency defect may lead to "noticeable" slowdowns. At most, Plaintiffs have shown that the SB6190 Modem was less efficient, in some tests, than the SB6183. That evidence is insufficient to raise a genuine dispute of fact as to whether the SB6190 Modem's latency defect drastically undermined the modem's operability or left the modem lacking "even the most basic degree of fitness for ordinary use." *Mocek*, 114 Cal. App. 4th at 406. Accordingly, the Court GRANTS Arris's motion for summary judgment on Plaintiffs' claim for violation of the Song-Beverly Act's implied warranty of merchantability to the extent that Plaintiffs contend the SB6190 Modem lacked even a basic degree of fitness for ordinary use.[3]

### B. Plaintiffs Allege that Arris is Liable for False Advertising Under the FAL, CLRA, and UCL

Next, the Court discusses Plaintiffs' false advertising claims. Plaintiffs allege that Arris's product box and online statements fraudulently misrepresented and falsely omitted information related to the SB6190 Modem's performance in violation of California's FAL, CLRA, and UCL. SACC ¶¶ 233–269. Plaintiffs' claims under all three statutes are evaluated under the same "reasonable consumer" standard. *See Ebner v. Fresh, Inc.*, 838 F.3d 958, 963, 954 (9th Cir. 2016) (applying the reasonable consumer standard to the plaintiff's claims under the FAL, CLRA, and UCL); *see also Punian v. Gillette Co.*, 2016 WL 1029607, at *5 (N.D. Cal. Mar. 15, 2016) ("Because the same standard governs all three statutes [the FAL, CLRA, and UCL], courts often analyze the three statutes together."). Neither party disputes that Plaintiffs' claims under the FAL,

---

[3] Plaintiffs also briefly contend in a footnote that Arris violated the Song-Beverly Act's implied warranty of merchantability because the SB6190 Modem does not conform to the promises on the label that it performs better than the SB6183. Opp. at 15 n.9. This contention overlaps with Plaintiffs' false advertising claims, which fail for the reasons explained in the following section. Although the Court addresses Plaintiffs' argument, the Court also observes that the Ninth Circuit has held that "[a]rguments raised only in footnotes, or only on reply, are generally deemed waived." *Estate of Saunders v. C.I.R.*, 745 F.3d 953, 962 n.8 (9th Cir. 2014).

17

1    CLRA, and UCL rise or fall together.  Mot. at 17; Opp. at 17.  Accordingly, the Court applies the

2    reasonable consumer test to all of Plaintiffs' false advertising claims.

3         Under the reasonable consumer test, Plaintiffs must show that there is a "probability 'that a

4    significant portion of the general consuming public or of targeted consumers, acting reasonably in

5    the circumstances, could be misled.'"  *Ebner*, 838 F.3d at 965 (quoting *Lavie v. Procter & Gamble*

6    *Co.*, 105 Cal. App. 4th 496, 508 (2003)); *see also Williams v. Gerber Prods. Co.*, 552 F.3d 934,

7    938 (9th Cir. 2008) (holding that to prevail on false advertising claims, a plaintiff must "show that

8    members of the public are likely to be deceived") (internal quotation marks and citation omitted).

9    To survive a motion for summary judgment on false advertising claims, a plaintiff "must produce

10   evidence showing a likelihood of confounding an appreciable number of reasonably prudent

11   purchasers exercising ordinary care."  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026

12   (9th Cir. 2008) (internal quotation marks and citation omitted).  "Surveys and expert testimony

13   regarding consumer assumptions and expectations may be offered but are not required; anecdotal

14   evidence may suffice."  *Id.*

15        Plaintiffs contend that Arris violated the FAL, CLRA, and UCL through two sets of

16   affirmative misrepresentations and one omission.  The Court discusses these alleged

17   misrepresentations in turn.

### 1. Arris's Representations About the Modem's Speed are All Either Nonactionable Puffery or Not False

20        Plaintiffs first allege that Arris's representations about the SB6190 Modem's speed are

21   false in light of the latency test results in the HTTP, TCP, UDP, and DNS protocols.  SACC ¶¶

22   10–11, 179.  Plaintiffs contend that Arris's representations violate the FAL, CLRA, UCL, and the

23   prong of the Song-Beverly Act that requires a product to "conform to the affirmations of fact" on

24   the label.  *See* Cal. Civ. Code § 1791.1(a).

25        In the instant case, the SB6190 Modem product box includes the following representations

26   about the SB6190 Modem's speed: "First Gigabit+ Cable Modem," "Speeds Up to 1.4 GBPS,"

27   and "Get what you pay for – supports Gigabit service tiers."  ECF No. 173-21 at 1.  Arris's

28
                                                    18

1    website has featured similar statements: "Introducing the first Gigabit+ Cable Modem on the

2    market.  The SURFboard SB6190 is a DOCSIS 3.0 modem is [sic] capable of download speeds up

3    to 1.4 Gbps!"  ECF No. 181-35.  Although the Amazon product page for the SB6190 Modem is

4    not in the record, Plaintiff Knowles testified that the Amazon product page advertised the SB6190

5    Modem's "Lightning fast broadband speed" and alleges that the product page advertised the

6    SB6190 Modem's "most reliable connection to the Internet."  SACC ¶ 11; Knowles Depo. 101:25-

7    102:1.

8         The back of the SB6190 Modem box states that the SB6190 Modem delivers "Blazing-Fast

9    Internet," and includes a chart that compares the SB6190 Modem to Arris's other cable modem

10   models, the SB6141 and SB6183.  ECF No. 173-21 at 2.  The chart indicates that the SB6190

11   Modem rates "*****" (or what both parties call "five stars") for features including "HD

12   Multimedia Streaming," "Internet Browsing," "Large file downloads – music/videos," and "High-

13   Performance Online Gaming."  *Id.*  According to the chart, the SB6183 rates four stars in the

14   above features, and the SB6141 three stars.  *Id.*

15        In their opposition to the instant motion for summary judgment, Plaintiffs cabin their claim

16   to the following sets of statements: (1) Arris's comparison chart, which states that the SB6190

17   Modem rates "five stars"; and (2) Arris's statements that the SB6190 Modem is the First Gigabit+

18   Cable Modem" and that the modem supports "speeds of up to 1.4 Gbps."  Opp. at 19.  Arris argues

19   that Plaintiffs' claims predicated on the comparison chart are nonactionable puffery and that

20   Plaintiffs have failed to raise a genuine dispute of material fact as to whether the SB6190 Modem

21   could never attain throughput speeds of 1.4 Gbps.  The Court agrees with Arris.

22        Puffery is "exaggerated advertising, blustering, and boasting upon which no reasonable

23   buyer would rely."  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997).

24   "The common theme that seems to run through cases considering puffery in a variety of contexts

25   is that consumer reliance will be induced by specific rather than general assertions."  *Cook,*

26   *Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990).

27   Consequently, "[a]dvertising which merely states in general terms that one product is superior is

28                                                    19

1    not actionable.  However, misdescriptions of specific or absolute characteristics of a product are

2    actionable."  *Id.* (internal quotation marks and citations omitted).

3            "Likewise, courts in this circuit have concluded that statements that a product is best in

4    class, 'unsurpassed,' or 'state of the art,' are puffery."  *Finney v. Ford Motor Co.*, 2018 WL

5    2552266, at *8 (N.D. Cal. June 4, 2018) (citing cases).  Rather, to be actionable, a representation

6    must be "a specific and measurable claim, capable of being proved false or of being reasonably

7    interpreted as a statement of objective fact."  *Rasmussen v. Apple Inc.*, 27 F. Supp. 3d 1027, 1039–

8    40 (N.D. Cal. 2014); *see Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir.

9    2008) ("Ultimately, the difference between a statement of fact and mere puffery rests in the

10   specificity or generality of the claim."); *see, e.g.*, *Johnson v. Mitsubishi Digital Elecs. Am. Inc.*,

11   578 F. Supp. 2d 1229, 1238 (C.D. Cal. 2008) (holding that a statement that a television had

12   "unsurpassed picture quality" was puffery).

13           Here, Arris's comparison chart is textbook puffery.  The comparison chart communicates

14   that the SB6190 Modem is "five stars," and thus superior to the "four star" SB6183 and "three

15   star" SB6141.  *See* ECF No. 173-21 at 2.  Those claims about the SB6190 Modem's relative

16   superiority are parallel to statements that a product is "best in class" and "state of the art."  *Finney*,

17   2018 WL 2552266, at *8.  Although Plaintiffs now disclaim reliance on other statements of

18   superiority, Arris's other representations, including that the SB6190 Modem offers "Blazing-Fast

19   Internet," "lightning-fast broadband speed," and "most reliable connection to the Internet," are

20   also puffery.  These advertisements and the comparison all "state[] in general terms that one

21   product is superior," and are thus not actionable.  *Cook, Perkiss, & Liehe*, 911 F.2d at 246.

22           Courts have found similar statements to be nonactionable puffery.  For example, in *Vitt*,

23   the Ninth Circuit affirmed the dismissal of advertising claims predicated on statements that a

24   laptop computer was, among other things, "high performance," "high value," an "affordable

25   choice," and an "ideal student laptop."  *Vitt v. Apple Computer, Inc.*, 469 F. App'x 605, 607 (9th

26   Cir. 2012).  The Ninth Circuit held that the statements were "generalized" and that none

27   represented that the laptop would remain defect-free for at least two years.  *Id.* at 607.  Likewise,

28
                                                    20

in *Oestreicher*, a district court held that statements that a device was "faster, more powerful, and more innovative than competing machines" were puffery. *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008); *see also Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 167 (E.D.N.Y. 2012) (in case involving New York false advertising law, holding that statements that a service would provide "High Speed Internet," "Faster Internet," and "blazing fast speed" were all nonactionable puffery).

Even the primary case that Plaintiffs cite shows how the challenged statements in this case are puffery. In *Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, 685 F. Supp. 2d 1001 (N.D. Cal. 2009), the defendant stated that its "'free data translation plug-in for AutoCAD users' can 'work easily with DWG files created by any version of AutoCAD software.'" *Id.* at 1017. The district court held that although the defendant's statement that its product would "work easily" was "subjective and not measurable in isolation," the defendant's statement as a whole was measurable non-puffery because the claim that a consumer could work with "any version" of AutoCAD was specific and testable. *Id.* at 1018. In fact, the plaintiff identified evidence that the defendant's product did not work with all versions of AutoCAD. *Id.* By contrast, Plaintiffs are unable to identify any specific, measurable claim in Arris's statement that the SB6190 Modem provides, for example, "Blazing-Fast Internet." Plaintiffs also offer no argument about how one would measure whether a given modem is "five stars" as opposed to "four stars."

Next, Plaintiffs allege that the following Arris representation about the SB6190 Modem's speed is false: "Speeds up to 1.4 Gbps." ECF No. 173-21. In that statement, Arris does not represent that the SB6190 Modem "always" or "consistently" reaches speeds of 1.4 Gbps. Arris represents only that the SB6190 Modem *can* reach speeds of 1.4 Gbps. Although Arris's statement is measurable, Plaintiffs have not identified evidence that Arris's statement is false. Plaintiffs' expert, Richard Newman, opines only that the SB6190 Modem cannot consistently reach its maximum throughput (or download speed): "While the ARRIS SB6190 does seem to have offered higher throughput than its predecessor, it did not *consistently* deliver the throughput of which the increased channel bonding should make it capable." Newman Supp. ¶ 18 (emphasis

21

United States District Court
Northern District of California

added). Thus, Newman concedes that the SB6190 Modem can reach its maximum speed of 1.4 Gbps, as Arris represents. Arris never represented that the SB6190 Modem could consistently deliver speeds up to 1.4 Gbps. Therefore, Plaintiffs have not identified a genuine dispute of material fact as to whether Arris's representation of "Speeds up to 1.4 Gbps" was false.

Accordingly, the Court GRANTS Arris's motion for summary judgment on Plaintiffs' false advertising claims, to the extent that Plaintiffs predicate those claims on Arris's statements about the SB6190 Modem's speed.

### 2. Arris Did Not Falsely Represent the Level of Service a Purchaser of the SB6190 Modem Would Receive from Comcast

Next, Plaintiffs contend that via several separate statements on the front of the SB6190 Modem box, Arris represented that a purchaser of the SB6190 Modem with Internet service through Comcast would receive 32 downstream channels (and resulting increased download speeds). *See* SACC ¶¶ 141–147. It is undisputed that Comcast only provided 24 downstream channels for consumers with the SB6190 Modem. Hays Depo. 99:20-24. However, no reasonable consumer would understand Arris's statement on the SB6190 Modem box that the SB6190 Modem is "compatible" with Comcast to promise that the consumer will, upon purchase of the SB6190 Modem, receive a certain level of service from Comcast.

Plaintiffs rely on the following statements. In large text on the front of the SB6190 Modem box, Arris states: "32 Downstream Channels" and "Speeds up to 1.4 GBPS." ECF No. 173-21 at 1. Below that text, Arris states: "Get what you pay for – supports Gigabit service tiers." *Id.* At the very bottom of the front of the box, Arris states: "Compatible with Major U.S. Cable Providers, Including: Xfinity from Comcast / Time Warner / Cox." *Id.* Several lines of text and three icons separate Arris's statement about the SB6190 Modem's 32 downstream channels from its statement that the SB6190 Modem is compatible with Comcast. *See id.* Yet Plaintiffs contend that a reasonable consumer would understand Arris's disparate statements to promise that the SB6190 Modem supports 32 channels and resulting gigabit speeds on Comcast, regardless of a purchaser's Internet service plan with Comcast. *See* Opp. at 22.

However, the SB6190 Modem box makes clear to the reasonable consumer that Arris has no power to guarantee that any given consumer will reach any specific speed. First, the front of the box states that the SB6190 Modem "*supports* Gigabit service tiers," not that Arris guarantees gigabit speeds. ECF No. 173-21 at 1. Second, Arris explicitly states on the side of the SB6190 Modem box that the specific speeds a consumer can achieve are dependent on the consumer's Internet service plan:

> Actual speeds will vary, and are often less than the maximum possible. Upload and download speeds are affected by several factors including, but not limited to: the capacity of, and the services offered by your cable service provider or broadband service provider, network traffic, computer equipment, type of server, number of connections to server, and availability of Internet router(s). DOCSIS 3.0 broadband cable service, if supported by your local cable service provider, is required to achieve speeds up to 32 times faster than DOCSIS 2.0. Internet capable gaming console required for gaming experience.

*Id.* at 2. Furthermore, Arris states on the same panel that "ARRIS cannot guarantee the availability, reliability, or performance of the broadband service used." *Id.*

In light of those statements, no reasonable consumer who purchased the SB6190 Modem and had a service plan with Comcast could believe that *Arris* was promising that *Comcast's network* would provide speeds of 1.4 Gbps simply because the consumer purchased Arris's modem. Arris's only statement on the SB6190 Modem box relating to Comcast is that the SB6190 Modem is "compatible" with Comcast, but that statement offers no representation about the SB6190 Modem's *performance* on Comcast's network. ECF No. 173-21 at 1.

The district court and Ninth Circuit decisions in *Maloney* are instructive as to how a reasonable consumer would view Arris's statements. In that case, an Internet service provider advertised download speeds of "up to 3 MBPS." *Maloney v. Verizon Internet Servs., Inc.*, 2009 WL 8129871 (C.D. Cal. Oct. 4, 2009). However, the plaintiff's telephone line was provisioned to a maximum speed of approximately 1.8 Mbps. *Id.* at *2. The district court explained that the defendant's "'up to' language should have put any reasonable customer on notice that his or her own speed may not reach 3 Mbps." *Id.* at *5. Moreover, the user's terms of service with the defendant clearly indicated that the defendant was not guaranteeing speeds of 3 Mbps, and that the

defendant could limit a user's maximum speed to thresholds below 3 Mbps. *Id.* at *1, 5.

On appeal, the Ninth Circuit affirmed the district court's dismissal because "[a] reasonable consumer would not have been deceived by Defendants' statements, which included the qualifier 'up to' (meaning the same or less than) and an explanation that each consumer's maximum speed would vary depending on several listed customer-specific factors, including factors that applied to Plaintiff." *Maloney v. Verizon Internet Servs., Inc.*, 413 F. App'x 997, 999 (9th Cir. 2011); *see also Freeman v. Time Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (dismissing claim that mailers deceived a consumer into believing that he had won a prize because the mailers "expressly and repeatedly state the conditions which must be met in order to win").

As in *Maloney*, Arris's statements on the SB6190 Modem box include the qualifier "up to," such that no reasonable consumer would believe that Arris guarantees gigabit download speeds and 32 download channels. Moreover, Arris explains that "[u]pload and download speeds are affected by several factors including, but not limited to: the capacity of, and the services offered by your cable service provider or broadband service provider." ECF No. 173-21 at 2.

Finally, the named Plaintiffs' own testimony demonstrates that a reasonable consumer is aware that Arris cannot guarantee the service tiers that an Internet service provider will offer to the consumer. For example, Plaintiff Knowles testified that when he purchased his SB6190 Modem, Knowles was aware that because of the Comcast service plan that *Knowles had chosen*, Knowles knew that he could not achieve gigabit transmission speeds even with the SB6190 Modem:

> **Q**: And so at the time you made the purchase, you were not actually subscribing to or able to have gigabit speed at your residence?
> **A**: That's true. I actually cannot say whether it was available, but I certainly could not afford it at that time.

Knowles Depo. at 19:2-7. Similarly, Plaintiff Alexander testified that because Alexander had subscribed to Comcast's 200 Mbps service plan, Alexander knew that he would not receive 1.4 Gbps simply because he purchased the SB6190 Modem: "Yes, I understand that it's not – I wasn't going to get 1.4 gigabit download speeds." Alexander Depo. 31:14-18.

Further, Knowles testified that in the future, he hoped to be able to achieve gigabit speeds

on the SB6190 Modem: "[E]ven though I wasn't – didn't have gigabit speed at that time, my assumption was that at some point in the future I would get that, and this modem would be capable of doing that." Knowles Depo. at 17:17:2-10. Knowles' expectation is entirely consistent with the undisputed facts. If Comcast offers 32 channels, and Knowles purchases that service plan, the SB6190 Modem can support 32 channels on Comcast and generate 1.4 Gbps download speeds: "Comcast could decide tomorrow to offer a 32 downstream channel service and the SB6190 would fully support it." Walston Rebuttal Report ¶ 20.

Thus, Plaintiffs' own testimony demonstrates that a consumer's access to 32 download channels and ensuing download speed are affected both by two choices: (1) the Internet service provider's choice about what service plans to offer; and (2) the consumer's own choice of which service plan to purchase from the Internet service provider. Arris has no hand in either choice. No reasonable consumer could view Arris—a cable modem manufacturer—as guaranteeing a specific speed or specific channel performance on the SB6190 Modem regardless of the Internet service provider's and consumer's independent choices about the consumer's Internet service plan.

Therefore, the Court GRANTS Arris's motion for summary judgment on Plaintiffs' false advertising claims, to the extent that Plaintiffs predicate those claims on Arris's statements about the SB6190 Modem's channels and compatibility with Comcast.

### 3. Arris is Not Liable for Fraudulent Omissions Because the Latency Defects Did Not Impair the SB6190 Modem's Central Function

Plaintiffs also bring FAL, UCL, and CLRA claims predicated on Arris's alleged fraudulent omissions. Plaintiffs allege that Arris fraudulently omitted from the SB6190 Modem box and Arris's website that the SB6190 Modem suffered from latency defects. *See* SCAC ¶¶ 242, 255 (alleging that Arris concealed "that these cable modems contained a defect that causes severe network latency and unreliable Internet connectivity"). Arris argues that Arris had no duty to disclose the latency defects, that the latency defects were not material, and that Arris was unaware of the latency defects at the time of sale. The Court concludes that Arris had no duty to disclose the latency defects, and thus does not reach Arris's other arguments.

Under controlling Ninth Circuit law, an "omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir. 2018). In *Hodsdon*, the Ninth Circuit held that a defendant only has a duty to disclose a defect that impairs the product's central function or that implicates the consumer's safety. *Id.* at 864. Plaintiffs rely only on the central function prong, and do not contend that Arris's omissions were either contrary to a representation or implicate consumers' safety. However, because Plaintiffs have not identified a genuine dispute of material fact as to whether any latency issues impaired the SB6190 Modem's central function, summary judgment is warranted.

In *Hodsdon*, the Ninth Circuit held that "the central functionality of the product is not based on subjective preferences about a product." *Id.* at 864. Rather, such a defect is one that "renders those products incapable of use by any consumer." *Id.* As explained at length in the discussion of Plaintiffs' implied warranty of merchantability claim, Plaintiffs have presented no evidence that the latency results rendered the SB6190 Modem "incapable of use by any consumer."

The California Court of Appeal's decision in *Collins*, which *Hodsdon* cited at length, is indicative of how a defect renders a product incapable of use, and thus impairs its central function. In *Collins*, a floppy disk defect caused critical data corruption of a computer's hard drive. *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 256 (2011). At the time the computers were sold, "floppy disks provided the primary means of storing and transporting computer data," and were "integral to the storage, access, and transport of accurate computer data." *Id.* Accordingly, the California Court of Appeal held that the defective floppy disk "was central to the function of a computer as a computer." *Id.* at 258. Similarly, *Rutledge* involved a malfunctioning display screen on a laptop, which "would require the connection of an outside monitor" for the consumer to actually use the laptop. *Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164, 1175 (2015). By contrast, in *Hodsdon*, the Ninth Circuit held that the existence of slave labor in a chocolate supply chain had no connection to the "chocolate's function as chocolate," and observed that

United States District Court
Northern District of California

"some consumers of chocolate are not concerned about the labor practices used to manufacture the product." 891 F.3d at 864.

Plaintiffs argue that the SB6190 Modem's central functions are "the ability to browse the web, download files, play online games, and stream video and audio." Opp. at 24. Even so, Plaintiffs have not presented evidence that the latency defects so impair the SB6190 Modem's ability to perform those functions that the SB6190 Modem is unusable. Rather, Plaintiffs' expert Newman opines that latency test results in the HTTP, TCP, UDP, and DNS protocols "would have manifested to end users in the form of slow web browsing and file transfers; less responsive online gaming; glitches in video and audio streaming; and delays in video and audio conferencing." Newman Report ¶ 157. That evidence pales in comparison to the facts of *Collins* and *Rutledge*, in which the defects rendered the products unusable as sold. Plaintiffs offer no evidence that the latency defects corrupted the SB6190 Modem's data capabilities (as in *Collins*) or that Plaintiffs had to purchase an additional device simply to ensure that the SB6190 Modem functioned as a cable modem (as in *Rutledge*). Accordingly, Plaintiffs have not identified a genuine dispute of material fact as to whether the latency issues impaired the SB6190 Modem's central function, and thus cannot show that Arris had any duty to disclose the latency issues.

Therefore, the Court GRANTS Arris's motion for summary judgment on Plaintiffs' false advertising claims, to the extent that Plaintiffs predicate those claims on Arris's omission of any statements about the latency issues identified in Arris and Intel testing.[4]

## C. Plaintiffs' UCL Unlawful and Unfair Prong Claims and Unjust Enrichment Claims Also Fail

Plaintiffs also allege that Arris violated the UCL's unlawful and unfair prongs. SACC ¶¶ 264, 266. However, these claims overlap entirely with Plaintiffs' claim under the UCL's fraudulent prong, on which the Court granted Arris's motion for summary judgment. For similar

---

[4] Accordingly, the Court does not reach Arris's alternative argument—common to all of Plaintiffs' false advertising claims—that Plaintiffs have failed to raise a genuine dispute of material fact as to consumer expectations about the SB6190 Modem, and thus need not address Arris's evidentiary objections to the message board posts that Plaintiffs attempt to offer as evidence of consumer expectations. *See* Reply at 15.

Case No. 17-CV-01834-LHK
ORDER GRANTING ARRIS'S MOTION FOR SUMMARY JUDGMENT

1    reasons, Plaintiffs' unlawful and unfair prong claims also fail. The Court also grants Arris's

2    motion to dismiss Plaintiffs' unjust enrichment claims, which Plaintiffs do not contest.

3        First, Plaintiffs argue that Arris is liable under the UCL's unlawful prong for violations of

4    the Song-Beverly Act and the CLRA. Opp. at 18 n.12. The UCL's unlawful prong "borrows

5    violations of other laws and treats them as independently actionable." *Daugherty v. Am. Honda*

6    *Motor Co., Inc.*, 144 Cal. App. 4th 824, 837 (2006). Accordingly, absent a predicate violation of

7    another law, a plaintiff cannot maintain a claim under the UCL's unlawful prong. *Id.* However,

8    the Court has granted Arris's motion for summary judgment on Plaintiffs' claims under the Song-

9    Beverly Act and the CLRA. Therefore, the Court must also grant summary judgment on

10    Plaintiffs' claim under the UCL's unlawful prong. *See Ng v. US Bank, NA*, 2016 WL 5390296, at

11    *8 (N.D. Cal. Sept. 26, 2016) (dismissing UCL claim premised on predicate violations that had

12    been dismissed with prejudice).

13        Second, Plaintiffs argue that Arris violated the UCL's unfair prong based on the "latency

14    defects and compatibility issue" related to SB6190 Modem purchasers with Comcast Internet

15    service. Opp. at 18 n.12. However, "courts in this district have held that where the unfair

16    business practices alleged under the unfair prong of the UCL overlap entirely with the business

17    practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the

18    UCL cannot survive if the claims under the other two prongs of the UCL do not survive." *Hadley*

19    *v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104 (N.D. Cal. 2017) (dismissing cause of action

20    under UCL unfair prong because it overlapped with plaintiff's dismissed claims under the

21    unlawful and fraudulent prongs); *see Punian*, 2016 WL 1029607, at *17 (holding cause of action

22    under the unfair prong of the UCL did not survive where the "cause of action under the unfair

23    prong of the UCL overlaps entirely with Plaintiff's claims" under the FAL, CLRA, and fraudulent

24    prong of the UCL that also do not survive); *see also In re Actimmune Mktg. Litig.*, 2009 WL

25    3740648, at *14 (N.D. Cal. Nov. 6, 2009), *aff'd*, 464 F. App'x 651 (9th Cir. 2011) (dismissing

26    unfair prong UCL cause of action where "plaintiffs' unfair prong claims overlap entirely with their

27    claims of fraud" that were dismissed). Accordingly, because Plaintiffs' claim under the UCL's

28

Case No. 17-CV-01834-LHK
ORDER GRANTING ARRIS'S MOTION FOR SUMMARY JUDGMENT

fraudulent prong does not survive, the Court must also grant Arris's motion for summary

judgment on Plaintiffs' claim under the UCL's unfair prong.

Lastly, Arris moves to dismiss the named Plaintiffs' individual unjust enrichment claims.

Mot. at 1 n.1. Plaintiffs did not move for class certification on this claim. *See* ECF No. 136 at 8–

9. Plaintiffs offer no argument in response to Arris's motion, and the Court thus deems abandoned

the named Plaintiffs' unjust enrichment cause of action. *See Jenkins v. Cty. of Riverside*, 398 F.3d

1093, 1095 n.5 (9th Cir. 2005) (holding that a plaintiff abandons a claim by not raising them in an

opposition to a motion for summary judgment). Accordingly, the Court GRANTS Arris's request

to dismiss Alexander's and Knowles's unjust enrichment claims.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Arris's motion for summary judgment on

Plaintiffs' California class claims for violation of the Song-Beverly Act, UCL, CLRA, and FAL

and DISMISSES Plaintiffs' individual unjust enrichment claims.

**IT IS SO ORDERED.**

Dated: August 20, 2019

_Lucy H. Koh_

LUCY H. KOH
United States District Judge